No. 21-35567

_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

CHONG and MARILYN YIM, KELLY LYLES, EILEEN, LLC, and
RENTAL HOUSING ASSOCIATION OF WASHINGTON,

Plaintiffs – Appellants,

v.

THE CITY OF SEATTLE,

Defendant – Appellee.

_____

On Appeal from the United States District Court
for the Western District of Washington
Honorable John C. Coughenour, District Judge

_____

## APPELLANTS' OPENING BRIEF

_____

James M. Manley
Pacific Legal Foundation
3241 E. Shea Boulevard, Suite 108
Phoenix, Arizona 85028
Telephone: (916) 419-7111
Email: JManley@pacificlegal.org

Ethan W. Blevins
Brian T. Hodges
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
Email: EBlevins@pacificlegal.org
Email: BHodges@pacificlegal.org

*Attorneys for Plaintiffs – Appellants*

## CORPORATE DISCLOSURE

Plaintiff-Appellant Eileen, LLC, is a limited liability corporation organized under the laws of the State of Washington. It has no parent corporation and issues no shares. Rental Housing Association of Washington is a nonprofit corporation organized under the laws of the State of Washington. It has no parent corporation and issues no shares.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF JURISDICTION......................................................1

STATEMENT OF ISSUES ...................................................................1

INTRODUCTION ...............................................................................2

STATEMENT OF FACTS ...................................................................5

STANDARD OF REVIEW ................................................................15

SUMMARY OF THE ARGUMENT ..................................................17

ARGUMENT .....................................................................................19

   I.   The Ordinance Violates the First Amendment ...............................19

      a.   The Ordinance Must Survive Strict Scrutiny Because It Restricts Speech Based on Content .......................................................................19

      b.   The Ordinance Restricts the Right To Receive Information ....................20

      c.   The Ordinance Regulates Non-Commercial Speech ................................23

      d.   Even Under Intermediate Scrutiny, the Ordinance Is Not Adequately Tailored to the Government's Interests .......................................................30

         i.   The Ordinance does not directly advance the government's interests because it exempts federally assisted housing......................................31

         ii.   The Ordinance extends to speech unrelated to the government's interests ..................................................................36

         iii.   The government has failed to demonstrate that less-restrictive alternatives will not satisfy the government's interests.........................38

   II.   The Ordinance Violates Due Process by Extinguishing a Fundamental Right...........................................................................45

      a.   The "Substantially Advances" Test Requires that the Court Evaluate Whether the Government's Selected Means Is Effective in Advancing a Legitimate Government Purpose and Is Not Unduly Oppressive ............47

      b.   The Fair Chance Housing Ordinance Flunks Even Rational Basis Review...........................................................................................51

         i.   The exemption for federally assisted housing is arbitrary......................53

         ii.   Imposing burdens on a race-neutral process in order to address disparities resulting from other conduct is arbitrary.............................55

iii.   Failure to account for meaningful differences between offenders and behaviors is arbitrary.................................................................56

iv.   The Ordinance's distinctions between types of housing arrangements are arbitrary ......................................................................58

v.   The Ordinance is unduly oppressive on housing providers' property rights ..........................................................................58

CONCLUSION.........................................................................................59

STATEMENT OF RELATED CASES ....................................................60

CERTIFICATE OF SERVICE ................................................................61

CERTIFICATE OF COMPLIANCE FOR BRIEFS ...............................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agins v. City of Tiburon*,
447 U.S. 255 (1980)......................................................................48

*Americans for Prosperity Foundation v. Bonta*,
141 S. Ct. 2373 (2021)..................................................................45

*Ariix, LLC v. NutriSearch Corp.*,
985 F.3d 1107 (9th Cir. 2021) ......................................24, 25, 28, 29

*Ballen v. City of Redmond*,
466 F.3d 736 (9th Cir. 2006) .............................................38, 39, 45

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982)......................................................................20

*Bolger v. Youngs Drug Products Co.*,
463 U.S. 60 (1983)........................................................................23

*Borden's Farm Products Co. v. Baldwin*,
293 U.S. 194 (1934)......................................................................51

*Botosan v. Paul McNally Realty*,
216 F.3d 827 (9th Cir. 2000) .........................................................15

*Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*,
331 U.S. 519 (1947)......................................................................37

*Brown v. Entertainment Merchants Ass'n*,
564 U.S. 786 (2011)......................................................................31

*Bucklew v. Precythe*,
139 S. Ct. 1112 (2019)...................................................................15

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021)...................................................3, 4, 45, 46

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New
York*, 447 U.S. 557 (1980) ............................................................23

*Citizens United v. Federal Elections Comm'n*,
558 U.S. 310 (2010)......................................................................42

*City of Bremerton v. Widell*,
146 Wn.2d 561 (2002) ........................................................................3

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993)...........................................................................39

*City of Cleburne, Tex. v. Cleburne Living Center*,
473 U.S. 432 (1985)......................................................50, 51, 52, 53

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988)...........................................................................28

*City of Los Angeles, Cal. v. Patel*,
576 U.S. 409 (2015).............................................................15, 16, 17

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011) ........................................36, 39–41, 43

*Craigmiles v. Giles*,
312 F.3d 220 (6th Cir. 2002) ......................................................54, 56

*Dex Media West, Inc. v. City of Seattle*,
696 F.3d 952 (9th Cir. 2012) ...........................................23, 24, 27

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990).............................................................................35

*Get Outdoors II, LLC v. City of San Diego*,
506 F.3d 886 (9th Cir. 2007) .............................................................37

*Goldblatt v. Town of Hempstead, N.Y.*,
369 U.S. 590 (1962).....................................................................48, 59

*Greater Philadelphia Chamber of Commerce v. City of Philadelphia*,
949 F.3d 116 (3d Cir. 2020) ........................................................28, 29

*Griffin v. W. RS, Inc.*, 97 Wn. App. 557 (1999) ...............................2, 12

*Haynes v. State of Wash.*,
373 U.S. 503 (1963)...........................................................................59

*Heller v. Doe by Doe*,
509 U.S. 312 (1993)...........................................................................51

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978)...............................................................................21

*Hutchins v. 1001 Fourth Avenue Associates*,
116 Wn.2d 217 (1991).........................................................................2

*Ibanez v. Florida Department of Business and Professional Regulation*, 512 U.S. 136 (1994) ........................................................ 28

*Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227 (9th Cir. 1994) .............................................................. 53

*Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019) .................................................................. 4, 45

*Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) ..................................................................... 55

*Lamplighter Vill. Apartments LLP v. City of St. Paul*, No. CV 21-413 (PAM/HB), 2021 WL 1526797 (D. Minn. Apr. 19, 2021) ................................................................................................. 46

*Lawrence v. Texas*, 539 U.S. 558 (2003) ..................................................................... 58

*Lee v. Weisman*, 505 U.S. 577 (1992) ..................................................................... 27

*Legi-tech, Inc. v. Keiper*, 766 F.2d 728 (2d Cir. 1985) ............................................................. 21, 22

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005) ......................................................... 47, 48, 49, 50

*Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32 (1999) ........................................................... 21, 22, 50

*Lynch v. Household Fin. Corp.*, 405 U.S. 538 (1972) ..................................................................... 46

*Mathews v. Lucas*, 427 U.S. 495 (1976) ..................................................................... 51

*Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898 (2009) ........................................................... 31, 32, 36

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ..................................................................... 16

*Moore v. East Cleveland*, 431 U.S. 494 (1977) ..................................................................... 50

*Mugler v. Kansas*, 123 U.S. 623 (1887) ..................................................................... 48

*Murr v. Wisconsin*,
137 S. Ct. 1933 (2017)........................................................................46

*NAACP v. Button*,
371 U.S. 415 (1963)...........................................................................40

*Nectow v. City of Cambridge*,
277 U.S. 183 (1928)...........................................................................47

*Nollan v. Cal. Coastal Comm'n*,
483 U.S. 825 (1987)...........................................................................50

*North Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, Inc.*,
414 U.S. 156 (1973)...........................................................................50

*Oncale v. Sundowner Offshore Services, Inc.*,
523 U.S. 75 (1998).............................................................................38

*Outdoor Systems, Inc. v. City of Mesa*,
997 F.2d 604 (9th Cir. 1993) ............................................................23

*Peel v. Attorney Registration and Disciplinary Comm'n of Ill.*,
496 U.S. 91 (1990)...............................................................................4

*Pennsylvania Dep't of Corrections v. Yeskey*,
524 U.S. 206 (1998)...........................................................................38

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
505 U.S. 833 (1992)...........................................................................16

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015).............................................................19, 20, 23

*Retail Digital Network v. Prieto*,
861 F.3d 839 (9th Cir. 2017) ............................................................23

*Riley v. Nat'l Fed. of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)...........................................................................25

*Romer v. Evans*,
517 U.S. 620 (1996)...........................................................................53

*San Francisco Taxi Coalition v. City and County of San Francisco*,
979 F.3d 1220 (9th Cir. 2020) ..........................................................54

*Shapero v. Kentucky Bar Ass'n*,
486 U.S. 466 (1988)...........................................................................41

*Simon & Schuster, Inc. v. Members of New York State Crime*
*Victims Bd.*, 502 U.S. 105 (1991) .....................................................28

*Smith v. Daily Mail*,
    443 U.S. 97 (1979)............................................................................21

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011)...............................................................21, 22, 23

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (5th Cir. 2013) ...........................................................54

*State v. Sigman*,
    118 Wn.2d 442 (1992) .........................................................................3

*The Florida Star v. B.J.F.*,
    491 U.S. 524 (1989)......................................................................31, 32

*U.D. Registry, Inc. v. State of California*,
    34 Cal. App. 4th 107 (1995) ........................................................24, 26

*United States Department of Agriculture v. Moreno*,
    413 U.S. 528 (1973).........................................................................55

*United States v. Stanchich*,
    550 F.2d 1294 (2d Cir. 1977) ..........................................................54

*United States v. Stevens*,
    559 U.S. 460 (2010)....................................................................15, 37

*Valle Del Sol Inc. v. Whiting*,
    709 F.3d 808 (9th Cir. 2013) ....................... 23, 24, 30, 31, 39, 40, 44

*Village of Euclid v. Ambler Realty Co.*,
    272 U.S. 365 (1926)..........................................................................47

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer
    Council, Inc.*, 425 U.S. 748 (1976)......................................3, 4, 17, 20

*Virginia v. American Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988)..........................................................................37

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)..........................................................................44

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)....................................................................13, 46

*Williams-Yulee v. Florida Bar*,
    575 U.S. 433 (2015)..........................................................................31

**Statutes**

18 U.S.C. § 3142 (Bail Reform Act) ........................................................9

28 U.S.C. § 1291 .......................................................................................1

28 U.S.C. § 1331 .......................................................................................1

RCW § 9.97.020 (Certificate of Restoration of Opportunities Act).......42

RCW § 43.43.830 *et seq*. .........................................................................9

Seattle Municipal Code § 6.310.405......................................................10

SMC § 7.24.030(H) ...................................................................................8

SMC § 7.24.030(I) .....................................................................................7

SMC § 12A.14.180(A)(3)........................................................................10

SMC § 14.09.005 .......................................................................................5

SMC § 14.09.010 .......................................................................................5

SMC § 14.09.010(K).................................................................................33

SMC § 14.09.025 ....................................................................................5, 6

SMC § 14.09.025(A)(2)...................................................................2, 5, 38

SMC § 14.09.025(A)(3)........................................................................6, 57

SMC § 14.09.045 .......................................................................................6

SMC § 14.09.090 .......................................................................................6

SMC § 14.09.100 .......................................................................................6

SMC § 14.09.115 .....................................................................................35

SMC § 14.09.115(B) ..................................................................................6

SMC § 14.09.115(D)............................................................................7, 58

SMC § 14.17.020(B), (E)..........................................................................9

SMC § 22.206.160(C)................................................................................8

SMC § 22.206.160(11)(a)..........................................................................8

SMC § 22.206.160(C)(8)(a).......................................................................8

**Rules of Court**

Fed. R. of App. P. 4...................................................................................1

Fed. R. Evid. 609 ....................................................................................10

**Other Authorities**

24 C.F.R. § 982 *et seq*..........................................................9, 32, 34, 35, 42

Antenangeli, Leonardo & Durose, Matthew R., Recidivism of
    Prisoners Released in 24 States in 2008: A 10-Year Follow-Up
    Period (2008-2018), Bureau of Justice Statistics Special Report
    (2021), https://bjs.ojp.gov/library/publications/recidivism-
    prisoners-released-24-states-2008-10-year-follow-period-2008-
    2018...................................................................................................10, 59

Hr.research Institute, *How Human Resource Professionals View and
    Use Background Screening in Employment* (2019),
    https://www.hr.com/en/resources/free_research_white_papers/hrco
    m-background-screening-june-2019-research_jwvmqi89.html ..........................8

McGlynn-Wright, Anne, et al., The Usual, Racialized, Suspects: The
    Consequence of Police Contacts with Black and White Youth on
    Adult Arrest, *Social Problems* (2020) ................................................41

Seattle Housing Authority, About Us,
    https://www.seattlehousing.org/about-us (last visited October 18,
    2021) .....................................................................................................7

Seattle Office for Civil Rights, Fair Chance Housing Ordinance, SMC
    § 14.09: Frequently Asked Questions (2018),
    https://www.seattle.gov/Documents/Departments/CivilRights/Fair
    %20Housing/Fair%20Chance%20Housing%20FAQ_amendments
    _FINAL_08-23-18.pdf...................................................................6, 33

## STATEMENT OF JURISDICTION

Pursuant to 28 U.S.C. § 1331, the federal district court had subject matter jurisdiction over this dispute under the United States Constitution. On July 6, 2021, that court issued an order granting summary judgment to the City of Seattle and entered final judgment. Appellants filed a timely notice of appeal on July 14, 2021, under Rule 4 of the Federal Rules of Appellate Procedure. This Court granted an extension on September 9, 2021, setting the deadline for filing the opening brief on appeal as October 29, 2021. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Seattle's Fair Chance Housing Ordinance bars landlords—or anyone—from inquiring about the criminal history of prospective tenants. The Ordinance also prohibits landlords from taking adverse action, such as denial of a rental application, against prospective tenants because of their criminal history.

1. The First Amendment protects the right to ask questions and the right to receive publicly available information. By prohibiting inquiries about the criminal histories of prospective tenants, does the Ordinance violate the First Amendment?

2. The Due Process Clause of the Fourteenth Amendment forbids governments from depriving citizens of fundamental property interests unless the

1

deprivation substantially advances a legitimate government purpose. By burdening landlords' right to exclude prospective tenants based on criminal history, does the Ordinance violate due process?

## INTRODUCTION

This appeal challenges the constitutionality of an unprecedented regulation that burdens Seattle landlords' right to select their tenants based on reasonable, neutral, and nondiscriminatory criteria. The Fair Chance Housing Ordinance declares it unlawful for a landlord—or anyone else—to inquire about the criminal history of a prospective or current tenant, regardless of the gravity of the crime or the risk of recidivism, with a narrow exception for sex crimes. SMC § 14.09.025(A)(2). The Ordinance also prohibits landlords from taking adverse action, such as denial of a rental application, based on criminal history. *Id.*

This Ordinance is a radical departure from ordinary business and government practices, which commonly inquire into criminal history to assess reliability and safety in contexts like housing, employment, business licenses, childcare, and firearm purchases. Indeed, landlords screen an applicant's criminal history and check the sex offender registry for both business reasons and to fulfill their legal and moral duty to protect tenants against criminal acts of people landlords invite onto their property. *Griffin v. W. RS, Inc.*, 97 Wn. App. 557, 570 (1999), *rev'd on other grounds by* 143 Wn.2d 81 (2001); *Hutchins v. 1001 Fourth Avenue Associates*,

116 Wn.2d 217, 224 (1991); *see also State v. Sigman*, 118 Wn.2d 442, 447 (1992) (landlords can even be held criminally liable for certain offenses committed by their tenants). Because of this unique duty, the Washington Supreme Court has observed that, if a landlord may be held liable for the criminal acts of tenants, "[i]t would seem only reasonable that the landlord should at the same time enjoy the right to exclude persons who may foreseeably cause such injury." *City of Bremerton v. Widell*, 146 Wn.2d 561, 572 (2002).

This "right to exclude is 'universally held to be a fundamental element of the property right,' and is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)). The Ordinance burdens the fundamental right to exclude—both directly by declaring it unlawful for a landlord to exercise such discretion, and indirectly by prohibiting speech related to an applicant's criminal history. In both respects, the Ordinance is unconstitutional.

First, the Ordinance clashes with First Amendment values that favor a society of open access to public information. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976) ("It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us."). Rather than

3

censor information the City deems dangerous, the City should "assume that this information is not harmful in itself, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Id.* at 769–70. After all, "disclosure of truthful, relevant information is more likely to make a positive contribution to decisionmaking than is concealment of such information." *Peel v. Attorney Registration and Disciplinary Comm'n of Ill.*, 496 U.S. 91, 108 (1990).

Second, the Ordinance deprives landlords of a fundamental property right expressly secured by the Bill of Rights, *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162, 2170 (2019), in violation of the Due Process Clause of the Fourteenth Amendment. *Cedar Point Nursery*, 141 S. Ct. at 2077 (As a fundamental right, the right to exclude "cannot be balanced away.").

The district court, however, held that the Ordinance survived both the First Amendment and the Due Process Clause as "a reasonable means of achieving the City's objectives." ER 026. This conclusion fails to apply the scrutiny due under both these constitutional guarantees and discounts the Ordinance's sloppy fit between means and end.

# STATEMENT OF FACTS

**The Ordinance**

In 2017, the City adopted the "Fair Chance Housing" Ordinance,[1] which declares it an "unfair practice for any person to . . . [r]equire disclosure, inquire about, or take an adverse action against a prospective occupant, tenant, or member of their household based on any arrest record, conviction record, or criminal history." SMC § 14.09.025(A)(2). "Adverse action" includes denying tenancy, evicting an occupant, or terminating a lease. *Id.* § 14.09.010. The purposes of the Ordinance are to reduce recidivism and any disparate impact on minorities allegedly caused by criminal background checks in rental housing. *See* ER 137–38.

The Ordinance applies to any "person," defined as "one or more individuals, partnerships, organizations, trade or professional associations, corporations, legal representatives . . . [or] any owner, lessee, proprietor, manager, agent, or employee, whether one or more natural persons, and any political or civil subdivision or agency or instrumentality of the City." SMC § 14.09.010. The Ordinance does not limit the prohibition on inquiries about criminal history to inquiries related to rental housing or adverse action. Hence, a landlord cannot ask about criminal history even for

---

[1] In 2021, the City amended the Ordinance, adopting the title "Fair Chance Housing and Eviction Records Ordinance," SMC § 14.09.005, but the amendments are not relevant here.

reasons that might benefit a tenant, such as offering rental assistance or providing other support.

The Ordinance allows an aggrieved person to file a charge with the Civil Rights Office. *See* SMC § 14.09.045. The Civil Rights Office may also initiate an action. *Id.* A hearing examiner reviewing such charges "may order the respondent to take such affirmative action or provide such relief as is deemed necessary to correct the violation," including rent refunds, reinstatement to tenancy, advertising measures, attorneys' fees, and so on. *Id.* § 14.09.090. Violators also face civil penalties up to $11,000 for a first offense, $27,500 for a second offense, and $55,000 for each subsequent offense. *Id.* § 14.09.100.

The Ordinance carves out a qualified exception for adults on a sex offender registry. *See id.* § 14.09.025(A)(3). A landlord can take adverse action based on sex offender status if the landlord can demonstrate a "legitimate business reason" for doing so, which must be "necessary to achieve a substantial, legitimate, nondiscriminatory interest." *Id.* §§ 14.09.010, 025(A)(3).

The Ordinance completely exempts federally assisted housing. *Id.* § 14.09.115(B). Landlords of federally assisted housing can still check criminal history and deny tenancy based on that history. *Id. See also* Seattle Office for Civil Rights, Fair Chance Housing Ordinance, SMC § 14.09: Frequently Asked Questions (2018) ("The ordinance does not preclude screening or adverse actions taken by

landlords of federally assisted housing . . . .").[2] The Seattle Housing Authority administers federally assisted housing in the City, such as Section 8 vouchers that renters may use in renting in the private housing market and project-based housing managed directly by the housing authority. Seattle Housing Authority, About Us, https://www.seattlehousing.org/about-us (last visited October 18, 2021).

The Ordinance also exempts certain housing arrangements. It does not apply "to the renting, subrenting, leasing, or subleasing of an accessory dwelling unit or detached accessory dwelling unit wherein the owner or person entitled to possession thereof maintains a permanent residence, home, or abode on the same lot." SMC § 14.09.115(D). Hence, a tenant who subleases space in the rental unit to a roommate is exempt from the Ordinance, but a tenant leasing from a landlord who directly leases to several roommates is not. Likewise, a landlord who rents out an accessory dwelling unit on the same lot as their residence is exempt, while landlords like the Yims who rent out duplexes or triplexes and live in one of the units must still comply.

A review of the broader regulatory environment shows other ways the Ordinance limits the right to exclude. For instance, a separate ordinance requires landlords to allow a tenant to invite a roommate of their choosing to occupy the rental property. *Id.* § 7.24.030(I). Thanks to the Fair Chance Housing Ordinance,

---

[2] https://www.seattle.gov/Documents/Departments/CivilRights /Fair%20Housing/Fair%20Chance%20Housing%20FAQ_amendments_FINAL_08 -23-18.pdf.

landlords cannot inquire about these strangers' criminal history or exclude them because of that history. Additionally, landlords cannot hold a tenant liable for property damage "caused by a perpetrator of domestic violence, sexual assault, unlawful harassment, or stalking." *Id.* § 7.24.030(H). The inability to check or rely upon criminal history renders landlords helpless to avoid these costs.

City law also heavily regulates termination of a tenancy. The City prohibits landlords from evicting school employees or individuals with school-aged children during the school year. *Id.* § 22.206.160(11)(a). Seattle law also prohibits eviction during the "winter," December through March of every year. *See id.* § 22.206.160 (C)(8)(a). These and other laws limiting a landlord's right to end a tenancy mean that the inability to consider all relevant factors when deciding whom to rent to takes on even greater significance. *See generally* SMC § 22.206.160(C) (limiting evictions to City-defined "just cause").

**Widespread Reliance on Criminal History**

Governments and industries around the country, including the City itself, rely upon criminal background screening to assess trustworthiness, safety, and risk.

About 93% of employers run criminal background checks on job candidates. Hr.research Institute, *How Human Resource Professionals View and Use*

8

*Background Screening in Employment* (2019) at 7.[3] Indeed, the City expressly allows employers to conduct criminal background checks and reject an applicant with a past conviction for a legitimate business reason. SMC § 14.17.020(B), (E). Moreover, governments frequently require criminal background checks for certain types of employment. *See, e.g.*, Revised Code of Washington (RCW) § 43.43.830–845 (requiring criminal background checks for staff with unsupervised access to children or vulnerable adults).

Governments also frequently recognize the importance of criminal background checks in the housing context. Federal regulation, for instance, expressly allows public housing authorities to reject applicants with past drug-related criminal activity, violent criminal activity, or other criminal activity that threatens health, safety, or property. 24 C.F.R. § 982.553(a)(2)(ii)(A).

Federal, state, and local laws recognize criminal history as an important indicator of reliability and risk in many other settings. Among other things, the Bail Reform Act calls on courts to consider prior criminal activity in weighing pretrial detainment, 18 U.S.C. § 3142, the U.S. Sentencing Guidelines cite criminal history as a relevant factor in sentencing, U.S. Sentencing Commission, Guidelines Manual §§ 4A1.1–4A1.3 (2018), and the Federal Rules of Evidence allow parties to use

---

[3] https://www.hr.com/en/resources/free_research_white_papers/hrcom-background-screening-june-2019-research_jwvmqi89.html.

criminal history to impeach witnesses. Fed. R. Evid. 609. The City itself recognizes that criminal history is an important consideration by, for instance, requiring a criminal background check for taxicab licenses and firearm purchases. SMC §§ 6.310.405, 12A.14.180(A)(3).

These widespread practices are common because of a powerful correlation between prior criminal history and future arrests and convictions. Within ten years of release, 82 percent of ex-offenders are re-arrested. *See* Leonardo Antenangeli & Matthew R. Durose, *Recidivism of Prisoners Released in 24 States in 2008: A 10-Year Follow-Up Period (2008–2018)*, Bureau of Justice Statistics Special Report 1 (2021).[4] While that percentage declines over time, the chance of re-arrest stands at 66 percent within the first three years following release. *Id.* The likelihood of re-arrest is even higher for those with more prior arrests in their history. *Id.* at 6. The chance of these re-arrests leading to convictions is likewise high: 55 percent of ex-offenders face an arrest that leads to conviction within five years of release. *Id.* at 8. For employers, landlords, and governments around the country, the predictive value of criminal history is significant.

---

[4] https://bjs.ojp.gov/library/publications/recidivism-prisoners-released-24-states-2008-10-year-follow-period-2008-2018.

**Appellants**

Chong and MariLyn Yim, Kelly Lyles, and Eileen, LLC, own and manage small rental properties in Seattle. *See* ER 084–86. Plaintiff Rental Housing Association of Washington (RHA) is a membership organization that provides screening services. *See* ER 086–88.

The Yim family owns a duplex and a triplex in Seattle. ER 084. They and their children live in one of the triplex units and rent out the other two. *Id*. Their tenants occasionally need to find new roommates. ER 085. Sometimes new roommates have been strangers to the current tenants before moving in. *Id*.

Prior to the Fair Chance Housing Ordinance, the Yims regularly checked criminal background of rental applicants, including roommate applicants. *Id*. The Yims are willing to rent to individuals with a criminal history depending on the number of convictions, the severity of the offenses, and other factors they deem relevant to the safety of the Yims, their children, and their other tenants. ER 086.

Kelly Lyles is a single woman who owns and rents out a house in the City. ER 085. Ms. Lyles understands the needs of individuals recovering from addiction and would consider an applicant who did not otherwise satisfy her screening criteria if the applicant was part of a recovery program. *Id*.

Ms. Lyles is a local artist who relies on her rental income to afford living in Seattle. *Id*. She cannot afford to miss a month's rental payment and cannot afford an

unlawful detainer action to evict a tenant who fails to timely pay. *Id.* As a single woman who frequently interacts with her tenants, she considers her personal safety when selecting them. *Id.*

Scott and Renee Davis own and manage Eileen, LLC, through which they operate a seven-unit residential complex in Seattle. ER 086. The Davises would consider applicants with a criminal history based on the circumstances of the crime and the safety needs of other tenants. ER 086.

RHA is a membership organization serving landlords throughout Washington. ER 086. Among other services, RHA provides background screening. *Id.* Landlords must become RHA members and certify property ownership to use this service. *Id.* Additionally, tenants can purchase a reusable screening report from RHA. *Id.* The criminal history section of RHA's reports displays the relevant jurisdiction of any given offense, a short description of the offense, the disposition and disposition date, sentence length, probation length, and other minor details. ER 087.

Because of the Ordinance, Appellants must operate in the dark with respect to rental applicants' criminal history. As a result, they cannot fulfill their legal and moral obligation to protect their tenants against crimes committed by other tenants. *See Griffin*, 97 Wn. App. at 570. The Yim family can no longer assure their tenants searching for new roommates that an applicant does not have a violent history. Kelly Lyles can no longer ensure her own safety and comfort as a single woman by

determining whether her renters have committed a serious crime. RHA, in turn, cannot communicate criminal background information to its Seattle members.

While landlords have a responsibility to seek out information bearing on the safety and well-being of their tenants, they are generally willing to rent to individuals with a criminal history. For example, the Ordinance relied in part on a 1997 article[5] showing that 67 percent of surveyed landlords checked for criminal background, and only 43 percent of those said "they would be inclined to reject an applicant with a criminal conviction." Jacqueline Helfgott, *Ex-offender Needs versus Community Opportunities in Seattle, Washington*, 61 Fed. Probation 12, 20 (1997). This percentage changed dramatically depending on offense type. While 49 percent of surveyed landlords were inclined to reject ex-offenders because of violent offenses, less than 10 percent were inclined to reject someone because of a past drug, property, or domestic abuse offense. *Id.*

**Procedural History**

Plaintiffs challenged the Ordinance in a Section 1983 action in King County Superior Court in May 2018. ER 146. The complaint claimed that the Ordinance violated their free speech and due process rights under the federal and state

---

[5] *Yim v. City of Seattle*, No. 2:18-cv-00736, City of Seattle's Combined Opp. to Pl.'s Mot. for Summ. J., Dkt. #33-7 at 6.

constitutions. ER 148. The City removed proceedings to the United States District Court for the Western District of Washington. ER 141–142.

After the parties filed cross-motions for summary judgment on a stipulated record, the district court granted the City's motion to certify state law questions to the Washington Supreme Court regarding the meaning of the state due process guarantee. ER 071–73. The Washington Supreme Court granted the certified questions and held that state due process mirrors its federal counterpart. ER 042–44. It went on to hold that rational basis review is the appropriate standard under which to analyze a claim that a plaintiff has been deprived of a fundamental property interest. ER 063.

In July 2021, the district court denied Plaintiffs' motion for summary judgment and granted the City's cross-motion. ER 004. The district court held that the prohibition against inquiries about criminal history regulated speech rather than commercial conduct. ER 012. It then held that the Ordinance was subject to the intermediate scrutiny reserved for commercial speech. ER 017. According to the district court, the City satisfied this standard because: (1) the goals of mitigating recidivism and the disparate impact of criminal records on minorities were important government interests; (2) the Ordinance substantially advances those interests by barring questions about and reliance upon criminal history; and (3) Appellants had

not proven that the Ordinance did not extend further than necessary to satisfy the City's interests. ER 017–31.

On the due process issue, the district court held that rational basis applied to deprivations of property interests such as the right to exclude, rejecting Appellants' argument that the "substantially advances" standard was the appropriate test for deprivations of fundamental property rights. ER 007–08. The court concluded that the City satisfied rational basis. ER 009.

Plaintiffs filed this appeal shortly after. ER 166.

## STANDARD OF REVIEW

This appeal arises from an order dismissing Plaintiffs' facial constitutional claims on summary judgment and is subject to de novo review. *See Botosan v. Paul McNally Realty*, 216 F.3d 827, 830 (9th Cir. 2000). In the First Amendment context, "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (tidied).

To prevail on a non-First Amendment facial challenge, the plaintiff bears the burden of showing that, under the constitutional doctrine's applicable test, the Ordinance will violate the constitution "in all of its applications." *City of Los Angeles, Cal. v. Patel*, 576 U.S. 409, 417 (2015); *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127–28 (2019) (whether a lawsuit is classified as facial or as-applied matters

only as to the remedy; "it does not speak at all to the substantive rule of law necessary to establish a constitutional violation") (citations omitted). While this standard appears to place a steep burden on the plaintiff, the phrase "in all of its applications" is much more limited in scope than it would initially appear, establishing a meaningful standard under which plaintiffs often succeed. *Patel*, 576 U.S. at 418. When considering a facial constitutional claim, a court must consider only those applications of the statute "in which it actually authorizes or prohibits conduct." *Id*. Thus, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the Supreme Court's analysis of a spousal-notification law did not include "the group for whom the law is irrelevant"—*i.e.*, women who would have voluntarily notified their husbands. 505 U.S. 833, 894 (1992) ("Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."); *see also Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 257–58 (1974) (holding a law that required a newspaper to print a candidate's reply to an unfavorable editorial invalid on its face, despite the fact that most newspapers would adopt the policy absent the law). Likewise, *Patel*'s review of a law authorizing police to search hotel guest registries without a warrant excluded those hoteliers who would have consented to the inspections, as well as

16

warrantless searches justified by exigency. *Patel*, 576 U.S. at 418–19. Such circumstances are "irrelevant" and cannot "prevent facial relief." *Id*.

## SUMMARY OF THE ARGUMENT

By restricting access to relevant information regarding rental applicants and barring landlords from acting on what they learn, the Ordinance has abrogated landlords' fundamental right to exclude. The ban on inquiries into criminal history violates Appellants' First Amendment rights to share and receive public information, while the ban on adverse action based on criminal history violates due process.

The First Amendment disfavors paternalistic barriers to information simply because the government fears what the public might do were it fully informed. *See Virginia State Bd. of Pharmacy*, 425 U.S. at 770 ("There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them."). The public has a First Amendment right to request and receive criminal background information, and the providers of such information have a First Amendment right to share it. The Ordinance burdens these rights. The speech restricted by the Ordinance is not limited to commercial speech only, since landlords have non-commercial reasons to ask about criminal history—namely to protect the safety and quiet enjoyment of

themselves, their families, and their other tenants. Moreover, the Ordinance prohibits any inquiries about the criminal history of prospective and current tenants for any reason, extending well beyond the context of a commercial transaction such as a lease agreement.

The Ordinance falters under either intermediate or strict scrutiny. The Ordinance is underinclusive because it exempts federally assisted housing. By restricting all criminal background checks of anyone who happens to be a tenant or prospective tenant, the Ordinance censors a wide range of speech that does not further the City's interests. Moreover, the City has many alternatives to restricting speech.

The Ordinance's prohibition against taking adverse action based on criminal history violates due process by arbitrarily stripping landlords of the fundamental right to exclude. Unlike due process claims regarding non-fundamental liberty interests subject to rational basis review, deprivations of property—a fundamental right directly enumerated in the Fifth and Fourteenth Amendments—are subject to a higher standard of scrutiny. The government may only deprive someone of a property interest if doing so substantially advances an important government interest.

Regardless, the Ordinance fails under either a heightened "substantially advances" test or rational basis. The Ordinance arbitrarily exempts federally assisted

housing, allowing those landlords best positioned to help ex-offenders to take adverse action against them based on criminal history. The Ordinance also arbitrarily treats all offenses identically, regardless of age or gravity. Hence, the Ordinance treats a twenty-year-old arrest for shoplifting as if it poses the same risks to housing communities as a three-year-old armed robbery conviction. The Ordinance, moreover, unduly oppresses landlords, who are unable to fulfill their legal and moral duty to protect their other tenants.

## ARGUMENT

### I.   The Ordinance Violates the First Amendment

#### a.   The Ordinance Must Survive Strict Scrutiny Because It Restricts Speech Based on Content

Laws "that target speech based on its communicative content . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Thus, the "crucial first step" in analyzing a free speech claim is to "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* at 163, 165 (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011)). The term "content-based" has a "commonsense meaning:" a content-based law is one that applies to particular speech "because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. For instance, in *Reed*, a sign code was content-based because it applied

19

different rules depending on whether the sign conveyed a political, ideological, or directional message. *Id.* at 170.

The Ordinance here restricts speech based on its content.[6] It prohibits any "inquiry" about a tenant or applicant's criminal history, while leaving parties free to ask questions on other topics. Thus, application of the Ordinance hinges on the topic discussed, and the Ordinance must survive strict scrutiny.

### b. The Ordinance Restricts the Right To Receive Information

The First Amendment protects the rights to both share and receive information. An individual's prerogative to seek and access information is an "inherent corollary of the rights of free speech." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). This right to receive has two faces: "First, the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them." *Id.* at 867. And further, "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech." *Id.* In short, when someone opens her mouth, "the protection afforded is to the communication, to its source and to its recipients both." *Virginia State Bd. of Pharmacy*, 425 U.S. at 756.

---

[6] The district court correctly held that the Fair Chance Housing Ordinance regulates speech, ER 012.

20

The scope of this right to receive information depends on who controls the information. The government, for instance, has some authority to withhold information solely within its control. *See Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978) ("This Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control."). But the government cannot selectively restrict access to information already publicly available or controlled by others. *See Sorrell*, 564 U.S. at 568 ("Vermont has imposed a restriction on access to information in private hands."); *Smith v. Daily Mail*, 443 U.S. 97, 103 (1979) ("We held that once the truthful information was 'publicly revealed' or 'in the public domain' the court could not constitutionally restrain its dissemination."); *Legi-tech, Inc. v. Keiper*, 766 F.2d 728, 734 (2d Cir. 1985) ("Rather than seeking special access in addition to that enjoyed by the public, Legi-Tech seeks access equal to that offered to the public.").

Hence, a state could arguably withhold its own arrestee information without violating the First Amendment, but "[a] different, and more difficult, question is presented when the State makes information generally available, but denies access to a small disfavored class." *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 45 (1999) (Stevens, J., dissenting). A burden on speech thus arises when "a restriction upon access . . . *allows* access to the press . . . but at the same time *denies* access to persons who wish to use the information for certain

21

speech purposes." *Sorrell*, 564 U.S. at 569 (quoting *United Reporting*, 528 U.S. at 41–42 (Scalia, J., concurring)). For example, in *Sorrell*, the Supreme Court addressed a Vermont law that restricted the sale, disclosure, and use of certain pharmacy records to marketers, while allowing such sale or disclosure to others, such as academic researchers. *Sorrell*, 564 U.S. at 557. The Court held that denying a specific group access to otherwise accessible information because of how they planned to use the information violated the First Amendment. *Id.* at 564; *see also Legi-Tech*, 766 F.2d at 734 (First Amendment issue arose because state law "denies [plaintiff] the very access to information offered to the general public.").

The Ordinance restricts the right to receive publicly available information that the City does not control—criminal records. All 50 states provide publicly available criminal background information for a wide range of purposes, from firearms purchases to housing. *See* ER 103–04. The Ordinance has thus implicated the First Amendment by "den[ying] [Appellants] the very access to information offered to the general public," *Legi-Tech*, 766 F.2d at 734, thereby blocking information for a "small, disfavored class." *United Reporting*, 528 U.S. at 45 (Stevens, J., dissenting).

### c. The Ordinance Regulates Non-Commercial Speech

The district court erred in holding that the Ordinance covers only commercial speech and therefore warrants review under intermediate scrutiny rather than the strict scrutiny applicable to content-based speech regulations.[7]

The commercial speech test applies to regulation of "speech which does 'no more than propose a commercial transaction.'" *Bolger v. Youngs Drug Products Co.*, 463 U.S. 60, 66 (1983); *see also Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 562 (1980) (distinguishing between "speech proposing a commercial transaction" subject to lesser scrutiny and "other varieties of speech"). Intermediate scrutiny applies if all speech affected by the Ordinance falls within this category. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 819 (9th Cir. 2013). Where a law burdens both commercial and noncommercial speech, the law's impact on these two different types of speech must be considered separately. *See Outdoor Systems, Inc. v. City of Mesa*, 997 F.2d 604, 610 (9th Cir. 1993). And where the commercial and non-commercial elements of speech are "inextricably intertwined," strict scrutiny applies to the whole. *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012).

---

[7] Appellants believe that content-based regulations of even commercial speech should be subject to strict scrutiny following *Sorrell* and *Reed*, but this Circuit has held otherwise in *Retail Digital Network v. Prieto*, 861 F.3d 839, 846 (9th Cir. 2017). Appellants wish to preserve this issue for later proceedings.

While the core of commercial speech is traditional advertising, courts apply the commercial speech doctrine to speech that in effect "solicits a commercial transaction or speech necessary to the consummation of a commercial transaction." *Valle Del Sol*, 709 F.3d at 818. In close questions, the Ninth Circuit looks to three factors: advertising format, reference to a specific product, and economic motivation. *Dex Media*, 696 F.3d at 958. Economic motivation is not sufficient by itself to render speech commercial, and such motivation must be "the primary purpose for speaking" in order to count in favor of finding commercial speech. *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021); *see also id.* at 1116 ("This factor asks whether the speaker acted *primarily* out of economic motivation, not simply whether the speaker had *any* economic motivation.").

At least one state court in this circuit has held that background screening by landlords is not commercial speech. In *U.D. Registry, Inc. v. State of California*, California restricted consumer reports about prior unlawful detainer actions. 34 Cal. App. 4th 107, 109–10 (1995). The court of appeals held that the commercial speech test did not apply because "truthful information taken from public records regarding unlawful detainer defendants, does not propose a commercial transaction, and hence is not commercial speech." *Id.*

The district court wrongly held that the Ordinance is subject only to intermediate scrutiny because "[m]ost instances in which a landlord asks someone

seeking to rent property about his or her criminal history are commercial speech." ER 015. This conclusion clashes with the Ordinance's breadth, misconstrues the commercial speech doctrine, and lacks support in the record.

The district court lacked any factual basis for its conclusion that landlords ask about criminal history for "primarily economic" reasons. ER 015. As the stipulated facts explain, Appellants ask about criminal history both to protect their rental income *and* to promote safety and well-being for themselves and their other tenants. *See* ER 084–85. Kelly Lyles wants to ask for this information because she's a single woman who interacts with tenants in person. ER 085–86. The Yims ask about criminal history to protect their children and their tenants looking for new roommates. ER 085. While landlords may have some economic motivation for asking, such inquiries can only fall within the commercial speech definition if the *primary* purpose of inquiring about criminal history is a profit motive. *See Ariix*, 985 F.3d at 1117. At most, any commercial incentive for their inquiries into criminal background are "inextricably intertwined" with non-commercial motivations and thus still merit strict scrutiny. *See Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) ("Thus, where, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both

25

artificial and impractical. Therefore, we apply our test for fully protected expression.").

Moreover, the Ordinance impairs the right to receive non-commercial information and thereby warrants strict scrutiny. Criminal background information, much like the unlawful detainer history in *U.D. Registry*, does not propose a commercial transaction, nor is it necessary to consummate such a transaction. The district court failed to even acknowledge Appellants' right to receive information. In determining the level of scrutiny that should apply when analyzing the right, the district court should have looked to the non-commercial nature of the information that Appellants seek. *See U.D. Registry*, 34 Cal. App. 4th at 111. A criminal background report detailing prior arrests, convictions, and so forth does not resemble commercial speech. Therefore, strict scrutiny should at least apply to Appellants' claim that the Ordinance curtails their right to receive publicly available, non-commercial information.

The Ordinance also reaches non-commercial speech because it prohibits any person from asking anyone else for any reason about the criminal history of a current or prospective tenant of rental housing in Seattle or a member of that individual's household. For example, a tenant who wants to know about an incoming roommate cannot make such an inquiry, even though the reason the tenant would make the inquiry—their personal safety—is purely non-commercial. Hence, both the speaker

and the audience could be entirely divorced from any proposed commercial transaction and still fall within the Ordinance's scope, such as a journalist inserting a query into a criminal records database.

The district court noted that landlords, prior to the Ordinance, sometimes included a question regarding criminal history on rental applications, and rental applications, according to the district court, "fall squarely within the core notion of commercial speech." ER 015. This is an unduly formalistic understanding of the commercial speech doctrine. *See Lee v. Weisman*, 505 U.S. 577, 595 (1992) ("Law reaches past formalism."). Simply because speech is conveyed through a rental application does not render all of it commercial. The district court should have applied the nuanced *Dex Media* analysis to the content of the speech in question, not simply conclude that the commercial speech doctrine applies because of the type of document the speech appears in. But even if inquiries into non-commercial information somehow become commercial simply because they appear on a rental application, the Ordinance extends beyond inquiries that appear in that context.

The district court also reasoned that landlords who request a criminal background check from a service provider like RHA are engaged in a proposed commercial transaction because they pay for the background check. ER 016. Once again, however, the Ordinance is not limited to such transactional inquiries, such as a landlord asking about criminal history when calling up a prior landlord or

reference. Moreover, purchasing information does not render the information commercial speech. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988) ("[T]he degree of First Amendment protection is not diminished merely because the [protected speech] is sold rather than given away."). Otherwise, every book, film, or play that is traded for payment would only enjoy the protections of intermediate scrutiny. *Ariix*, 985 F.3d 1117; *cf. Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105 (1991).

Finally, the cases cited by the district court do not support its conclusion that the Ordinance only reaches commercial speech. For example, *Ibanez v. Florida Department of Business and Professional Regulation*, 512 U.S. 136 (1994), does not even address the definition of commercial speech, and the law at issue directly regulated actual advertising. *Id.* at 138. The district court also cited *Ariix*, 985 F.3d 1107, in which the Ninth Circuit held that a nutritional supplement guide was commercial speech. But *Ariix* found that the guide was in fact part of a complicated marketing campaign with a primary economic motivation. *Id.* at 1113, 1116, 1121. By contrast, landlords do not inquire about criminal history for primarily economic reasons, and the Ordinance encompasses speech that has no relationship to any commercial transaction.

The district court also cited *Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116 (3d Cir. 2020), in which the Third Circuit applied

28

intermediate scrutiny against an ordinance that prohibited employers from asking job applicants about wage history. But the Philadelphia ordinance affected a much narrower range of speech that was more closely connected to a commercial transaction. It prohibited only the prospective employer from asking a job applicant about wage history. *See id.* at 123. By contrast, the Ordinance here prohibits *everyone* from asking *anyone* about a potential or current tenant's criminal history. While the Philadelphia ordinance was limited to inquiries between the actual parties to a proposed commercial transaction, the Ordinance here prohibits, for instance, a neighboring tenant concerned for their children's safety from asking a prior landlord about the neighbor's criminal history.

The content of the regulated speech in *Greater Philadelphia Chamber of Commerce* was also more closely tied to a proposed commercial transaction. Employers ask about wage history in gauging how much the employer should offer to pay a job applicant. Hence, the topic bears directly on the terms of a transaction and the employer's economic motivation. Here, however, a landlord asks about criminal history for noneconomic reasons, such as the moral and legal responsibility to look after the peace and safety of neighboring tenants or roommates. Hence, in the Philadelphia case, application of intermediate scrutiny was appropriate because "the speaker acted *primarily* out of economic motivation," *Ariix*, 985 F.3d at 1117,

whereas the Ordinance applies to speech that is not driven primarily by economic considerations.

The district court erred in holding that the Ordinance was limited exclusively to the regulation of commercial speech. Landlords have non-economic reasons for asking about criminal history, and the Ordinance regulates speech with no connection to a proposed commercial transaction. Strict scrutiny applies.

### d. Even Under Intermediate Scrutiny, the Ordinance Is Not Adequately Tailored to the Government's Interests

Strict scrutiny is the appropriate standard, but the Ordinance fails even under intermediate scrutiny for at least three reasons: (1) it exempts the best housing option for ex-offenders; (2) it extends to speech that does not harm the City's interests; and (3) there are obvious less-restrictive alternatives available.

Intermediate scrutiny for commercial speech restrictions looks to four factors: (1) whether the restricted speech is misleading or related to unlawful activity; (2) whether the government's interest is substantial; (3) whether the speech restriction directly advances that interest; and (4) whether the speech restriction is not more extensive than necessary. *Valle Del Sol*, 709 F.3d at 816. If the speech is not misleading or related to unlawful activity under the first factor, then the government bears the burden of showing that it satisfies the remaining three factors. *Id.*

The district court correctly held that the speech restricted by the Ordinance is neither misleading nor unlawful. ER 017. As Appellants do not challenge the

30

importance of the City's asserted interests, the last two factors are the focus of this appeal.

### i. The Ordinance does not directly advance the government's interests because it exempts federally assisted housing

A law's underinclusive scope bears on the direct advancement inquiry. *Valle Del Sol*, 709 F.3d at 824. A law is underinclusive if it does not extend to equally harmful activity "when judged against [the law's] asserted justification." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 802 (2011). A law need not "address all aspects of a problem in one fell swoop," but First Amendment problems arise if it "regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest in a comparable way." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 451 (2015). This Circuit has held that exceptions that carve out some speech from the reach of a law "must relate to the interest the government seeks to advance." *Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898, 906 (2009). An underinclusive reach "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802.

This rule against underinclusive laws has been applied against laws barring the disclosure of public information. For instance, in *The Florida Star v. B.J.F.*, 491 U.S. 524, 526–27 (1989), the Supreme Court held underinclusive a state law prohibiting "mass media" from disclosing the names of rape victims even though the

state already revealed such names to the public. The Court held that the government "must demonstrate its commitment to advancing this interest by applying its prohibition evenhandedly" to small publishers and media giants alike. *Id.* at 540.

The Ordinance's exception for federally assisted housing renders it fatally underinclusive. The law fails to "apply[] its prohibition evenhandedly" to the housing industry, *id.*, even though federally assisted housing and the rest of the housing market pose the same risk to the City's interests. Indeed, many federally assisted housing providers are the same landlords who provide private housing, since renters who obtain housing vouchers take that rental subsidy into the private housing market. *See* 24 C.F.R. § 982.1. Hence, the Yims could inquire about the criminal history of someone with federal rent vouchers in one duplex unit but cannot make the same inquiry about the tenant next door. The Ordinance therefore lacks the "logical connection" between the City's interests and "the exceptions it makes to its own application." *Metro Lights*, 551 F.3d at 905. In fact, the record shows that subsidized housing is more likely to further the City's interests in reintegration because voucher recipients are statistically more likely to have criminal records, *see* ER 124–25, yet this is the very housing that the City has exempted.

The district court nonetheless held that this exclusion did not raise any First Amendment concern. The district court wrongly reasoned that the exclusion for federally assisted housing does not apply to the inquiry provision. ER 019. This

reading of the Ordinance is untenable. First, the City concedes the exclusion for federally assisted housing applies to the inquiry provision, and the City has defended the exclusion of federally assisted housing from the Ordinance throughout the course of this litigation. *See, e.g.*, ER 035 (defending the Ordinance as satisfying First Amendment scrutiny because the federally assisted housing exclusion is not underinclusive); *Yim*, Dkt. #33 at 15–16 (same). Moreover, the Seattle Office for Civil Rights, which enforces the Ordinance, interprets the exclusion as applying to both screening and adverse actions. *See* Seattle Office for Civil Rights, Fair Chance Housing Ordinance, SMC § 14.09: Frequently Asked Questions (2018) ("The ordinance does not preclude screening or adverse actions taken by landlords of federally assisted housing . . . .").[8]

The City's view of the Ordinance makes sense, as the district court's reading creates a logical impossibility, since a landlord cannot take an adverse action because of information about which he cannot inquire. Moreover, the Ordinance excludes federally assisted housing providers from taking "adverse action," which is defined in such a way as to reasonably include inquiries about criminal history. That definition includes "discriminating against any person for any reason prohibited by" the Ordinance. SMC § 14.09.010(K). Inquiring about criminal history is, of

---

[8] https://www.seattle.gov/Documents/Departments/CivilRights/
Fair%20Housing/Fair%20Chance%20Housing%20FAQ_amendments_FINAL_08
-23-18.pdf.

course, prohibited by the Ordinance, and the City considers such a practice to be discriminatory. *See, e.g.*, ER 140 ("[A] housing provider may be in violation of fair housing laws if their policy or practice does not serve a substantial, legitimate, nondiscriminatory interest, due to the potential for criminal record screening to have a disparate impact on African Americans and other communities of color."); *Yim*, Dkt. #33 at 14 (describing criminal history screening "as a proxy to discriminate against people of color."). Indeed, the district court itself conceded that "the City likely intended to" exclude federally assisted housing from the inquiry provision. ER 019.

The district court also erred in holding that the exclusion for federally assisted housing is justified to prevent federal preemption. Federal regulation does not require providers of federally assisted housing to inquire about and rely upon all forms of criminal history. Federal regulation only requires—as a funding condition—that public housing authorities reject applicants who have been convicted "for manufacture or production of methamphetamine on the premises of federally assisted housing" or are "subject to a lifetime registration requirement under a State sex offender registration program." 24 C.F.R. § 982.553(a)(1)(ii)(C), (2)(i). The Ordinance's exclusion for federally assisted housing expressly extends beyond these two categories:

> This Chapter 14.09 shall not apply to adverse action taken by landlords
> of federally assisted housing subject to federal regulations that require

denial of tenancy, *including but not limited to* when any member of the household is subject to a lifetime sex offender registration requirement under a state sex offender registration program and/or convicted of manufacture or production of methamphetamine on the premises of federally assisted housing.

SMC § 14.09.115 (emphasis added). Hence, the broad exclusion is not required by federal law. This is especially so with regard to the federal Section 8 housing voucher program. A voucher recipient who obtains housing in the private housing market has already been vetted by the public housing authority for criminal background in determining voucher eligibility. *See* 24 C.F.R. § 982.553(a). Yet the Ordinance exempts the landlords of voucher recipients even though they have no screening obligation under federal law.

The district court appeared to recognize that the exclusion is not necessary to avoid preemption but nonetheless held that the exclusion was unproblematic because federal law *might someday* preempt the Ordinance as to federally assisted housing. *See* ER 019 (accepting "the City's explanation that it sought to avoid enacting an Ordinance that could be preempted by federal law"). There is no "someday" preemption principle that excuses unconstitutional underinclusivity; indeed, such a rule would clash with the longstanding presumption against preemption. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).

The district court likewise reasoned that the exclusion was not "intended to burden private landlords while advantaging publicly funded housing." ER 019–20.

35

But whether or not some illicit motive lurks under the surface is irrelevant. Regardless of motive, "exceptions that make distinctions among different kinds of speech must relate to the interest the government seeks to assert." *Metro Lights,* 551 F.3d at 906. The blanket exclusion for federally assisted housing lacks the necessary logical connection to the government's interests.

### ii. The Ordinance extends to speech unrelated to the government's interests

The Ordinance restricts speech beyond what is necessary to fulfill the City's interests. Speech restrictions that do not address the City's interests cannot satisfy the means-end analysis of intermediate scrutiny. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (en banc) ("The Plaintiffs have identified several obvious examples of prohibited speech that do not cause the types of problems that motivated the ordinance.").

Here, the Ordinance envelops a wide range of speech that poses no risk of an adverse action being taken against a tenant or prospective occupant. There is no nexus in the Ordinance that limits its reach to inquiries related to housing, and it applies to inquiries by "any person." The Ordinance thus extends to individuals with cause to ask about criminal history who do not pose a threat to the City's interests, such as employers, firearm dealers, commercial lessors, or journalists.[9]

---

[9] Under longstanding First Amendment standing principles, plaintiffs challenging a law as overbroad may raise First Amendment injuries to parties not before the court

No limiting construction can save the Ordinance because the text is not "readily susceptible" to an alternative reading. *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988). This Court cannot limit "any person" or conjure language *ex nihilo* that limits the prohibition to the housing context. Nor does a promise from the City not to enforce the law to its full extent alleviate the problem. *United States v. Stevens*, 559 U.S. 460, 480 (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

The district court nonetheless adopted a narrow reading of the Ordinance based solely on the Ordinance's title, "Fair Chance Housing Ordinance." ER 031. The district court itself admitted that this is a "thin reed" with which to interpret the Ordinance. *Id.* Titles or headings only guide interpretation "when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain." *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947).

Here, there is no ambiguous language that the title can clarify. The text says simply: "It is an unfair practice for any person to require disclosure, inquire about,

---

due to "the special nature of the risk to expressive rights." *See Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 891 (9th Cir. 2007).

or take an adverse action against a prospective occupant, a tenant, or a member of their household, based on any arrest record, conviction record, or criminal history . . . ." SMC § 14.09.025(A)(2). By its plain language, it prohibits any criminal history inquiry by any person for any reason, so long as the person being inquired about is a prospective occupant, tenant, or household member.

Perhaps the City never intended to impose such a broad restriction, but the regulated public are not governed by intentions. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."). While the reach of the Ordinance may range beyond the principal evil the City intended to address, the broad language contains no ambiguous term or phrase that would permit the district court to confine its reach. *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth."). By its plain language, the Ordinance regulates speech that does not threaten the City's interests.

### iii.   The government has failed to demonstrate that less-restrictive alternatives will not satisfy the government's interests

To satisfy the more-extensive-than-necessary prong, the City must prove that less-restrictive alternatives could not have satisfied its interests. *See Ballen v. City of Redmond*, 466 F.3d 736, 743 (9th Cir. 2006) ("The availability of narrower

alternatives that intrude less on First Amendment rights is a factor to consider in determining whether the Ordinance satisfies *Central Hudson*'s fourth prong."); *id.* at 742 ("The City has the burden of proving that the Ordinance is narrowly tailored."). The government need not select the least restrictive means to satisfy intermediate scrutiny, but the existence of "numerous and obvious less-burdensome alternatives to the restriction on commercial speech . . . is certainly a relevant consideration in determining whether the fit between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993). *See also Valle Del Sol*, 709 F.3d at 826 ("[B]ecause restricting speech should be the government's tool of last resort, the availability of obvious less-restrictive alternatives renders a speech restriction overinclusive."); *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 949 ("The city has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech."). Here, the City has failed to rebut numerous and obvious less-restrictive alternatives.

Perhaps foremost among these alternatives is the Ordinance's existing prohibition against adverse action based on criminal history. The government's true interests lie in prohibiting adverse action based on criminal history, not barring access to information. *See* ER 139–40 (purpose of Ordinance is to "regulate the use of criminal history in rental housing" to address the disparate impact of reliance on criminal history in tenant selection and to help ex-offenders obtain stable housing).

The inquiry prohibition is simply a prophylactic measure designed to make it more difficult for landlords to violate the conduct prohibition.

The Supreme Court is clear, however, that "[b]road prophylactic rules in the area of free expression are suspect." *NAACP v. Button*, 371 U.S. 415, 438 (1963). Since speech restrictions, even in the area of commercial speech, may only come into play as a "tool of last resort," *Valle del Sol*, 709 F.3d at 826, the City must show that its regulation of conduct—adverse action based on criminal history—is inadequate to address the City's interests. *See id.* at 827 ("[G]overnment must consider pursuing its interests through conduct-based regulations before enacting speech-based regulations."). The City has not made an affirmative effort to meet this burden and has offered no evidence in the record that the prohibition on adverse action based on criminal history cannot satisfy the City's interests.

The City's failure to demonstrate that the conduct regulation alone cannot satisfy its interests resembles a similar circumstance addressed by an en banc panel of this Court in *Comite de Jornaleros de Redondo Beach*, 657 F.3d 936. There, an ordinance forbade street soliciting in order to promote traffic safety and ease congestion. The Court invalidated the ordinance under intermediate scrutiny in part because the City could achieve similar results by focusing on the undesirable conduct rather than speech that might prompt that conduct: "The City need only enforce laws against jaywalking, stopping in traffic along a red-painted curb, and

stopping a car so as to obstruct the normal movement of traffic." *Id.* at 949 (citations omitted). Even under intermediate scrutiny, the Court concluded it "cannot ignore the existence of these readily available alternatives." *Id.* at 950. Likewise, the City here need only enforce its existing law regulating adverse action to fully satisfy its interests, which is a "far less restrictive and more precise means" than barring inquiries into criminal background. *Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 476 (1988).

In addition to the adverse action provision, another obvious alternative is for the City to address the source of the racial disparities resulting from criminal history—the City's own biased policing practices. *See, e.g.*, Anne McGlynn-Wright, et al., The Usual, Racialized, Suspects: The Consequence of Police Contacts with Black and White Youth on Adult Arrest, *Social Problems* (2020) ("In Seattle, scholars have found evidence that racial stereotypes linking Black individuals with drug use lead police to surveil racially heterogeneous spaces and draw police attention away from White individuals' engagement in illegal drug sales."); *Yim*, Dkt. #33-6 at 19 (City memo acknowledging racial biases in criminal justice outcomes). Criminal background screening is not the source of the disparity that the City seeks to rectify, so the City must show that addressing this primary cause is infeasible.

A certification program constitutes another obvious alternative already in place elsewhere. Federal law, for instance, allows a public housing authority to assist someone previously denied housing because of criminal history "if the household member submitted a certification that she or he is not currently engaged in and has not engaged in such criminal activity during the specified period and provided supporting information from such sources as a probation officer, a landlord, neighbors, social service agency workers and criminal records." 24 C.F.R. § 982.553(a)(2)(ii)(C)(1). Likewise, Washington State's Certificate of Restoration of Opportunities Act provides ex-offenders with the chance to obtain a certification showing "a period of law-abiding behavior consistent with reentry" and "offer[s] potential public and private employers or housing providers concrete and objective information about an individual under consideration." S.H.B. 1553 (Wash. Leg. 2016 Reg. Sess.); *see also* RCW § 9.97.020. The City could utilize that program, or enact its own, which would promote the interests of both landlords and ex-offenders and inject more information into the marketplace, not less. *See Citizens United v. Federal Elections Comm'n*, 558 U.S. 310, 361 (2010) ("[I]t is our law and our tradition that more speech, not less, is the governing rule.").

The City could also expand supportive public housing. The legislative record shows that those reentering society after incarceration are most likely to succeed if they have supportive housing programs that provide social services and subsidies.

42

*See* ER 124–127, 135. But the City has taken the opposite tack, allowing public housing to continue screening for criminal history while thrusting the risks of renting to ex-offenders onto the private housing market—and forbidding landlords from inquiring about criminal history to provide support to tenants. The City carries the responsibility to show that these and other obvious less-restrictive alternatives cannot satisfy its interests. "If the First Amendment means anything, it means that regulation of speech must be a last—not a first—resort." *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 950 (quoting *Thomason v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002)).

The district court rejected these and other alternatives because they "would not achieve the City's objectives and none of them show that the City's choice to enact the Ordinance was an unreasonable means of pursuing them." ER 027. This holding, however, subtly relieved the government of its burden to demonstrate that such alternatives were unavailable. The district court, for instance, never addressed why the prohibition against adverse action did not satisfy the City's interests, nor did it respond to several of the alternatives raised by Plaintiffs, such as the certification program or following HUD's lead by simply prohibiting blanket rules forbidding any applicants with a criminal history. *Compare Yim*, Dkt. #23 at 13–17 *with* ER 027–28.

In concluding that it did not need to address possible alternatives, the district court wrongly relied upon *Ward v. Rock Against Racism*, 491 U.S. 781, 797 (1989), ER 027, which held that less-restrictive alternatives are not relevant to the validity of a content-neutral time, place, and manner restriction. But, as already discussed, the commercial speech test *does* require courts (and defendants) to consider less-restrictive alternatives. *See Valle Del Sol*, 709 F.3d at 826 ("[B]ecause restricting speech should be the government's tool of last resort, the availability of obvious less-restrictive alternatives renders a speech restriction overinclusive.").

The district court, moreover, wrongly concluded that "Plaintiffs do not dispute that the Ordinance is a reasonable means of achieving the City's interest in combatting landlords' use of criminal history as a pretext for racial discrimination" and that "Plaintiffs do not offer any alternative policies the City could have pursued to achieve this goal." ER 027. Plaintiffs' briefing specifically challenged the City's claim that the Ordinance was a lawful approach to dealing with discriminatory screening. *See Yim*, Pls.' Opp. and Reply, Dkt. #48 at 1 ("The City casts landlords engaging in a neutral practice as bad actors using criminal history 'as a proxy to discriminate against people of color.'"). Appellants pointed to existing laws against discrimination as an alternative for addressing discriminatory screening. *See id.* Moreover, the district court's conclusion that Appellants had offered no alternative policies to deal with discriminatory screening improperly flips the burden of proof

44

onto Appellants. *See Ballen*, 466 F.3d at 742 (Under *Central Hudson*'s fourth prong, "[t]he City has the burden of proving that the Ordinance is narrowly tailored."); *see also Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373, 2389 (2021) ("California has not considered alternatives to indiscriminate up-front disclosure."). Below, the City never attempted to demonstrate that existing laws against discrimination in housing practices could not deal with discriminatory screening practices. Indeed, the legislative record indicates that the City can successfully identify and investigate instances of discriminatory screening. *See Yim*, Dkt. #33-6 at 19 (describing how the City successfully identified instances of discriminatory screening).

## II. The Ordinance Violates Due Process by Extinguishing a Fundamental Right

By extinguishing landlords' fundamental right to exclude individuals with serious criminal histories, the Ordinance violates due process. *Cedar Point Nursery*, 141 S. Ct. at 2072 (a property owner's right to exclude is a fundamental right); *see also Knick*, 139 S. Ct. at 2170 (2019) (The text of the Constitution required the Court to "restor[e]" property rights to the "full-fledged constitutional status the Framers envisioned when they included the [Takings] Clause among the other protections in the Bill of Rights."). The Due Process Clause protects those fundamental rights and liberties "deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they

were sacrificed," *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citations omitted), and demands that state action implicating a fundamental right must satisfy strict scrutiny. *Id*. at 722. Indeed, in a decision issued late last term after the district court's order, the Supreme Court held that the right to exclude is a fundamental right that "cannot be balanced away." *Cedar Point Nursery*, 141 S. Ct. at 2077. This follows a long tradition of recognizing the fundamental nature of property rights as a basic building block of "ordered liberty" without which "neither liberty nor justice would exist." *See Cedar Point*, 141 S. Ct. at 2071 ("The Founders recognized that the protection of private property is indispensable to the promotion of individual freedom."); *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (The protection of property rights is "necessary to preserve freedom" and "empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them."); *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 544, 552 (1972) (Property rights are "an essential pre-condition to the realization of other basic civil rights and liberties which the [Fourteenth] Amendment was intended to guarantee. . . . [A] fundamental interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other.").

The district court committed reversible error when it failed to address the fundamental nature of the right to exclude and, as a result, failed to address the proper standard of review. ER 006–07; *but see Lamplighter Vill. Apartments LLP v.*

46

*City of St. Paul*, No. CV 21-413 (PAM/HB), 2021 WL 1526797, at *4 (D. Minn. Apr. 19, 2021) (concluding that the right to exclude is a fundamental right, so an ordinance restricting landlords from excluding prospective tenants based on criminal history is subject to heightened scrutiny). Instead, the opinion "assumed without deciding" that the Ordinance impaired a property interest without deciding whether such an interest was fundamental. ER 007–08. The district court thus erred by applying the rational basis review reserved for non-fundamental liberty interests.

      **a.**    **The "Substantially Advances" Test Requires that the Court Evaluate Whether the Government's Selected Means Is Effective in Advancing a Legitimate Government Purpose and Is Not Unduly Oppressive**

The Supreme Court devised the "substantially advances" test to ensure that zoning and land-use restrictions that impair an owner's right to make productive use of property relate to a legitimate end of government. *See Nectow v. City of Cambridge*, 277 U.S. 183, 188 (1928). Although this test if often lumped together with "rational basis," the Supreme Court has repeatedly admonished that the "substantially advances" test requires courts to engage in "a means-ends test" to determine "whether a regulation of private property is effective in achieving some legitimate public purpose." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005); *see also Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387–88 (1926) (courts must evaluate the "circumstances and conditions" of the case because a court will only defer to legislative judgment where the validity of the government action is

deemed "fairly debatable"). As part of this test, the court must also determine whether the destruction of a property right is "not unduly oppressive upon individuals." *Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590, 595 (1962); *Mugler v. Kansas*, 123 U.S. 623, 8 S. Ct. 273, 289 (1887) (Due process prohibits laws "that are unnecessary, and that will be oppressive to the citizen.").

In the decision below, however, the district court rejected the "substantially advances" test upon its erroneous conclusion that the Supreme Court impliedly overruled that inquiry in *Lingle v. Chevron*, 544 U.S. 528. ER 007–08. *Lingle* contains no such ruling. *Lingle* involved one narrow question: "whether the 'substantially advances' formula announced in *Agins v. City of Tiburon* [447 U.S. 255 (1980)] is an appropriate test for determining whether a regulation effects a Fifth Amendment taking." *Lingle*, 544 U.S. at 532. The Court said no: "this formula prescribes an inquiry *in the nature of a due process*, not a takings test, and that it has no proper place in our takings jurisprudence." *Id*. at 540 (emphasis added). *Lingle* emphasized that its holding "does not require us to disturb any of our prior holdings." *Id*. at 545. Thus, insofar as *Lingle* addressed substantive due process, it merely reaffirmed the settled rule that property deprivations must "substantially advance a legitimate state interest." 544 U.S. at 540–41.

The district court, nonetheless, clung myopically to the phrase, "we have long eschewed such heightened scrutiny when addressing substantive due process

challenges" (ER 005 (quoting *Lingle*, 540 U.S. at 545)), as having impliedly rejected the "substantially advances" analysis. Reading *Lingle* in context, however, makes clear that the Court did no such thing.

In *Lingle*, Chevron sued the State of Hawaii, alleging that price caps constituted a regulatory taking. 544 U.S. at 532–34. The district court agreed, concluding that the statute failed to substantially advance a legitimate public interest. *Id*. at 535–36. On review, the Supreme Court concluded that the "substantially advances" test was properly categorized as a due process test, not a regulatory takings test. *Id*. at 543. It did not alter the analysis that applies to a due process claim. *See id*. at 542 ("An inquiry of this nature has some logic in the context of a due process challenge.").

*Lingle*'s reference to "such heightened scrutiny" was in response to the district court's mistaken ruling that the "substantially advances" test authorized courts to go beyond a means-ends analysis to instead "substitute their predictive judgments for those of elected legislatures and expert agencies." *Id.* at 544. It was in response to that "remarkable" expansion of the "substantially advances" test, that this Court stated, "we have long eschewed such heightened scrutiny when addressing substantive due process challenges to government regulation." *Id*. at 544–45 (emphasis added). Thus, when read in context, this passage does not comment on

the validity of the "substantially advances" test. The district court's reading of *Lingle* is erroneous and must be reversed.

This error matters because the "substantially advances" and "rational basis" tests are distinctly different inquiries. Unlike "rational basis" review, which simply asks whether a law is "rationally related" to the government's purpose, *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 440 (1985), the "substantially advances" test demands a more searching "means-ends test" to determine "whether a regulation of private property is effective in achieving some legitimate public purpose." *Lingle*, 528 U.S. at 542; *see also Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834 n.3 (1987) ("We have required that the regulation substantially advance the legitimate interest sought to be achieved, not that the State could rationally have decided that the measure adopted might achieve the State's objective.") (internal quotation marks and citation omitted); *see also Moore v. East Cleveland*, 431 U.S. 494, 498 n.6 (1977) ("[O]ur cases have not departed from the requirement that the government's chosen means must rationally further some legitimate state purpose."); *North Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 167 (1973) (the means selected must have "a manifest tendency to cure or at least to make the evil less"). This Court should reverse the district court's failure to consider whether the means selected by the City—depriving landlords of the right to exclude—substantially advances the City's goals of

50

addressing the racially disparate impacts of the criminal justice system and reducing recidivism. As the City failed to preserve any argument that the Ordinance survives the "substantially advances" inquiry, this Court should invalidate the Ordinance without need for a remand.

**b.     The Fair Chance Housing Ordinance Flunks Even Rational Basis Review**

Even if this Court opted to apply "rational basis" review, that test remains a meaningful limit on government power. *See Mathews v. Lucas*, 427 U.S. 495, 510 (1976) ("Rational basis" is not "toothless."). Indeed, although the "rational basis" test presumes that a challenged law has a rational relationship to a legitimate end, plaintiffs can rebut this presumption through actual evidence of irrationality. *Borden's Farm Products Co. v. Baldwin*, 293 U.S. 194, 209 (1934) (weight given to a government's means and objective is "not a conclusive presumption, or a rule of law which makes legislative action invulnerable to constitutional assault. Nor is such an immunity achieved by treating any fanciful conjecture as enough to repel attack."). This formulation of the rational basis test requires that legislation "must find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993).

This approach to examining a law's rationality is visible in cases like *City of Cleburne*, 473 U.S. 432. *Cleburne* asked whether a zoning ordinance that forbade operation of a home for the mentally handicapped violated equal protection.

Applying rational basis, the Court still carefully considered whether the zoning ordinance in fact satisfied the government's objectives. *See id.* at 446. A means-end analysis based in the record evidence was proper even though the question how to further a particular goal was "very much a task for legislators guided by qualified professionals." *Id.* at 443. But even though rational basis review is deferential, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary and irrational." *Id.* at 446. The City of Cleburne argued that the zoning ordinance would protect handicapped occupants from harassment and that placing the home in a floodplain raised safety concerns. *Id.* at 449.

The Court looked to whether the zoning ordinance was actually effective in achieving these goals: "Because in our view the record does not reveal any rational basis for believing the Featherston home would pose any special threat to the city's legitimate interests, we affirm the judgment below insofar as it holds the ordinance invalid as applied in this case." *Id.* at 448. Hence, courts applying rational basis to deprivations of property rights must still look to facts in the record in assessing rationality.

The district court, however, applied a version of rational basis that begins and ends with the presumption of rationality, divorcing the due process inquiry from fact. ER 008. Citing *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234 (9th Cir.

1994), the court stated that a law subject to rational basis review must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. This statement, however, runs contrary to the overwhelming weight of authority which establishes that a plaintiff can rebut the presumption of constitutionality with evidence of irrationality based on the actual objectives of the challenged law. Importantly, the standard of *Kawaoka* is contrary to *City of Cleburne*, which is a property rights case much more similar to this case. For rational basis to impose any genuine limit on government power, courts must "insist on knowing the relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). A law must still be "narrow enough in scope and grounded in a sufficient factual context for us to ascertain some relation between the classification and the purpose it serve[s]." *Id*. at 632–33.

### i.     The exemption for federally assisted housing is arbitrary

Just as the Fair Chance Housing Ordinance exempts federally assisted housing from the prohibition on criminal background inquiries, it also exempts federally assisted housing from the prohibition on adverse action based on criminal history. This exemption suffers from the same flaws as the exemption for criminal background checks by providers of federally assisted housing, but there are additional reasons it fails rational basis.

53

The City seeks to excuse this exemption under the theory that the City has a legitimate purpose in preventing future federal preemption that may or may not occur. The City came up with this speculative hypothesis during the course of litigation only after the Plaintiffs pointed out that the Ordinance's exemption is not in fact compelled by federal law. *Compare Yim*, Dkt. #33 at 16 (City initially claimed that the exemption was required by federal law) *with* Dkt. #50 at 6 (later claiming that the exemption was justified because federal regulations might change). These "post hoc hypothesized facts" do not furnish a rational reason to exempt federally assisted housing. *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013). Indeed, this rationale is likely a pretext to simply allow the City's own housing authority to carry on with its longstanding policy of relying on criminal history in rendering tenancy decisions while subjecting the private housing market to a harsher standard. This amounts to "naked favoritism lacking any legitimate purpose." *San Francisco Taxi Coalition v. City and County of San Francisco*, 979 F.3d 1220, 1225 (9th Cir. 2020). *See also Craigmiles v. Giles*, 312 F.3d 220, 229 (6th Cir. 2002) ("No sophisticated economic analysis is required to see the pretextual nature of the state's proffered explanations . . . ."); *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) ("Judges are not required to exhibit a naivete from which ordinary citizens are free."). Such favoritism toward the City's own housing authority cannot satisfy rational basis.

Indeed, the exemption is particularly perverse because it allows the landlords who are best positioned to help ex-offenders reintegrate to take adverse action against tenants due to criminal history. *See* ER 124–25. The City overlooked studies concluding that the "income-limiting" effect of a criminal history makes private housing "unattainable" for many ex-offenders. *See* ER 106. In fact, private housing, due to its higher cost, may result in higher eviction rates, which in turn worsens recidivism rates. *Id.* Such studies suggest removing barriers to supportive housing. The City has instead erected a higher barrier. The exemption thus cuts against the City's own asserted interests, which resembles the irrational law struck down in *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 538 (1973), that forbade food stamps for households of non-related persons, even though such households were the ones most likely to need government aid.

> ii. **Imposing burdens on a race-neutral process in order to address disparities resulting from other conduct is arbitrary**

The City adopted the Ordinance in order to help ex-offenders reintegrate and address racial impacts of the criminal justice system. *See* ER 137, 139. Yet the tenant selection process has no connection to the criminal justice system. Restrictions on private landlords cannot undo the harm caused by discriminatory prosecution of racial minorities. Hence, the Ordinance imposes the type of burden-shifting prohibited by due process. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570

U.S. 595, 618 (2013) (Due process protects property owners "from an unfair allocation of public burdens.").

Under due process, courts are "suspicious of a legislature's circuitous path to legitimate ends when a direct path is available." *Craigmiles*, 312 F.3d at 227. The City's most direct route to addressing the disparate impact of criminal history on racial minorities is to reaffirm non-discriminatory police practices. As mentioned above, there is also a more direct route to addressing the housing stability of ex-offenders: provide them with social and financial support services—the very services that the specially exempted housing authority provides.

### iii.   Failure to account for meaningful differences between offenders and behaviors is arbitrary

The City's failure to account for fundamental differences in types of criminal history is also arbitrary. The City's objective of reducing recidivism bears no relation to the Ordinance's blanket ban on inquiries and reliance upon criminal history. The categorical nature of these bans fails to take into account the studies relied upon by the City concluding that the seriousness of the crime, number of convictions, and the time since the last conviction are the primary drivers when determining risks of recidivism. *See Yim*, Dkt. #33-6 at 19. Indeed, studies cited by the City show the unsurprising truth that landlords are overwhelmingly willing to rent to individuals with lighter offenses, while they exercise more caution with more serious crimes.

*See Yim*, #33-7 at 6 (citing the Helfgott study); Helfgott, *supra* at 20. The City failed to account for such differences.

Further, the structure of the Ordinance makes clear that one of its purposes is to allow some landlord discretion in taking adverse action against individuals with certain types of criminal history. For example, it does allow a landlord to take adverse action against adult sex offenders for a legitimate business reason, regardless of the gravity or age of the underlying offense. *See* SMC § 14.09.025(A)(3). Meanwhile, a landlord is forbidden from taking adverse action for any offense that does not place that individual on a sex offender registry, regardless of the business reason for such adverse action. Hence, a landlord can never show a legitimate business reason that would justify taking adverse action based on a recently completed sentence for a murder conviction, but she can make such a showing for a long-ago statutory rape offense. This is an arbitrary means of protecting landlord interests. Likewise, the Ordinance's treatment of all non-sex-offenses equally results in similar absurdities, such as treating a dusty shoplifting conviction as if it presents the same risk to landlords and neighbors as a recent armed robbery.

While the Plaintiffs raised this argument below, the district court declined to address it. *See Yim*, Dkt. #66 at 5–6.

### iv. The Ordinance's distinctions between types of housing arrangements are arbitrary

The Ordinance also draws arbitrary distinctions between living arrangements. For instance, a housing provider renting out a residence in a separate structure on the same lot as the housing provider's primary residence can take adverse action based on criminal history. SMC § 14.09.115(D). Meanwhile, the Yims, who live in one of the units of a triplex, cannot take adverse action. Similarly, the Ordinance exempts lessees who are subleasing space. *Id.* This means that a resident who arranges their own lease agreement with a roommate may take adverse action based on a potential or current roommate's criminal history, but neither that resident nor the housing provider can check a roommate's criminal history if the housing provider is the lessor. The Ordinance thus treats similarly situated parties differently for no rational reason that furthers the City's interests. Once again, the district court declined to even address this argument. *See Yim*, Dkt. #66 at 7 n.7.

### v. The Ordinance is unduly oppressive on housing providers' property rights

The burden imposed on the regulated public is a factor that courts consider when assessing rational basis review. *See, e.g., Lawrence v. Texas*, 539 U.S. 558, 575 (2003) ("The stigma this criminal statute imposes, moreover, is not trivial . . . . This underscores the consequential nature of the punishment and the state-sponsored condemnation attendant to the criminal prohibition. Furthermore, the Texas criminal

conviction carries with it the other collateral consequences always following a conviction . . . ."). A law that is "unduly oppressive" fails to satisfy even rational basis review. *See Goldblatt*, 369 U.S. at 594. Evaluation of the law's impact on the regulated public is necessary because "[t]here is no reasonable or rational basis for claiming that the oppressive and unfair methods [are] in any way essential to the [government's objective]." *Haynes v. State of Wash.*, 373 U.S. 503, 519 (1963).

Here, the inability to offer basic protections for neighboring tenants is unduly oppressive, as is the inability to consider a strongly predictive factor in assessing risk of default. Two-thirds of ex-offenders will face re-arrest in the first three years following release. Antenangeli & Durose, *supra* at 1. Over half of these re-arrests result in conviction. *Id.* at 8. These statistics demonstrate that the presence of ex-offenders in a residential unit poses safety and financial risks that housing providers are entitled to consider. Barring landlords from taking such a significant factor into account is unduly oppressive. Yet again, the district court declined to address Plaintiffs' extensive arguments that the "unduly oppressive" test is a valid rational basis factor and that the Ordinance is unduly oppressive. *See, e.g.*, *Yim*, Dkt. #23 at 17–20.

## CONCLUSION

Appellants have a fundamental right to inquire about truthful, publicly available information. They also have a fundamental right to select the individuals

59

who live in their property based on neutral, non-discriminatory criteria. The City's

destruction of these rights does not survive judicial scrutiny. Appellants ask that this

Court reverse the district court and remand with instructions to enter summary

judgment in their favor.

DATED: October 29, 2021.                         Respectfully submitted,

                                                  s/ Ethan W. Blevins

James M. Manley                                  Ethan W. Blevins
Pacific Legal Foundation                         Brian T. Hodges
3241 E. Shea Boulevard, Suite 108                Pacific Legal Foundation
Phoenix, Arizona 85028                           555 Capitol Mall, Suite 1290
Telephone: (916) 419-7111                        Sacramento, California 95814
Email: JManley@pacificlegal.org                  Telephone: (916) 419-7111
                                                 Fax: (916) 419-7747
                                                 Email: EBlevins@pacificlegal.org
                                                 Email: BHodges@pacificlegal.org

*Attorneys for Plaintiffs – Appellants*

## STATEMENT OF RELATED CASES

Counsel for Appellants state there are no related cases within the meaning of

Circuit Rule 28-2.6.

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

  s/  Ethan W. Blevins
                 Ethan W. Blevins

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

9th Cir. Case Number: 21-35567

I am the attorney or self-represented party.

**This brief contains  13,770  words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief (select only one):

    [X] complies with the word limit of Cir. R. 32-1.

    [ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

    [ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

    [ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

    [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

    [ ] it is a joint brief submitted by separately represented parties;

    [ ] a party or parties are filing a single brief in response to multiple briefs; or

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

    [ ] complies with the length limit designated by court order dated _____.

    [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

DATE:  October 29, 2021.       s/  Ethan W. Blevins

                               Ethan W. Blevins

                           *Attorney for Plaintiffs – Appellants*