No. 21-35567

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

CHONG and MARILYN YIM, KELLY LYLES, EILEEN, LLC,
and RENTAL HOUSING ASSOCIATION OF WASHINGTON,

Plaintiffs – Appellants,

v.

THE CITY OF SEATTLE,

Defendant – Appellee.

---

On Appeal from the United States District Court
for the Western District of Washington
Honorable John C. Coughenour, District Judge

---

## EXCERPTS OF RECORD, VOLUME 1 OF 1

---

James M. Manley
Pacific Legal Foundation
3241 E. Shea Boulevard, Suite 108
Phoenix, Arizona 85028
Telephone: (916) 419-7111
Email: JManley@pacificlegal.org

Ethan W. Blevins
Brian T. Hodges
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
Email: EBlevins@pacificlegal.org
Email: BHodges@pacificlegal.org

*Attorneys for Plaintiffs – Appellants*

# Index

| Document Description | ECF No. | Volume | Page |
|---|---|---|---|
| Order on Cross Motions for Summary Judgment, July 6, 2021 | 88 | 1 | 004 |
| Judgment, July 6, 2021 | 89 | 1 | 032 |
| Transcript, Excerpt, Hearing on Cross Motions for Summary Judgment, held July 6, 2021 | | 1 | 033 |
| Certificate of Finality, Washington State Supreme Court, February 5, 2020 | 63 | 1 | 037 |
| Order Granting Motion to Certify Question to Washington Supreme Court, February 5, 2019 | 54 | 1 | 071 |
| Declaration of Asha Venkataraman, Oct. 26, 2018 | 34 | 1 | 074 |
| Plaintiffs' Appendix to Motion for Summary Judgment [Stipulated Facts and Record], Sept. 28, 2018 | 24 | 1 | 082 |
| Notice of Removal from King County Superior Court and Complaint, May 21, 2018 | 1 | 1 | 141 |
| Notice of Appeal, July 14, 2021 | 90 | 1 | 166 |

| | | | |
|---|---|---|---|
| Docket Report, Case No. 2:18-cv-00736-JCC, accessed October 26, 2021 | | 1 | 169 |

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHONG YIM, *et al.*,

Plaintiffs,

v.

CITY OF SEATTLE,

Defendant.

CASE NO. C18-0736-JCC

ORDER

This matter comes before the Court on the parties' cross motions for summary judgment (Dkt. Nos. 23, 33). Having thoroughly considered the parties' briefing and the relevant record, and oral argument from the parties, hereby GRANTS the City of Seattle's motion and DENIES Plaintiffs' motion for the reasons explained herein.

## I.   INTRODUCTION

In late 2017, the City of Seattle enacted the Fair Chance Housing Ordinance, Seattle Municipal Code § 14.09 *et seq.*, which, at its core, prohibits landlords from asking anyone about prospective or current tenants' criminal or arrest history and from taking adverse action against them based on that information.[1] A few months after the Ordinance took effect, three landlords

---

[1] During the COVID-19 pandemic, the City amended the Ordinance to also prohibit landlords from taking adverse action based on evictions occurring during or shortly after the state of emergency caused by the pandemic. *See* S.M.C. § 14.09.026. As a result, the City also renamed the Ordinance the "Fair Chance Housing and Eviction Records Ordinance." *See* S.M.C. §

ORDER
C18-0736-JCC
PAGE - 1

1  and the Rental Housing Association ("RHA"), a trade group comprised of "over 5,300 landlord

2  members," (Dkt. No. 24 at 5), filed the present suit, alleging that the Ordinance violates their

3  federal and state substantive due process rights and their federal and state free speech rights.

4       The section of the Ordinance Plaintiffs challenge contains three provisions that the Court

5  will refer to as the "adverse action provision," the "requirement provision," and the "inquiry

6  provision." *See* S.M.C. § 14.09.025(A)(2). The adverse action provision prohibits "any person"

7  from "tak[ing] an adverse action against a prospective occupant, a tenant, or a member of their

8  household, based on any arrest record, conviction record, or criminal history."[2] *Id.* The

9  requirement provision prohibits "any person" from "[r]equir[ing] disclosure" of "a prospective

10 occupant, a tenant, or a member of their household['s] . . . arrest record, conviction record, or

11 criminal history," and the inquiry provision prohibits "any person" from "inquir[ing] about" the

12 same information, even if it is not required. *Id.*

13      Plaintiffs argue that the adverse action provision violates their federal and state

14 substantive due process rights and that the inquiry provision violates their federal and state free

15 speech rights. (Dkt. No. 48 at 11.) Plaintiffs argue that both provisions are unconstitutional on

16 their face, and that the Court should prohibit the City from enforcing them against anyone. The

17 Court will not do so because neither provision violates Plaintiffs' substantive due process or free

18 speech rights and Plaintiffs have not shown that the Ordinance is unconstitutional on its face.

19 **II.  PROCEDURAL BACKGROUND**

20      The parties stipulated that "discovery and a trial are unnecessary" and that the Court

21 should resolve this matter based on the parties' cross motions for summary judgment, which are

22 based on a stipulated record. (Dkt. Nos. 9 at 2, 24, 33-1–33-13.) The parties further stipulated

---

14.09.005. Because only the criminal history provisions are relevant here, and because the
parties use the previous name, the Court refers to the Ordinance as the "Fair Chance Housing
Ordinance."

[2] "Adverse action" is defined to include, among other things, refusing to rent to the person,
evicting the person, or charging higher rent. S.M.C. § 14.09.010.

1  that if the Court determines that there is a genuine issue of material fact, it should resolve the

2  disputed factual issue based on the record before it, without holding a trial. (Dkt. No. 9 at 2–3.)

3  ## III.   LEGAL STANDARD

4  "The court shall grant summary judgment if the movant shows that there is no genuine

5  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

6  Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing

7  law," and a dispute of fact is genuine if "the evidence is such that a reasonable jury could return

8  a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

9  ## IV.   DISCUSSION

10  ### A.   Substantive Due Process

11  The Fourteenth Amendment of the United States Constitution provides that "No state

12  shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const.

13  amend. XIV, § 1. This provision "guards against arbitrary and capricious government action,

14  even when the decision to take that action is made through procedures that are in themselves

15  constitutionally adequate." *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398,

16  1407 (9th Cir. 1989), *overruled on other grounds by Armendariz v. Penman*, 75 F.3d 1311 (9th

17  Cir. 1996). The Washington Constitution provides the same protection. *See* Wash. Const. art. I,

18  § 3. The Court certified several questions regarding Plaintiffs' state substantive due process

19  claims to the Washington Supreme Court, which concluded that "state substantive due process

20  claims are subject to the same standards as federal substantive due process claims." *Yim v. City*

21  *of Seattle*, 451 P.3d 694, 696 (Wash. 2019). Therefore, the Court's analysis of both claims

22  merges.[3]

23  "To establish a substantive due process claim, a plaintiff must, as a threshold matter,

24

25  _____

26  [3] The Court agrees with the parties that the Washington Supreme Court's analysis of federal law in *Yim* is not binding on this Court and therefore the Court analyzes Plaintiffs' due process claims independently.

show a government deprivation of life, liberty, or property." *Nunez v. City of L.A.*, 147 F.3d 867, 871 (9th Cir. 1998). Plaintiffs allege that the City has deprived them of their "right to rent their property to whom they choose, at a price they choose, subject to reasonable anti-discrimination measures."[4] (Dkt. No. 1-1 at 3.) The source of this property right is not clear. Plaintiffs originally cited Washington law, (*id*), but after the Washington Supreme Court answered the Court's certified questions Plaintiffs cited two different U.S. Supreme Court opinions: one that is nearly one-hundred years old, (*see* Dkt. No. 70 at 4 n.1 (citing *Terrace v. Thompson*, 263 U.S. 197, 215 (1923)), and another that was decided well after they filed their complaint, (*see* Dkt. No. 84 (citing *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021)). But the Supreme Court has made clear that "[p]roperty interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Because the City does not dispute that such a property right exists or that the Ordinance deprives Plaintiffs of that right, the Court assumes without deciding that the Ordinance deprives Plaintiffs of a property right.[5]

The parties disagree about the next step of the analysis. Plaintiffs argue that because a property right is involved, the Court must examine whether the Ordinance "substantially advances" a legitimate public purpose, (Dkt. Nos. 23 at 24, 48 at 30–32), meaning the Court must determine whether the Ordinance "is *effective* in achieving some legitimate public purpose," *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 542 (2005). The City argues that the Court's analysis should be more deferential, and that it must determine "only whether the government could have harbored a rational [and legitimate] reason for adopting the law." (Dkt. No. 69 at 3.) According to the City, its *actual* purpose in enacting the Ordinance and the

---

[4] Plaintiffs do not argue that the Ordinance affects the RHA's property rights, so the Court understands only the landlord Plaintiffs to assert substantive due process claims.

[5] The Ordinance does not regulate price, so the Court focuses exclusively on landlords' alleged right to rent to whom they choose.

Ordinance's actual effectiveness in achieving that purpose are not relevant to the due process analysis. (*Id.* at 9.) The City is correct.

Nearly a century ago, the Supreme Court held that a municipal ordinance does not violate a property owner's substantive due process rights unless it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." *Vill. of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926). The Court has repeatedly reaffirmed this rule. *See, e.g.*, *Nebbia v. People of N.Y.*, 291 U.S. 502, 537 (1934) ("If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied . . . ."); *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 124–25 (1978) (upholding statute that bore "a reasonable relation to the State's legitimate purpose" and declining to analyze "the ultimate economic efficacy of the statute"). Most recently, in *Lingle*, the Court confirmed that it has "long eschewed [the] heightened scrutiny" that the substantially advances test requires "when addressing substantive due process challenges to government regulation." 544 U.S. at 545. Instead, courts must defer "to legislative judgments about the need for, and likely effectiveness of, regulatory actions." *Id.* It is no surprise then that the Ninth Circuit has continued to apply the rational basis test to property-based substantive due process claims after *Lingle*. *See, e.g.*, *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 484 (9th Cir. 2008) ("The irreducible minimum of a substantive due process claim challenging land use regulation is failure to advance *any* governmental purpose.") (emphasis added).

To determine whether the Ordinance violates Plaintiffs' substantive due process rights, the Court must determine whether the Ordinance could advance any legitimate government purpose. *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234 (9th Cir. 1994) ("In a substantive due process challenge, we do not require that the City's legislative acts actually advance its stated purposes, but instead look to whether 'the governmental body *could* have had no legitimate reason for its decision.'") (quoting *Levald, Inc. v. City of Palm Desert*, 998 F.2d

680, 690 (9th Cir. 1993)). The Court need not stray into the hypothetical, however, because the City's *actual* reasons for enacting the statute are legitimate, and, as discussed in detail below, the Ordinance directly advances those legitimate purposes. *See infra* Section B(3)(c). Therefore, with respect to the substantive due process claims, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS the City's motion for summary judgment.

### B.      Free Speech

Plaintiffs' central claims are their free speech claims. The parties assume that the scope of the free speech clause in Washington's constitution is coextensive with the First Amendment in this context and the Court will assume the same. (*See* Dkt. Nos. 23 at 9 n.2, 33 at 13 n.38.) Before turning to the merits of Plaintiffs' claims, the Court must first define the scope of their challenge.

The Court understands Plaintiffs to challenge only the inquiry provision on free speech grounds.[6] That provision prohibits "any person" from "inquir[ing] about . . . a prospective occupant, a tenant, or a member of their household['s] . . . arrest record, conviction record, or criminal history." S.M.C. § 14.09.025(A)(2). Plaintiffs challenge the inquiry provision on its face, meaning they request that the Court enjoin the City from enforcing it against *anyone*, not just the plaintiffs before the Court. (*See* Dkt. No. 1-1 at 18–19.) "To succeed in a typical facial attack, [Plaintiffs] would have to establish 'that no set of circumstances exists under which [the Ordinance] would be valid,' or that [it] lacks any 'plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 472 (2010) (internal citations omitted). In the First Amendment context, however, a plaintiff may assert an overbreadth challenge, which is less demanding than a typical facial challenge. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6

---

[6] To the extent Plaintiffs challenge the requirement provision, the Court concludes that it does not violate the First Amendment because it governs conduct and only incidentally burdens speech. *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011) ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."); *see also Rumsfeld v. F. for Acad. and Inst'l Rts., Inc.*, 547 U.S. 47, 62 (2006).

1   (2008). To succeed on their overbreadth challenge, Plaintiffs must show that "a substantial

2   number of [the Ordinance's] applications are unconstitutional, judged in relation to [its] plainly

3   legitimate sweep." *Stevens*, 559 U.S. at 473 (quoting *Wash. State Grange*, 552 U.S. at 449 n.6).

4   Plaintiffs' theory has shifted over the course of the litigation. In their opening brief,

5   Plaintiffs assert only a traditional facial challenge and do not mention the overbreadth doctrine.

6   (*See* Dkt. No. 23.) Twenty-one pages into their combined reply and response to the City's

7   motion, however, Plaintiffs introduce a two-paragraph overbreadth argument for the first time.

8   (*See* Dkt. No. 48 at 28–29.) Ordinarily "arguments raised for the first time in a reply brief are

9   waived," *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010), but the Court will consider the

10   overbreadth argument here because the brief in which it was introduced is also Plaintiffs'

11   response to the City's motion for summary judgment and the City had an opportunity to respond

12   to it.

13   Although Plaintiffs purport to challenge the inquiry provision in its entirety, the Court

14   concludes that Plaintiffs lack Article III standing to challenge the inquiry provision with respect

15   to inquiries about current tenants.[7] To establish Article III standing to challenge the tenants

16   provision, Plaintiffs must demonstrate that they have suffered an injury in fact that is fairly

17   traceable to that provision and that is likely to be redressed by a favorable decision. *Lujan v.*

18   *Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also California v. Texas*, 141 S. Ct. 2104,

19   2119–20 (2021) (holding that a plaintiff lacks standing to challenge a statutory provision if he or

20   she cannot demonstrate that that particular provision caused his or her injuries).

21   In the First Amendment context, a plaintiff can establish an injury in fact by showing that

22   a statute chilled his or her speech. *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870

23

24   ───────────────
     [7] The parties purport to stipulate to Plaintiffs' standing, (Dkt. No. 24 at 3), but "consent cannot
25   confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III,
     § 2," *Commodity Future Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986). *See also Sosna v.*
26   *Iowa*, 419 U.S. 393, 398 (1975) (parties "may not by stipulation invoke the judicial power of the
     United States").

1    (9th Cir. 2013). A plaintiff may also establish an injury in fact by "demonstrat[ing] a realistic

2    danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt*

3    *v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). To do so, the plaintiff must

4    demonstrate a concrete "intention to engage in a course of conduct arguably affected with a

5    constitutional interest, but proscribed by a statute, and there exists a credible threat of

6    prosecution thereunder." *Id.*; *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139

7    (9th Cir. 2000). "[N]either the mere existence of a proscriptive statute nor a generalized threat of

8    prosecution" suffices. *Thomas*, 220 F.3d at 1139. In sum, to have standing to challenge the

9    tenants provision, Plaintiffs must show that the statute has already chilled their speech or that

10   they have concrete plans to ask current tenants about their criminal history in the future but have

11   refrained because of a realistic risk of the City enforcing the Ordinance against them. At

12   summary judgment, Plaintiffs must establish standing with "affidavit[s] or other evidence."

13   *Lujan*, 504 U.S. at 561.

14        Plaintiffs have not met their burden. The landlord plaintiffs do not allege that they have

15   ever asked a current tenant about his or her criminal history in the past, nor do they allege that

16   they intend to do so in the future. Further, nothing in the record shows that the RHA has ever run

17   a background check on a current tenant or that it has concrete plans to do so in the future. Indeed,

18   the fact that the RHA requires landlords to submit a "rental applicant's application" before

19   running a background check suggests that the RHA runs background checks only on prospective

20   occupants.[8] (Dkt. No. 24 at 6.) Therefore, none of the plaintiffs have demonstrated that they have

21   standing to challenge the tenants provision. Accordingly, the Court DISMISSES Plaintiffs' free

---

[8] To be sure, it is possible that some landlords require current tenants to apply to renew their
leases each year and that these landlords purchase background reports regarding these tenants
from the RHA, but nothing in the record shows that to be the case, and the Court cannot
conclude that the RHA has standing based on speculation. *Lujan*, 504 U.S. at 561. Further, even
if Plaintiffs had produced this evidence, they would have standing only if these individuals
would fall under the tenants provision instead of or in addition to the prospective occupants
provision.

ORDER
C18-0736-JCC
PAGE - 8

speech claims aimed at the tenants provision, and the Court's analysis of Plaintiffs' free speech claims will focus exclusively on the prospective occupants provision.

1.   The Ordinance Regulates Speech and the First Amendment Applies.

The City argues that the inquiry provision does not implicate the First Amendment because it regulates conduct, not speech. (*See* Dkt. Nos. 33 at 14–16, 50 at 5–6.) The Court disagrees. The inquiry provision directly regulates speech: it prohibits "any person" from "inquir[ing] about . . . a prospective occupant, a tenant, or a member of their household['s] . . . arrest record, conviction record, or criminal history." S.M.C. § 14.09.025(A)(2). Therefore, it implicates the First Amendment because it regulates what people can *ask*, not just what they can do. To the extent there is any doubt about the effect of the Ordinance, its disclaimer provision dispels it by requiring landlords to state on their rental applications "that the landlord is prohibited from . . . *asking about* . . . any arrest record, conviction record, or criminal history . . . ." S.M.C. § 14.09.020 (emphasis added).

The inquiry provision is a content-based restriction on speech because it prohibits landlords from asking about certain content: prospective occupants' criminal history. *See Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009). Therefore, it is subject to heightened scrutiny. *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 957 (9th Cir. 2012). The level of scrutiny turns on the nature of the regulated speech. *Id.* If the Ordinance governs non-commercial speech, as Plaintiffs argue, the provision is subject to strict scrutiny. *Id.* If the Ordinance governs commercial speech, as the City argues, the provision is subject to intermediate scrutiny. *Id.*

2.   At its Core, the Inquiry Provision Regulates Commercial Speech.

The Court starts with the core of the inquiry provision, which prohibits landlords from asking prospective occupants or other entities, like the RHA, about prospective occupants' criminal histories. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989) ("It is not . . . generally desirable to proceed to an overbreadth issue unnecessarily—that is, before it

1    is determined that the statute would be valid as applied."). Plaintiffs argue that the inquiry

2    provision does not regulate commercial speech because "the commercial speech doctrine applies

3    only to 'speech which does no more than propose a commercial transaction,'" (Dkt. No. 48 at 14

4    (quoting *Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)), and "criminal history is

5    not a proposal to engage in a commercial transaction," (Dkt. No. 48 at 15). This argument

6    suggests Plaintiffs misunderstand the commercial speech doctrine.

7            Plaintiffs are correct that "the core notion of commercial speech" is "speech which does

8    no more than propose a commercial transaction." *Bolger,* 463 U.S. at 66 (quoting *Va. State Bd.*

9    *of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). But when

10   evaluating whether a statute governs commercial speech, courts look to the context in which the

11   speech appears, not just to the speech in isolation. *See, e.g., Bolger*, 463 U.S. at 67–68

12   (explaining that speech about public issues "in the context of commercial transactions" is entitled

13   to less First Amendment protection than the same speech in other contexts). Thus, the Supreme

14   Court has held that a rule governing the use of CPA and CFP designations in accountant

15   advertising regulated commercial speech even though the terms "CFA" and "CFP," in isolation,

16   do not propose a commercial transaction. *See Ibanez v. Fla. Dep't of Bus. and Pro. Regul.*, 512

17   U.S. 136, 142 (1994). Similarly, the Ninth Circuit has held that statutes regulating companies'

18   use of words like "biodegradable" and "recyclable" in their advertising and physicians' use of

19   the term "board certified" governed commercial speech, even though the words "biodegradable,"

20   "recyclable," and "board certified" do not propose commercial transactions. *See Am. Acad. of*

21   *Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (board certified); *Assoc. of Nat'l*

22   *Advertisers, Inc. v. Lungren*, 44 F.3d 726, 728–29 (9th Cir. 1994) (biodegradable, recyclable);

23   *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481–82 (1995) (assuming that "information

24   on beer labels constitutes commercial speech"). These cases demonstrate that when determining

25   whether speech proposes a commercial transaction, the Court must look to the context in which

26   the speech appears, not just to the speech in isolation.

ORDER
C18-0736-JCC
PAGE - 10

Further, "speech that does not propose a commercial transaction on its face can still be commercial speech." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021). For example, in *Bolger* itself the Supreme Court held that "an eight-page pamphlet discussing at length the problem of venereal disease and the use and advantages of condoms in aiding the prevention of venereal disease" was commercial speech even though it did not expressly propose a transaction and the only commercial element was a statement at the bottom of the last page explaining that "the pamphlet [was] contributed as a public service by Youngs, the distributor of Trojan-brand prophylactics." 463 U.S. at 62 n.4, 68. In *Ariix*, the Ninth Circuit held that a book that purported to "describe[] the science of nutritional supplements and provide[] [objective] ratings for various nutritional supplement products" was commercial speech because it was actually "a sophisticated marketing sham" that promoted a particular manufacturer's products but did not expressly propose a commercial transaction. 985 F.3d at 1115, 1118. And in *Jordan v. Jewel Food Stores, Inc.*, the Seventh Circuit held that advertisements that promote "brand awareness or loyalty" are commercial speech even if they do not expressly propose a transaction. 743 F.3d 509, 518 (7th Cir. 2014).

"Because of the difficulty of drawing clear lines between commercial and non-commercial speech, the Supreme Court in *Bolger* outlined three factors to consider." *Ariix*, 985 F.3d at 1115. There, the Court considered whether the speech (1) occurred in the context of an advertisement, (2) referred to a specific product, and (3) whether the speaker spoke primarily because of his or her economic motivation. *See Bolger*, 463 U.S. at 671; *Ariix*, 985 F.2d at 1116–17. The "*Bolger* factors are important guideposts, but they are not dispositive." *Ariix*, 985 F.3d at 1116. Speech may be commercial speech even if fewer than all three factors are present. *See Bolger*, 463 U.S. at 67 n.14.

With these principles in mind, the Court turns to the core of the statute here.[9] A

_____

[9] The Supreme Court has also recognized a second, broader category of commercial speech: speech "related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980). This second definition has

prospective occupant is "any person who seeks to lease, sublease, or rent real property." S.M.C. § 14.09.010. Most instances in which a landlord asks someone seeking to rent property about his or her criminal history are commercial speech. For example, the record suggests that some landlords included questions about criminal history on their rental applications before the Ordinance was enacted.[10] Rental applications fall squarely within the core notion of commercial speech: they are documents that propose a commercial transaction between a landlord and a prospective occupant. Therefore, when the City regulates what landlords can ask in their rental applications, it regulates commercial speech. Landlords also engage in commercial speech when they ask prospective occupants about their criminal history while showing them the property or discussing its features and the terms of the rental. In those circumstances, the purpose of the speech is to advertise a particular product—property rental—and the landlord's motivation for speaking is primarily economic. Thus, many core applications of the statute constitute commercial speech. *See, e.g.*, *Campbell v. Robb*, 162 F. App'x 460, 469 (6th Cir. 2006) (holding that "a statement made by a landlord to a prospective tenant describing the conditions of rental" falls within the core definition of commercial speech); *S.F. Apartment Ass'n v. City and Cnty. of S.F.*, 881 F.3d 1169, 1176 (9th Cir. 2018) (holding that "a discussion between a landlord and a tenant about the possibility of entering into a buyout agreement is commercial speech"); *see also Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 137 (3d Cir. 2020) (holding that City ordinance prohibiting employers from asking applicants about their salary history regulates

---

been criticized from the start, *see id.* at 579–80 (Stevens, J. concurring in the judgment) (arguing that this definition of commercial speech is "too broad"), but the Supreme Court has not expressly overruled this portion of *Central Hudson* so lower courts must continue to apply it. *Nunez-Reyes v. Holder*, 646 F.3d 684, 692 (9th Cir. 2011). Nevertheless, because most, if not all, of the speech the inquiry provision regulates falls within the first definition, the Court need not examine this broader definition.

[10] According to the stipulated facts, after the Ordinance was enacted, the RHA "created a new model application for tenancy for Seattle Landlord members that . . . omits questions about criminal history." (Dkt. No. 24 at 7.) The previous model application is not in the record, but the clear implication is that the previous version asked about criminal history.

commercial speech).

Plaintiffs argue that many landlords seek criminal history information from the RHA, and that speech between landlords and the RHA is not commercial speech because the RHA is not a party to the underlying rental transaction between the landlord and tenant. (*See* Dkt. No. 48 at 17.) But that framing overlooks that the only speech the Ordinance restricts between a landlord and the RHA is a proposal to engage in *a separate* commercial transaction—the purchase of a background report.

The RHA's website advertises various "Screening Products" landlords can purchase, including a "Background Screening" package for "$25 per applicant" and a "Seattle Premium" screening package for "$45 per applicant."[11] *See* Rental Housing Association of WA, *Screening Products*, RHAWA.org (July 6, 2021, 8:10 AM), https://www.rhawa.org/tenant-screening##. A landlord wishing to purchase a background report may do so by logging onto the RHA's online system and entering an "applicant's name, date of birth, and social security number" and submitting "the rental applicant's application" and "the applicant's consent to be screened." (Dkt. No. 24 at 6–7.) In addition, the landlord must pay for the report.[12] After a landlord purchases a report, the RHA obtains a background report from a company called Innovative Software Solutions and provides a copy to the landlord without any "alter[ation] or re-format[ting] by the RHA." (*Id.*) Landlords may also request the report by e-mail or by fax. (*Id.* at 6.) In short, landlords pay the RHA to serve as a middleman between them and Innovative

---

[11] The Court takes judicial notice of the website pursuant to Federal Rule of Evidence 201(c)(1) because the parties cannot reasonably question the accuracy of the RHA's website regarding this point. Fed. R. Evid. 201(b)(2).

[12] The stipulated facts omit the fact that landlords must pay for the reports, and Plaintiffs' briefing characterizes the communication between a landlord and the RHA as a "request" or "query." (Dkt. Nos. 24 at 5–7, 48 at 10.) Plaintiffs' briefing also refers generically to "screening companies . . . offer[ing] information for a price," (Dkt. No. 23 at 13), and landlords purchasing background reports, (Dkt. No. 48 at 15), but studiously avoids drawing attention to the fact that *the RHA* sells background reports. Whether that framing was intentional or inadvertent, there is no dispute that to obtain a background report from the RHA, a landlord must *purchase* the report, not just "request" criminal history information.

1    Software Solutions.

2    The speech the Ordinance covers—a landlord specifying the background check he or she

3    wishes to purchase—is quintessential commercial speech. It boils down to the landlord asking,

4    "Can I purchase a background report for this particular applicant?" Therefore, these applications

5    of the statute also regulate commercial speech.

6    3.   <u>The Core of the Statute is Constitutional.</u>

7    When evaluating the permissibility of government restrictions on commercial speech, the

8    Court must evaluate four factors. First, the Court must determine whether the speech concerns

9    unlawful activity or is misleading. *Central Hudson*, 447 U.S. at 566. If so, it is not entitled to

10   First Amendment protection and the government may ban it "without further justification."

11   *Edenfield v. Fane*, 507 U.S. 761, 768 (1993). If not, the government may regulate the speech if it

12   satisfies the following three-part test: "First, the government must assert a substantial interest in

13   support of the regulation; second, the government must demonstrate that the restriction on

14   commercial speech directly and materially advances that interest; and third, the regulation must

15   be 'narrowly drawn.'" *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 624 (1995) (quoting *Central*

16   *Hudson*, 447 U.S. at 564–65).

17      a.  *The Ordinance Does Not Regulate Speech that is Misleading or that Concerns Unlawful*
18          *Activity.*

19   The inquiry provision does not target misleading speech. Indeed, the central purpose of

20   the Ordinance is to prevent landlords from learning and using *true* information about prospective

21   occupants' criminal histories. The Ordinance also does not regulate speech concerning unlawful

22   activity. That limitation "has traditionally focused on . . . whether the speech proposes an illegal

23   transaction . . . instead of whether the speech is associated with unlawful activity." *Valle Del Sol,*

24   *Inc. v. Whiting*, 709 F.3d 808, 821 (9th Cir. 2013). The speech at issue here does not propose an

25   illegal transaction.

26      b.  *The City's Interests in Reducing Barriers to Housing for People with Criminal Records*

ORDER
C18-0736-JCC
PAGE - 14

*and Combatting Racial Discrimination in Housing are Substantial.*

When determining whether the government's interest in regulating commercial speech is substantial, the Court may consider only "the interests the [government] itself asserts." *Edenfield*, 507 U.S. at 768. In other words, the Court may not supply hypothetical interests that the government could have but did not offer. *Id.* Further, the Court need not accept the interests the government offers "if it appears that the stated interests are not the actual interests served by the restriction." *Id.*

The City argues the Ordinance advances two interests: "reduc[ing] barriers to housing faced by people with criminal records and . . . lessen[ing] the use of criminal history as a proxy to discriminate against people of color disproportionately represented in the criminal justice system."[13] (Dkt. No. 33 at 20.) Plaintiffs all but concede that these interests are substantial, and the Court agrees that they are.

Plaintiffs appear to argue that the Court should not consider the City's professed interest in combatting racial discrimination because that interest did not actually motivate the City in enacting the Ordinance. (*See* Dkt. No. 48 at 8–9 (arguing that "[r]acial discrimination is not the issue here").) However, the Ordinance's recitals identify "racial inequities in the criminal justice system [that] are compounded by racial bias in the rental applicant selection process" as one of the reasons the City enacted the Ordinance. (Dkt. 33-12 at 57.) Further, the record shows that the City was concerned with racial discrimination when it was considering the legislation. In May 2017, the Director of Seattle's Office for Civil Rights sent a letter to the City Council's Civil Rights Committee that identified "Racial equity" as "Goal 2" of the proposed legislation. (Dkt. No. 33-6 at 19.) Two months later, the Office for Civil Rights moved "Racial equity" to "Goal 1." (Dkt. No. 33-7 at 7.) Plaintiffs do not cite any evidence suggesting that the City's professed

---

[13] Although the City does not state it as clearly, the City advances a third interest: counteracting the disparate impact the use of criminal history in housing decisions has on people of color, even absent intentional discrimination. (*See, e.g.*, Dkt. No. 33 at 8–9.) Because the Court concludes the other two interests are substantial, the Court need not examine this third interest.

1  interest in combatting racial discrimination is just a *post hoc* litigating position. Therefore, there

2  is no genuine dispute that one of the reasons the City enacted the Ordinance was to combat racial

3  discrimination.[14]

4          Plaintiffs also argue that the Ordinance's limited exemption for federally funded housing

5  demonstrates that both of the City's proffered interests are pretextual and that its actual purpose

6  in enacting the Ordinance was to burden private landlords while advantaging City-owned public

7  housing. (*See* Dkt. Nos. 23 at 14–17, 48 at 23–25.) This argument strains credulity. While it is

8  true that a statute's underinclusiveness could raise "doubts about whether the government is in

9  fact pursuing the interest it invokes," the narrow exemption Plaintiffs complain about does not.

10 *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011). That exemption provides:

11             This Chapter 14.09 shall not apply to an adverse action taken by landlords of
12             federally assisted housing subject to federal regulations that require denial of
               tenancy, including but not limited to when any member of the household is
13             subject to a lifetime sex offender registration requirement under a state sex
               offender registration program and/or convicted of manufacture or production of
14             methamphetamine on the premises of federally assisted housing.

15 S.M.C. § 14.09.115(B). Although the City likely intended it to do so, this provision does not

16 actually exempt federally funded public housing providers from the inquiry provision, which is

17 the only provision Plaintiffs challenge on free speech grounds. It states only that the Chapter

18 does not apply "to an adverse action taken by" a public housing provider; it never says that the

19 Chapter does not apply to an inquiry by the provider. The provision that appears to exempt

20 federally funded public housing providers from the inquiry provision is the first exemption,

21 which provides that the Ordinance "shall not be interpreted or applied to diminish or conflict

22 with any requirements of state or federal law." S.M.C. § 14.09.115(A). Regardless, both

23 provisions support the City's explanation that it sought to avoid enacting an Ordinance that could

24 be preempted by federal law; they do not show that the City intended to burden private landlords

25

26 ——————————————
   [14] To the extent there is a genuine dispute, the Court resolves the dispute in favor of the City and
   finds that one of the reasons the City enacted the Ordinance was to combat racial discrimination.

1    while advantaging publicly funded housing. (*See* Dkt. No. 50 at 10.)

2        *c.*  *The Ordinance Directly Advances the City's Interests in Reducing Barriers to Housing*

3            *for People with Criminal Records and Combatting Racial Discrimination.*

4           The City bears the burden of showing that the Ordinance directly advances its proffered

5    interests. *Edenfield*, 507 U.S. at 770. "This burden is not satisfied by mere speculation or

6    conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech

7    must demonstrate that the harms it recites are real and that its restriction will in fact alleviate

8    them to a material degree." *Id.* at 770–71. The City's burden is not a heavy one. The City must

9    show only that it did not enact the Ordinance "based on mere 'speculation and conjecture.'"

10   *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 561 (2001) (quoting *Edenfield*, 507 U.S. at 770).

11   When making that determination the Court's role is not "to reweigh the evidence *de novo*, or to

12   replace [the City's] factual predictions with [its] own." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S.

13   622, 666 (1994). It is only to ensure that "the municipality's evidence . . . fairly support[s] the

14   municipality's rationale for its ordinance." *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425,

15   438 (2002).

16          The Supreme Court has not provided detailed guidance in a commercial speech case

17   about what kind evidence is required. At one end of the spectrum, the Court held in *Edenfield*

18   that the government fails to meet its burden when it offers "*no* evidence or anecdotes in support

19   of its restriction." *Fla. Bar*, 515 U.S. at 628 (characterizing *Edenfield*). At the other end of the

20   spectrum, the Court held in *Florida Bar* that "a 106-page summary of [a] 2-year study" that

21   contained "both statistical and anecdotal" evidence supporting the government's conclusion

22   sufficed. *Id.* at 626–29. Plaintiffs suggest that *Florida Bar* set the constitutional floor, and that

23   the Court must strike down the Ordinance unless the City provides evidence similar to the 106-

24   page summary of the study in that case. (*See* Dkt. No. 48 at 19.) The Court disagrees.

25          The Supreme Court has held that "the validity of restrictions on commercial speech

26   should not be judged by standards more stringent than those applied to expressive conduct . . . or

ORDER
C18-0736-JCC
PAGE - 17

to relevant time, place, or manner restrictions." *United States v. Edge Broad. Co.*, 509 U.S. 418, 429 (1993). Thus, when faced with gaps in its commercial speech jurisprudence, the Court has looked to those "other First Amendment contexts" for guidance. *Fla. Bar*, 515 U.S. at 628; *see also Edge Broad.*, 509 U.S. at 429–31; *Fox*, 492 U.S. at 477–79. In *Alameda Books*, Justice O'Connor, writing for four justices, explained that the government is not required to justify a time, place, or manner restriction with "empirical data" because a "municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously." 535 U.S. 425, 439–40 (2002). Justice Kennedy concurred in the judgment and in the plurality's analysis of "how much evidence is required," *id.* at 449, ultimately concluding that "a city must have latitude to experiment, at least at the outset, and that very little evidence is required," *id.* at 451. Accordingly, in addition to or instead of empirical data, the government may rely on anecdotes, "history, consensus, and 'simple common sense.'" *Fla. Bar*, 515 U.S. at 628 (quoting *Burson v. Freeman*, 504 U.S. 191, 211 (1992).

     i.   <u>The Ordinance Directly Advances the City's Interest in Reducing Barriers to Housing for Individuals with Criminal Records.</u>

Plaintiffs concede that the record demonstrates "that many people have criminal records, that such records are disproportionately held by minorities, that stable housing helps these individuals to re-integrate into society, and that those with a criminal history tend to struggle with housing." (Dkt. No. 48 at 19.) Plaintiffs argue, however, that the City has not shown that the Ordinance directly advances its interest in reducing barriers to housing for people with criminal records because the record does not show "that landlords frequently reject potential tenants solely because of their criminal records." (*Id.*)

Before turning to the record, the Court makes two observations. First, the City is not required to show that landlords reject potential tenants "solely" because of their criminal records. If a prospective occupant's criminal record is one of several factors that contributes to a

landlord's decision to refuse to rent to him, the City could reasonably conclude that the Ordinance would materially reduce barriers to housing for those with criminal records. Second, the City is not required to show that landlords reject applicants based on criminal history "frequently." While the City must show that housing discrimination against individuals with criminal records is real, the City is not required to wait for some threshold number of residents to face discrimination before acting. With these clarifications, the Court turns to the record, which contains both empirical and anecdotal evidence demonstrating that some landlords in Seattle rejected potential tenants based on their criminal records before the Ordinance was enacted.[15]

First, the City cites to a 1997 study in which the author surveyed ex-offenders and property managers in Seattle about barriers to housing for people released from prison. *See* Jacqueline Helfgott, *Ex-offender Needs Versus Community Opportunity in Seattle, Washington*, 61 Fed. Probation 12 (1997). Out of 196 property managers surveyed, 43% "said that they would be inclined to reject an applicant with a criminal conviction." *Id.* at 20. The most common reason property managers were inclined to reject applicants with criminal records was to ensure the safety of the community, and the second most common reason was that "ex-offenders are not wanted on the property or in the neighborhood because they have bad values." *Id.* One landlord commented, "I don't like these people. They should all stay in jail." *Id.* This finding was consistent with the survey of ex-offenders, who reported that "housing was the[ir] most difficult need to meet," in part, because of "discrimination as a result of ex-offender status." *Id.* at 16.

Second, the City considered anecdotal evidence from members of the public. On May 23, 2017, the City heard from a social worker assisting individuals in a law enforcement diversion program who testified that "a majority" of the "over 400" people in the program are "unable to access the rental market because of their criminal histories." *Civil Rights, Utilities, Economic*

---

[15] Because the three categories of evidence the Court examines suffice to show that the inquiry provision directly advances the City's interests, the Court need not examine every piece of evidence the City considered before enacting the Ordinance.

1   *Development & Arts Committee 5/23/17*, SEATTLE CHANNEL (May 23, 2017),

2   http://www.seattlechannel.org/mayor-and-council/city-council/2016/2017-civil-rights-utilities-

3   economic-development-and-arts-committee/?videoid=x76441 (28:00–30:04). She reported that

4   "on a daily basis" she has "conversations with landlords who say, 'We don't accept individuals

5   here with any drug conviction. We don't accept individuals here with any theft conviction.'" *Id.*

6   at 28:23–28:34. A housing case manager with Catholic Community Services whose "job boils

7   down to calling private landlords and asking if they're willing to rent to someone with [certain]

8   conviction[s]," *id.* at 24:01–24:18, reported that although Catholic Community Services "offers a

9   guaranteed payment of up to a certain dollar amount for landlords during a certain period of time

10  . . . it is still extremely difficult for [the organization] to house the people [it] work[s] with, with

11  criminal backgrounds," *Civil Rights, Utilities, Economic Development & Arts Committee*

12  *7/13/17*, SEATTLE CHANNEL (May 23, 2017), http://www.seattlechannel.org/mayor-and-

13  council/city-council/2016/2017-civil-rights-utilities-economic-development-and-arts-

14  committee/?videoid=x78912 (1:50:18–1:50:53). The City also heard from individuals who

15  testified that they had been denied housing based on their criminal histories. (*See* Dkt. No. 34 at

16  5.)

17          Third, the City was aware that some landlords were asking prospective occupants about

18  their criminal history. *See* Dkt. No. 33-12 at 56; *see also* Helfgott at 20 (finding that 67% of

19  property managers surveyed "indicated that they inquire about criminal history on rental

20  applications"). Landlords do not often include questions on their rental applications just because

21  they are curious, and the City was entitled to use common sense to infer that the reason landlords

22  were asking for that information during the application process was to use it to screen applicants.

23          Plaintiffs argue the City could not have reasonably concluded that any landlords had

24  refused to rent to people based on their criminal history because the evidence it considered

25  shows only "correlation, not causation" and did not "control for . . . other variables," such as

26  limited credit history, that might be causing individuals with criminal records to struggle to

ORDER
C18-0736-JCC
PAGE - 20

1   secure housing. (Dkt. No. 48 at 22.) This argument is not persuasive.

2   First, in *Alameda Books* the Supreme Court held that the government may rely on

3   evidence that is "consistent with" the government's theory and it is not required to "prove that its

4   theory is the only one that can plausibly explain the data." *See* 535 U.S. at 435–39. In other

5   words, the government is not required to isolate the other variables and conclusively establish

6   that its theory about why a particular social problem is occurring is the only cause before

7   legislating. *See id.* at 436–37 (holding that the government "does not bear the burden of

8   providing evidence that rules out every theory . . . that is inconsistent with its own."). That

9   alternative theories may also explain the evidence does not render the Ordinance

10  unconstitutional.

11  Second, the City *did* consider evidence showing that some landlords took adverse action

12  against prospective occupants based on their criminal history. The City heard testimony from

13  people who were told directly by landlords that they would not rent to people who had been

14  convicted of certain crimes. It also considered the Helfgott study, which reported that the two

15  primary reasons landlords were not inclined to rent to individuals with criminal histories were to

16  ensure the safety of the community and because people with criminal records were not welcome

17  because they have bad values. Therefore, although it was not required, the City considered

18  evidence showing that criminal history *itself* is a barrier to housing, even when considered in

19  isolation from other variables like credit history.

20  Plaintiffs complain that the evidence the City considered is not reliable because the

21  public comments were "unsworn" and the Helfgott study is "dated" and has "a small sample

22  size." (Dkt. No. 48 at 19, 21.) But the Supreme Court has not limited the kind of evidence a

23  legislature may consider. In fact, it has expressly rejected some of the arguments Plaintiffs make

24  now. For instance, in *Florida Bar*, the Court held, over the dissent's objection, that the

25  government was entitled to rely on a report that summarized survey results with "few indications

26  of the sample size . . . and no copies of the actual surveys employed." 515 U.S. at 628. And in

ORDER
C18-0736-JCC
PAGE - 21

1    *Alameda Books*, the Court held that the government was entitled to rely on a survey that was

2    several years old. 535 U.S. at 430. At bottom, the Court's role is to determine whether *the*

3    *legislature* could have reasonably concluded from the evidence before it that prohibiting

4    landlords from asking about criminal history would materially advance its interest in reducing

5    barriers to housing for people with criminal histories. Based on the evidence above, the City's

6    conclusion was reasonable.

7          ii.    The Ordinance Directly Advances the City's Interest in Combatting Racial

8                 Discrimination in Housing.

9          Plaintiffs do not argue that the Ordinance fails to directly advance the City's interest in

10   combatting racial discrimination and the record shows that it does. In 2014, Seattle's Office for

11   Civil Rights conducted fair housing testing by having "paired testers posing as prospective

12   renters . . . measure the differences in the services they received from leasing agents, as well as

13   information about vacancies, rental rates, and other conditions." Press Release, Seattle Office for

14   Civil Rights, City Files Charges Against 13 Property Owners for Alleged Violations of Rental

15   Housing Discrimination (June 9, 2015),

16   https://www.seattle.gov/Documents/Departments/CivilRights/socr-pr-060915.pdf. "The matched

17   pairs of testers had similar rental profiles in every respect except for their race or disability." *Id.*

18   Even so, "African American and Latino testers were told about criminal background and credit

19   history checks more frequently than the white testers." *Id.* In 2017, as the City Council was

20   developing the Ordinance, the Director of Seattle's Office for Civil Rights shared this

21   information with the Council, noting that, "[i]n some cases, African Americans were told they

22   would have to undergo a criminal record check when similarly situated white counterparts were

23   not." (Dkt. Nos. 33-6 at 19, 33-7 at 8.) The City could reasonably conclude from this evidence

24   that some landlords were using criminal history as a pretext for racial discrimination and that

25   prohibiting landlords from considering criminal history would reduce racial discrimination.

26         4.    There is a Reasonable Fit Between the Inquiry Provision and the City's Objectives.

ORDER
C18-0736-JCC
PAGE - 22

1      To justify the inquiry provision, the City must establish a "reasonable fit" between that

2  provision and the City's objectives. *Fox*, 492 U.S. at 480. To satisfy this standard, the

3  government must show that the fit between the ends it seeks and the means it used "is not

4  necessarily perfect, but reasonable; that [the government's approach] represents not necessarily

5  the single best disposition but one whose scope is 'in proportion to the interest served.'" *Id.*

6  (quoting *In re R.M.J.*, 455 U.S. 191, 203 (1982)). One "relevant consideration in determining

7  whether the 'fit' between ends and means is reasonable" is whether "there are numerous and

8  obvious less-burdensome alternatives to the restriction on commercial speech." *City of*

9  *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993). At the same time, the

10  reasonable fit inquiry does not "require elimination of all less restrictive alternatives." *Fox*, 492

11  U.S. at 478; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (holding that a

12  speech restriction does not fail intermediate scrutiny "simply because a court concludes that the

13  government's interest could be adequately served by some less-speech-restrictive alternative").

14  Because the government "need[s] leeway," *id.* at 481, to exercise its "ample scope of regulatory

15  authority," *id.* at 477, regarding commercial speech, the Supreme Court has held that commercial

16  speech restrictions that go "only marginally beyond what would adequately have served the

17  governmental interest," *id.* at 479, do not violate the First Amendment. A commercial speech

18  restriction fails the reasonable fit inquiry only if it "burden[s] substantially more speech than is

19  necessary to further the government's legitimate interests." *Id.* at 478 (quoting *Ward*, 491 U.S. at

20  799). In other words, "Government may not regulate expression in such a manner that a

21  substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S.

22  at 799. The Supreme Court has "been loath to second-guess the Government's judgment to that

23  effect." *Fox*, 492 U.S. at 478.

24      With these principles in mind, the Court concludes that the Ordinance is a reasonable

25  means of achieving the City's objectives and does not burden substantially more speech than is

26  necessary to achieve them. The Ordinance burdens a limited amount of speech—inquiries about

1   prospective occupants' criminal history—and most, if not all, of the speech that the City has

2   regulated serves to advance its goals. Plaintiffs argue that the City could have pursued a host of

3   purportedly less-speech-restrictive measures to achieve its objective in reducing barriers to

4   housing for people with criminal records, but most of Plaintiffs' proposals would not achieve the

5   City's objectives and none of them show that the City's choice to enact the Ordinance was an

6   unreasonable means of pursuing them.

7          Before turning to Plaintiffs' proposals, the Court observes that Plaintiffs do not dispute

8   that the Ordinance is a reasonable means of achieving the City's interest in combatting landlords'

9   use of criminal history as a pretext for racial discrimination. Plaintiffs do not offer any

10   alternative policies the City could have pursued to achieve this goal, much less numerous

11   obvious alternatives, and the City's fair housing testing shows that existing federal, state, and

12   local laws prohibiting racial discrimination in housing have not been sufficient to solve the

13   problem. Therefore, the Court concludes that the Ordinance is a reasonable means of achieving

14   the City's goal of combatting the use of criminal history as a pretext for racial discrimination.

15          Although the Court need not "sift[] through all the available or imagined alternative

16   means of" achieving the City's objectives, it will discuss several of Plaintiffs' suggestions to

17   explain why they do not show that the Ordinance was an unreasonable means of pursuing the

18   City's objectives. *Ward*, 491 U.S. at 797. Plaintiffs first suggest that the City could have

19   "reform[ed] Washington tort law to better protect landlords from liability for crimes committed

20   by their tenants." (Dkt. No. 23 at 18.) But the City does not have the power to change state law,

21   and this alternative would do nothing to reduce barriers to housing erected by landlords who

22   discriminate against individuals with criminal histories for reasons other than concerns about

23   potential tort liability. For instance, many landlords in the Helfgott study reported that they

24   would be inclined to refuse to rent to individuals with criminal records because "they have bad

25   values." Helfgott, 61 Fed. Probation at 20. Reforming Washington tort law would have no

26   impact on these landlords. Plaintiffs' suggestion that the City could "indemnify or insure

ORDER
C18-0736-JCC
PAGE - 24

landlords willing to rent to individuals with a criminal history" suffers from the same defect. (*Id.* at 19.)

Plaintiffs also offer several suggestions that would allow landlords to continue to discriminate against some individuals with criminal histories but not everyone. Specifically, Plaintiffs suggest that the City could have allowed landlords to continue to ask about all crimes but not arrests, "serious offenses" but not other crimes, or all crimes committed within two years of the date of a prospective occupant's rental application. (*Id.*) Along similar lines, Plaintiffs suggest that the City could have exempted more landlords from the Ordinance or could have required landlords to consider applicants' criminal history on a case-by-case basis rather than entirely prohibiting them from considering it. (*Id.* at 20–21.) The problem with these suggestions is that they would require the City to substitute Plaintiffs' objectives for the City's.

In enacting the Ordinance, the City made a policy decision to prohibit landlords from considering *any* crimes, no matter how violent or how recent. Plaintiffs argue that the City should have pursued different objectives: perhaps allowing landlords to continue to reject any tenant based on criminal history so long as the landlord makes an individualized assessment of each tenant's criminal history or perhaps prohibiting landlords from considering non-violent crimes or crimes committed several years ago but allowing them to consider recent crimes. Reasonable people could disagree on the best approach, but the Court's role is not to resolve those policy disagreements; it is to determine whether there are numerous obvious and less burdensome methods of achieving *the City's* objectives.

If the Court were to accept Plaintiffs' logic, it would mean that commercial speech restrictions would rarely survive constitutional challenge because plaintiffs could always argue the government should have applied a restriction to fewer people. If, for example, the City had enacted Plaintiffs' proposal to prohibit landlords from asking about only crimes that were more than two years old, another plaintiff could argue that it should have been three years, or three-and-a-half, or four, and so on. The Supreme Court has not analyzed commercial speech

restrictions this way. For instance, in *Florida Bar*, the Court determined that the Florida Bar's regulation prohibiting personal injury lawyers from "sending targeted direct-mail solicitations to victims and their relatives" within 30 days of "an accident or disaster" was "reasonably well tailored," without requiring the bar to explain why it did not adopt a 28 or 29-day ban that would have burdened less speech. 515 U.S. at 620, 633. At bottom, the reasonable fit test "allow[s] room for legislative judgments" and the legislature's judgment here was that prohibiting landlords from considering *all* crimes was the best way to achieve the City's interests. *Edge Broad.*, 509 U.S. at 434.

> A.   The Ordinance is Not Substantially Overbroad.

Having concluded that the statute is constitutional in its core applications, Plaintiffs' traditional facial challenge fails. *See Stevens*, 559 U.S. at 472. The Court now must turn to whether the statute is facially unconstitutional under the less-demanding overbreadth standard. Plaintiffs argue that even if the statute is constitutional at its core, it is substantially overbroad for two reasons: First, the Ordinance prohibits landlords from asking individuals and entities other than prospective occupants and the RHA about prospective occupants' criminal history, such as former landlords or the courts. (Dkt. No. 48 at 28.) Second, Plaintiffs argue, the statute is so broad that it prohibits *anyone* from investigating the criminal history of any prospective occupant or tenant. (*See id.* at 28–29.) Thus, according to Plaintiffs, the Ordinance prohibits journalists from investigating the criminal history of anyone who happens to be a renter and prohibits firearm dealers and employers from running background checks on gun purchasers or prospective employees who are renters. (*Id.*) Neither argument is persuasive.

Prohibiting the government from enforcing a statute that is constitutional in its core applications but arguably unconstitutional in others is "strong medicine" that courts use "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). To prevail on their overbreadth challenge, Plaintiffs "must demonstrate from the text of [the Ordinance] and from actual fact that a substantial number of instances exist in which the

[Ordinance] cannot be applied constitutionally." *N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 14 (1988). When a statute is overbroad but not substantially overbroad, "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Broadrick*, 413 U.S. at 615–16. Thus, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).

Plaintiffs argue that the statute is substantially overbroad because it prohibits landlords from asking individuals other than prospective occupants about their criminal history, and these conversations are not commercial speech because they are not proposals to engage in commercial transactions. (Dkt. No. 48 at 28.) The City does not dispute that the statute covers these inquiries, so the Court accepts Plaintiffs' interpretation. Even so, the Court need not analyze whether these hypothetical applications of the Ordinance would be constitutional because even assuming they are not, Plaintiffs have not shown "from actual fact that a substantial number of [those] instances exist." *N.Y. State Club Ass'n*, 487 U.S. at 14; *see also Wash. State Grange*, 552 U.S. at 449–50 ("In determining whether a law is facially invalid, [courts] must be careful not to . . . speculate about 'hypothetical' or 'imaginary' cases."). Plaintiffs do not claim to have ever contacted a former landlord or court for criminal history information, nor do they provide any evidence that other landlords have. Therefore, Plaintiffs have not shown on this record that *any* landlord has done so, much less a substantial number of landlords. *See id.*

Plaintiffs also argue that the statute extends well beyond the housing context because it prohibits "any person" from asking about a prospective occupant's criminal history. Thus, Plaintiffs argue, the statute prohibits journalists, firearm dealers, and employers from investigating the criminal history of anyone who happens to be a renter. (Dkt. No. 48 at 29.) The Court agrees that the inquiry provision, which applies to "any person," could be interpreted to cover these inquiries. But, because the Court is construing a City ordinance, it may defer to the

1   City's plausible interpretation of the Ordinance, including any limiting construction the City has

2   adopted. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 563 (2011); *Vill. of Hoffman Ests. v. Flipside,*

3   *Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) ("In evaluating a facial challenge to a state

4   law, a federal court must, of course, consider any limiting construction that a state court or

5   enforcement agency has proffered."); S.M.C. § 14.09.085 (providing that the City Attorney's

6   Office—the City's counsel in this litigation—shall enforce the Ordinance). The City argues that

7   the Ordinance applies only in the context of housing transactions because it is entitled the "Fair

8   Chance Housing Ordinance." (Dkt. No. 50 at 7.) Although the title of the Ordinance is a thin

9   reed on which to rest a limiting construction, and the precise boundaries of the Ordinance under

10  the City's interpretation are not clear, the City's interpretation is not implausible. *See* S.M.C. §

11  1.04.030 ("the names and headings of titles, chapters, subchapters, parts, . . . and sections of the

12  Seattle Municipal Code [are] part of the law"). Therefore, the Court accepts the City's limiting

13  construction that the statute does not apply to journalists or firearm dealers or employers running

14  background checks.

15          Because Plaintiffs have not shown "from the text of [the Ordinance] and from actual fact

16  that a substantial number of instances exist in which the [Ordinance] cannot be applied

17  constitutionally," their overbreadth challenge also fails. *N.Y. State Club Ass'n*, 487 U.S. at 14.

18  **V.      CONCLUSION**

19          For the foregoing reasons, the Court DENIES Plaintiffs' motion for summary judgment

20  and GRANTS the City's motion for summary judgment.

21

22          DATED this 6th day of July 2021.

23

24          _____

25          John C. Coughenour
            UNITED STATES DISTRICT JUDGE
26

ORDER
C18-0736-JCC
PAGE - 28

# UNITED STATES DISTRICT COURT

### WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

CHONG YIM, *et al.*,

                              Plaintiffs,

          v.

CITY OF SEATTLE,

                              Defendant.

**JUDGMENT IN A CIVIL CASE**

CASE NO. C18-0736-JCC

_____   **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

  X    **Decision by Court**. This action came to consideration before the Court. The issues have been considered and a decision has been rendered.

The Court has so ORDERED:

The Court DENIES Plaintiffs' motion for summary judgment and GRANTS the City's motion for summary judgment.

DATED this 6th day of July 2021.

RAVI SUBRAMANIAN
Clerk of Court

 /s/ *Paula McNabb*
Deputy Clerk

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

CHONG and MARILYN YIM, KELLY LYLES,)
EILEEN, LLC, and RENTAL HOUSING    ) CASE NO. 18-00736-JCC
ASSOCIATION OF WASHINGTON,         )
                                   ) Seattle, Washington
                  Plaintiffs,      )
v.                                 ) July 6, 2021
                                   ) 9:40 a.m.
THE CITY OF SEATTLE,               )
a Washington Municipal corporation,) MOTION FOR
                                   ) SUMMARY JUDGMENT
                  Defendant.       )
                                   )
_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN C. COUGHENOUR
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


  For the Plaintiffs:        ETHAN W. BLEVINS
                             Pacific Legal Foundation
                             930 G Street
                             Sacramento, CA 95814

                             BRIAN T. HODGES
                             Pacific Legal Foundation
                             255 South King Street, Suite 800
                             Seattle, WA 98104

  For the Defendant:         JESSICA L. GOLDMAN
                             Summit Law Group
                             315 1st Avenue South, Suite 1000
                             Seattle, WA 98104

                             ROGER DOUGLAS WYNNE
                             Seattle City Attorney's Office
                             701 Fifth Avenue, Suite 2050
                             Seattle, WA 98104-7097.

                Reported by:  Nancy L. Bauer
                Federal Official Court Reporter
                nancy_bauer@wawd.uscourts.gov
                      (206) 370-8506

Proceedings recorded by mechanical stenography; transcript produced with aid of computer

1          PROCEEDINGS

2    _____

3          THE CLERK:  We are here on CV18-736-JCC, Yim, et al.

4    versus the City of Seattle.

5       Counsel, please make your appearances for the record.

6          MR. BLEVINS:  Ethan Blevins, counsel for the

7    plaintiffs.

8          MR. HODGES:  Brian Hodges, co-counsel for the

9    plaintiffs.

10          MR. WYNNE:  Roger Wynne, Assistant City Attorney for

11    the City of Seattle.

12          MS. GOLDMAN:  Good morning, Your Honor.  Jessica

13    Goldman from the Summit Law Group, and with me is Hannah

14    Johnson, a rising 3L from the University of Washington.

15          THE COURT:  Who wants to lead off?

16          MR. BLEVINS:  I believe plaintiffs will.

17          THE COURT:  All right.

18          MR. BLEVINS:  Good morning, Your Honor.  May it please

19    the court.  I plan to reserve about three minutes of the 20

20    minutes for rebuttal.

21       The Fair Chance Housing Ordinance bars anyone from asking

22    about a renter's criminal history.  That's closing access to a

23    common-sense practice prevalent among governments and industries

24    around the country, including the City of Seattle itself; thus,

25    Kelly Lyles, a plaintiff in this matter, a single woman who

 1  Philadelphia inquiry provision only prohibited employers from

 2  inquiring about a single topic, while leaving employers free to

 3  ask a wide range of other questions, including qualifications,

 4  work history, skills, and any other job-related questions

 5  relevant to performance of fit with the company.

 6      The same conclusion is warranted here.  Seattle's inquiry

 7  provision only prohibits landlords from obtaining criminal

 8  history information for use in deciding who to rent to.

 9  Landlords may obtain any other information for use in making

10  that decision, and the inquiry provision does not restrict

11  landlords from saying anything they want about any subject at

12  any time.

13      But plaintiffs argue that Seattle's ordinance is

14  underinclusive due to its exception for federally controlled

15  housing.  This is an argument that the Third Circuit also

16  rejected.  I would note that federal housing comprises about

17  three percent of the housing stock.

18      The Third Circuit explained that underinclusiveness is only

19  important to our inquiry if it raises serious doubts about

20  whether the government is, in fact, pursuing the interests it

21  invokes rather than disfavoring a particular speaker or

22  viewpoint.  The Third Circuit held there is no such suggestion

23  of such insincerity here.  The same is true in the case at bar.

24      So in conclusion, Your Honor, unless you have any questions

25  you'd like me to address on the First Amendment claim,

# C E R T I F I C A T E

        I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

        I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

        Dated this 16th day of August 2021.

        /S/  Nancy L. Bauer

        Nancy L. Bauer, CCR, RPR
        Official Court Reporter



# THE SUPREME COURT OF WASHINGTON

| | |
|---|---|
| CERTIFICATION FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON )<br><br>IN )<br><br>CHONG and MARILYN YIM, KELLY LYLES, EILEEN, LLC, and RENTAL HOUSING ASSOCIATION OF WASHINGTON, )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE CITY OF SEATTLE, )<br><br>Defendant. ) | **CERTIFICATE OF FINALITY**<br><br>No. 96817-9<br><br>U.S. District Court<br>Western District No.<br>C18-00736-JCC |

**THE STATE OF WASHINGTON TO:**     United States District Court – Western District

THIS IS TO CERTIFY that the Supreme Court of the State of Washington addressed the

questions certified by the United States District Court for the Western District in its opinion filed in

this case on November 14, 2019. On January 9, 2020, an "ORDER AMENDING OPINION"

was filed. The opinion became final on January 9, 2020, upon entry of the "ORDER DENYING

FURTHER RECONSIDERATION". A true copy of the opinion, order amending opinion and

order on reconsideration are attached.

Page 2
No. 96817-9
CERTIFICATE OF FINALITY



IN TESTIMONY WHEREOF, I have hereunto
set my hand and affixed the seal of this Court
at Olympia, Washington on February 3, 2020.

SUSAN L. CARLSON
Clerk of the Supreme Court
State of Washington

cc:     Hon. John C. Coughenour, Judge
        Hon. William M. McCool, Clerk
        Roger D. Wynne
        Sara O'Connor-Kriss
        Jessica L. Goldman
        Brian Trevor Hodges
        Ethan Blevins
        Reporter of Decisions

FILED
JAN - 9 2020
WASHINGTON STATE
SUPREME COURT

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

CERTIFICATION FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON

IN

CHONG and MARILYN YIM, KELLY LYLES,
EILEEN, LLC, and RENTAL HOUSING
ASSOCIATION OF WASHINGTON,

Plaintiffs,

v.

CITY OF SEATTLE,

Defendant.

No. 96817-9

ORDER
AMENDING
OPINION

It is hereby ordered that the majority opinion of Yu, J., filed November 14, 2019, in the above entitled case is amended as indicated below.

On page 13, line 18 of the slip opinion, after "544 U.S. at 542." delete "It does not reflect the core concern of substantive due process, which is 'whether a regulation of private property is effective in achieving some legitimate public purpose.' *Id.*"

*Yim v. City of Seattle*, No. 96817-9 (order amending opinion)

DATED this 9th day of January, 2020.

_____
Chief Justice

APPROVED:

_____   _____

_____   _____

_____   _____

2



# THE SUPREME COURT OF WASHINGTON

| | |
|---|---|
| CERTIFICATION FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON<br><br>IN<br><br>CHONG and MARILYN YIM, KELLY LYLES, EILEEN, LLC, and RENTAL HOUSING ASSOCIATION OF WASHINGTON,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SEATTLE,<br><br>Defendant. | **ORDER DENYING FURTHER RECONSIDERATION**<br><br>No. 96817-9 |

The Court considered the "CITY OF SEATTLE'S MOTION FOR RECONSIDERATION TO DELETE TWO SENTENCES" and the "PLAINTIFFS' ANSWER TO CITY OF SEATTLE'S MOTION TO RECONSIDER TO DELETE TWO SENTENCES".

The Court entered an order amending opinion in the above cause on January 9, 2020.

Now, therefore, it is hereby

ORDERED:

That further reconsideration is denied.

DATED at Olympia, Washington this _____ day of January, 2020.

For the Court

CHIEF JUSTICE

ER 041

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE **NOV 1 4 2019**

for CHIEF JUSTICE

SC # 96817-9

Desireé ✓

Erin ✓

Camilla

**Trial Court Action Needed**

Yes (No)

This opinion was
filed for record
at 8 a.m. on Nov 14 2019

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CERTIFICATION FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON       IN | )<br>)<br>)<br>)<br>)    No. 96817-9<br>) |
| CHONG and MARILYN YIM, KELLY LYLES, EILEEN, LLC, and RENTAL HOUSING ASSOCIATION OF WASHINGTON, | )<br>)<br>)<br>)    En Banc<br>) |
|        Plaintiffs,<br>     v. | )<br>)<br>) |
| CITY OF SEATTLE, | )    Filed: **NOV 1 4 2019**<br>) |
|        Defendant. | )<br>) |

YU, J.— This case concerns the facial constitutionality of Seattle's Fair

Chance Housing Ordinance, which provides in relevant part that it is an unfair

practice for landlords and tenant screening services to "[r]equire disclosure, inquire

about, or take an adverse action against a prospective occupant, a tenant, or a

*Yim et al. v. City of Seattle*, No. 96817-9

member of their household, based on any arrest record, conviction record, or

criminal history," subject to certain exceptions.  SEATTLE MUNICIPAL CODE (SMC)

14.09.025(A)(2).  The plaintiffs claim that on its face, this provision violates their

state constitutional right to substantive due process and their federal constitutional

rights to free speech and substantive due process.  WASH. CONST. art. I, § 3; U.S.

CONST. amends. I, V, XIV.

The merits of the plaintiffs' claims are not before us.  Instead, we have been

certified three questions by the federal district court regarding the standard that

applies to the plaintiffs' state substantive due process claim: (1) "What is the

proper standard to analyze a substantive due process claim under the Washington

Constitution?" (2) "Is the same standard applied to substantive due process claims

involving land use regulations?" and (3) "What standard should be applied to

Seattle Municipal Code [chapter] 14.09 ('Fair Chance Housing Ordinance')?"

Order, No. C18-0736-JCC, at 2-3 (W.D. Wash. Feb. 5, 2019).

This court has not previously adopted heightened standards for substantive

due process challenges to laws regulating the use of property as a matter of

independent state law, and we are not asked to do so in this case.  Therefore, we

answer the district court's questions as follows: Unless and until this court adopts

heightened protections as a matter of independent state law, state substantive due

process claims are subject to the same standards as federal substantive due process

claims.  The same is true of state substantive due process claims involving land use

regulations and other laws regulating the use of property.  Therefore, the standard

applicable to the plaintiffs' state substantive due process challenge to the Fair

Chance Housing Ordinance is rational basis review.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2014, the mayor of Seattle and the Seattle City Council convened an

advisory committee "to evaluate potential strategies to make Seattle more

affordable, equitable, and inclusive."  Doc. 33-12, at 59 (Stipulated R.).  The

committee recommended "a multi-pronged approach of bold and innovative

solutions to address Seattle's housing affordability crisis," particularly as related to

"barriers to housing faced by people with criminal records."  *Id.* at 59-60.  Based

on the committee's report and its own findings, the Seattle City Council enacted

the Fair Chance Housing Ordinance, chapter 14.09 SMC.

Several Seattle landlords and the Rental Housing Association of Washington

(which provides tenant screening services) challenged the ordinance's facial

constitutionality in King County Superior Court.  Their challenge focuses on SMC

14.09.025(A)(2), which makes it an unfair practice for landlords and tenant

screening services to "[r]equire disclosure, inquire about, or take an adverse action

against a prospective occupant, a tenant, or a member of their household, based on

any arrest record, conviction record, or criminal history," subject to certain

*Yim et al. v. City of Seattle*, No. 96817-9

exceptions.  The plaintiffs claim that this provision facially violates their federal

free speech rights and their state and federal substantive due process rights.

Defendant city of Seattle (City) removed the case to federal district court,

and the parties filed cross motions for summary judgment based on stipulated facts

and a stipulated record.  The district court has not yet ruled on the summary

judgment motions because the parties dispute the standard of review that applies to

the plaintiffs' state substantive due process claim.  The plaintiffs contend that the

Fair Chance Housing Ordinance deprives property owners of "a fundamental

property interest" and is therefore subject to heightened scrutiny.  Doc. 23, at 21.

The City contends that rational basis review applies.

The district court noted that another pending case involving a different

Seattle ordinance, *Chong Yim v. City of Seattle*, No. 95813-1 (Wash. Nov. 14,

2019) (*Yim* I), raises a similar dispute regarding the standard that applies to state

substantive due process claims in Washington.  Therefore, "wary about applying a

potentially inaccurate standard under state law," the district stayed this case and

certified to us three questions regarding the applicable standard of review.  Order

at 2.

ISSUES

A.    "What is the proper standard to analyze a substantive due process

claim under the Washington Constitution?"  *Id.*

*Yim et al. v. City of Seattle,* No. 96817-9

B.     "Is the same standard applied to substantive due process claims

involving land use regulations?" *Id.*

C.     "What standard should be applied to Seattle Municipal Code

[chapter] 14.09 ('Fair Chance Housing Ordinance')?" *Id.* at 3.

ANALYSIS

Article I, section 3 of the Washington State Constitution provides, "No

person shall be deprived of life, liberty, or property, without due process of law."

Our state due process protection against "the arbitrary exercise of the powers of

government" has both procedural and substantive components. *State v. Cater's*

*Motor Freight Sys., Inc.*, 27 Wn.2d 661, 667, 179 P.2d 496 (1947).  The procedural

component provides that "[w]hen a state seeks to deprive a person of a protected

interest," the person must "receive notice of the deprivation and an opportunity to

be heard to guard against erroneous deprivation." *Amunrud v. Bd. of Appeals*, 158

Wn.2d 208, 216, 143 P.3d 571 (2006).  Meanwhile, the substantive component of

due process "protects against arbitrary and capricious government action even

when the decision to take action is pursuant to constitutionally adequate

procedures." *Id.* at 218-19.  This case concerns only the substantive component.

In a substantive due process claim, courts scrutinize the challenged law

according to "a means-ends test" to determine if "a regulation of private property is

effective in achieving some legitimate public purpose." *Lingle v. Chevron U.S.A.*

*Yim et al. v. City of Seattle.* No. 96817-9

*Inc.*, 544 U.S. 528, 542, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005) (emphasis

omitted). The level of scrutiny to be applied depends on "the nature of the right

involved." *Amunrud*, 158 Wn.2d at 219. "State interference with a fundamental

right is subject to strict scrutiny," which "requires that the infringement is narrowly

tailored to serve a compelling state interest." *Id.* at 220. Meanwhile, "[w]hen state

action does not affect a fundamental right, the proper standard of review is rational

basis," which requires only that "the challenged law must be rationally related to a

legitimate state interest." *Id.* at 222.

The plaintiffs characterize the right involved here as a "fundamental

property interest[ ]," specifically, "the right of each residential landlord to rent her

property to a person of her own choice." Pls.' Resp. Br. at 15-16. They do not

contend that this right requires the application of strict scrutiny, but they do not

concede that rational basis review applies either. Instead, the plaintiffs argue that

there is a third type of review, which applies in substantive due process challenges

to laws restricting "fundamental property rights" or "traditional 'old property'

rights." *Id.* at 15 n.6. This third type of review, the plaintiffs contend, is "some

form of intermediate scrutiny," which exceeds rational basis review by requiring

that laws regulating the use of property must either substantially advance a

government interest (the "substantially advances test") or not be unduly oppressive

on the property owner (the "unduly oppressive test"). *Id.* at 39.

*Yim et al. v. City of Seattle*, No. 96817-9

The level of scrutiny that applies to the plaintiffs' state substantive due

process claim is a constitutional question that we decide as a matter of law.

*Amunrud*, 158 Wn.2d at 215.   We hold that rational basis review applies, and we

clarify that the cases cited by the plaintiffs can no longer be interpreted as

requiring heightened scrutiny because their "legal underpinnings" have

"disappeared."   *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*,

180 Wn.2d 54, 66, 322 P.3d 1207 (2014).

A.   In answer to the first two certified questions, independent state law does not
require heightened scrutiny in article I, section 3 substantive due process
challenges to laws regulating the use of property

"[T]he protection of the fundamental rights of Washington citizens was

intended to be and remains a separate and important function of our state

constitution and courts that is closely associated with our sovereignty."   *State v.*

*Coe*, 101 Wn.2d 364, 374, 679 P.2d 353 (1984).   Therefore, this court has a duty to

recognize heightened constitutional protections as a matter of independent state

law in appropriate cases.   *O'Day v. King County*, 109 Wn.2d 796, 801-02, 749

P.2d 142 (1988).   Nevertheless, "[t]his court traditionally has practiced great

restraint in expanding state due process beyond federal perimeters."   *Rozner v. City*

*of Bellevue*, 116 Wn.2d 342, 351, 804 P.2d 24 (1991).   Accordingly, we have never

before required heightened scrutiny in substantive due process challenges to laws

*Yim et al. v. City of Seattle*, No. 96817-9

regulating the use of property as a matter of independent state law.  In light of the

arguments presented in this case, we decline to do so now.

We recognize that in a number of cases, this court has recited the "unduly

oppressive" test, which appears to exceed rational basis review by asking

"(1) whether the regulation is aimed at achieving a legitimate public purpose;

(2) whether it uses means that are reasonably necessary to achieve that purpose;

and (3) whether it is unduly oppressive on the landowner." *Presbytery of Seattle v.*

*King County*, 114 Wn.2d 320, 330, 787 P.2d 907 (1990); *see also, e.g., Tiffany*

*Family Tr. Corp. v. City of Kent*, 155 Wn.2d 225, 238, 119 P.3d 325 (2005); *Orion*

*Corp. v. State*, 109 Wn.2d 621, 651, 747 P.2d 1062 (1987).  We have never

explicitly rejected the "unduly oppressive" test, although we have noted that it "has

limited applicability even in land use cases." *Amunrud*, 158 Wn.2d at 226 n.5.  We

have also occasionally suggested that a "substantial relation" test applies and that

this test requires heightened scrutiny by asking whether police power regulations

bear a "'real or substantial relation'" (as opposed to a merely rational relation) to

legitimate government purposes. *Biggers v. City of Bainbridge Island*, 162 Wn.2d

683, 694, 169 P.3d 14 (2007) (plurality opinion) (quoting *State ex rel. Brislawn v.*

*Meath*, 84 Wash. 302, 313, 147 P. 11 (1915)); *see also, e.g., Remington Arms Co.*

*v. Skaggs*, 55 Wn.2d 1, 5-6, 345 P.2d 1085 (1959).

*Yim et al. v. City of Seattle*, No. 96817-9

However, this precedent is based on opinions of the United States Supreme Court, not on independent state law. Hugh D. Spitzer, *Municipal Police Power in Washington State*, 75 WASH. L. REV. 495, 513-15 (2000). The "unduly oppressive" test is derived from an 1894 opinion, *Lawton v. Steele*:

> To justify the State in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.

152 U.S. 133, 137, 14 S. Ct. 499, 38 L. Ed. 385 (1894); *see also Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594-95, 82 S. Ct. 987, 8 L. Ed. 2d 130 (1962).

Meanwhile, the "substantial relation" test is derived from an 1887 opinion, *Mugler v. Kansas*:

> If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

123 U.S. 623, 661, 8 S. Ct. 273, 31 L. Ed. 205 (1887). We have never held that any form of heightened scrutiny is independently required by article I, section 3 of the Washington State Constitution, and the parties do not ask us to do so now.[1]

---

[1] Two amici in *Yim* I appear to argue that article I, section 3 does provide enhanced substantive protections beyond those guaranteed by the federal due process clauses. *See* Br. of Amicus Curiae Goldwater Inst. (*Yim* I) at 5; Br. of Amicus Curiae Rental Hous. Ass'n of Wash. (*Yim* I) at 13. However, neither filed an amicus brief in this case and neither provides a principled basis on which to recognize enhanced protections as a matter of independent state law.

*Yim et al. v. City of Seattle*, No. 96817-9

Because the heightened scrutiny apparently required by some of our precedent derives from federal law, we need not consider whether such heightened scrutiny is "incorrect and harmful." *W.G. Clark*, 180 Wn.2d at 66. Instead, we may consider whether the federal "legal underpinnings of our precedent have changed or disappeared altogether." *Id.* As discussed below, the federal legal underpinnings of our precedent have disappeared because the United States Supreme Court requires only rational basis review in substantive due process challenges to laws regulating the use of property. In the absence of a *Gunwall*[2] analysis or any other principled basis for departing from federal law, we decline to do so at this time.

The district court's first two certified questions are "What is the proper standard to analyze a substantive due process claim under the Washington Constitution?" and "Is the same standard applied to substantive due process claims involving land use regulations?" Order at 2. We answer that unless and until this court adopts a heightened standard as a matter of independent state law, article I, section 3 substantive due process claims are subject to the same standards as federal substantive due process claims. The same is true for substantive due process claims involving land use regulations. Our precedent suggesting otherwise

---

[2] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

*Yim et al. v. City of Seattle*, No. 96817-9

can no longer be interpreted as requiring a heightened standard of review as a matter of independent state law.[3]

B.   In answer to the third certified question, we hold that rational basis review applies to the plaintiffs' state substantive due process challenge to the Fair Chance Housing Ordinance

Because the plaintiffs do not advance an independent state law argument, the parties' primary dispute is the minimum level of scrutiny required by the federal due process clauses.  Although this issue is arguably not a question of "local law," RCW 2.60.020, we exercise our discretion to address it because it is necessary to provide complete answers to the certified questions in this case.  *See Broad v. Mannesmann Anlagenbau, AG*, 141 Wn.2d 670, 676, 10 P.3d 371 (2000).  The plaintiffs contend that federal substantive due process law requires heightened scrutiny of laws regulating the use of property and that it does so because "fundamental attribute[s] of property" are recognized as "fundamental right[s] subject to heightened scrutiny" for substantive due process purposes.  Pls.' Resp. Br. at 31.  Therefore, the plaintiffs reason, their state substantive due process challenge to the Fair Chance Housing Ordinance cannot be subject to deferential rational basis review.

---

[3] Attached as an appendix is a list of this court's precedent that can no longer be interpreted as requiring a heightened standard of review.  We caution that this list is not exclusive and that any holding by this court or the Court of Appeals that heightened scrutiny is required in state substantive due process challenges to laws regulating the use of property is no longer good law.  We express no opinion as to whether the outcome of any particular case would have been different had it explicitly applied rational basis review.

*Yim et al. v. City of Seattle*, No. 96817-9

We disagree.  As a matter of current federal law, the "unduly oppressive"

and "substantial relation" tests are not interpreted as requiring heightened scrutiny,

and the "substantially advances" test has been explicitly rejected.  Instead, a law

regulating the use of property violates substantive due process only if it "fails to

serve any legitimate governmental objective," making it "arbitrary or irrational."

*Chevron U.S.A.*, 544 U.S. at 542; *see also Kentner v. City of Sanibel*, 750 F.3d

1274, 1280-81 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 950 (2015); *Samson v.*

*City of Bainbridge Island*, 683 F.3d 1051, 1058 (9th Cir.), *cert. denied*, 568 U.S.

1041 (2012).  This test corresponds to rational basis review.  In addition, the use of

property has not been recognized as a fundamental right for substantive due

process purposes.  Therefore, the standard that applies to the plaintiffs' state

substantive due process challenge to the Fair Chance Housing Ordinance is rational

basis review.

      1.    The "unduly oppressive" test is no longer interpreted as requiring
            heightened scrutiny

The plaintiffs correctly point out that the United States Supreme Court has

never explicitly overruled the "unduly oppressive" language that originated in

*Lawton* and was repeated in *Goldblatt*.  However, the plaintiffs fail to recognize

that the United States Supreme Court does not interpret this language as requiring

heightened scrutiny.  To the contrary, the United States Supreme Court has made it

clear in its 2005 *Chevron U.S.A.* decision that *Lawton* and *Goldblatt* should be

*Yim et al. v. City of Seattle*, No. 96817-9

interpreted as applying a deferential standard that corresponds to rational basis review.

The reason *Goldblatt* may appear to require heightened scrutiny is that *Goldblatt* was decided during a period of "doctrinal blurring that has occurred between due process and regulatory takings." *Orion Corp.*, 109 Wn.2d at 647. A "regulatory taking" occurs when a government restriction on the use of private property is so onerous that the regulation amounts to "a de facto exercise of eminent domain requiring just compensation." *Id.* at 645. For many years, United States Supreme Court cases did not clearly differentiate between the tests for determining (1) when a regulation is so burdensome that it effectively takes private property and (2) when a regulation arbitrarily interferes with the use of property in violation of substantive due process. *See Chevron U.S.A.*, 544 U.S. at 541-42.

*Goldblatt* was one such case. Its "unduly oppressive" test, which asks who must bear the economic burden of a regulation, *Amunrud*, 158 Wn.2d at 226 n.5, reflects concerns implicated by the takings clause, such as "the *magnitude or character of the burden* a particular regulation imposes upon private property rights" and "how any regulatory burden is *distributed* among property owners." *Chevron U.S.A.*, 544 U.S. at 542. It does not reflect the core concern of substantive due process, which is "whether a regulation of private property is *effective* in achieving some legitimate public purpose." *Id.*

*Yim et al. v. City of Seattle*, No. 96817-9

While *Goldblatt* "does appear to assume that the inquiries are the same" for both regulatory takings and substantive due process claims, the United States Supreme Court has recognized that "that assumption is inconsistent with the formulations of our later cases." *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834 n.3, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987). As such, *Goldblatt* has been cited most often for takings principles, not due process principles. *E.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1022, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 490, 107 S. Ct. 1232, 94 L. Ed. 2d 472 (1987); *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124-27, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978).

To the extent *Goldblatt* does appear to require heightened scrutiny of laws regulating the use of property for substantive due process purposes, the United States Supreme Court has clarified that it does not. Instead, *Goldblatt* has been interpreted as "applying a deferential 'reasonableness' standard." *Chevron U.S.A.*, 544 U.S. at 541 (internal quotation marks omitted) (quoting and citing *Goldblatt*, 369 U.S. at 594-95; *Lawton*, 152 U.S. at 137). This deferential standard protects against "arbitrary or irrational" restrictions on property use. *Id.* at 542; *see also id.* at 548 (Kennedy, J., concurring).

The "arbitrary or irrational" standard is not heightened scrutiny. It corresponds to rational basis review, which requires only that "the challenged law

must be rationally related to a legitimate state interest." *Amunrud*, 158 Wn.2d at

222.  The plaintiffs do not cite, and we cannot find, any post-*Chevron U.S.A.*

decision in which the United States Supreme Court has held the "unduly

oppressive" test requires heightened scrutiny in substantive due process challenges

to laws regulating the use of property.

As we have already held, "[t]hat a statute is unduly oppressive is not a

ground to overturn it under the due process clause." *Salstrom's Vehicles, Inc. v.*

*Dep't of Motor Vehicles*, 87 Wn.2d 686, 693, 555 P.2d 1361 (1976).  Today, we

reaffirm that holding and clarify that the "unduly oppressive" test recited in many

of our cases can no longer be interpreted as requiring heightened scrutiny in

substantive due process challenges to laws regulating the use of property.

> 2.   The "substantially advances" test has been rejected and the
>      "substantial relation" test is no longer interpreted as requiring
>      heightened scrutiny

As an alternative to the "unduly oppressive" test, the plaintiffs contend that

laws regulating the use of property must be scrutinized in accordance with the

"substantially advances" test, which the plaintiffs characterize as "a form of

heightened scrutiny that closely mirrors this Court's understanding of the unduly

oppressive test." Pls.' Resp. Br.  at 38.  We disagree.  Since at least 1934, federal

law has required only deferential rational basis review.

*Yim et al. v. City of Seattle*, No. 96817-9

The plaintiffs point to the United States Supreme Court's 2005 decision in *Chevron U.S.A.* to argue that a heightened "substantially advances" test is required. However, *Chevron U.S.A.* actually states "that the 'substantially advances' formula was *derived from* due process" and holds "that it has no proper place in our takings jurisprudence." 544 U.S. at 540 (emphasis added). *Chevron U.S.A.* does not hold that a heightened "substantially advances" test reflects current federal substantive due process law, and it clearly does not.

The "substantially advances" test was set forth in a takings case, *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S. Ct. 2138, 65 L. Ed. 2d 106 (1980). However, the test was derived from two *Lochner*-era[4] substantive due process cases, *Nectow v. City of Cambridge*, 277 U.S. 183, 48 S. Ct. 447, 72 L. Ed. 842 (1928), and *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S. Ct. 114, 71 L. Ed. 303 (1926). Both *Nectow* and *Ambler Realty Co.* do state that zoning regulations must have a "'*substantial relation* to the public health, the public morals, the public safety or the public welfare in its proper sense.'" *Nectow*, 277 U.S. at 187-88 (emphasis added) (quoting *Ambler Realty Co.*, 272 U.S. at 395). Nevertheless, both cases also state that a regulation fails this test only if it "'has *no* foundation in reason and is a mere *arbitrary or irrational* exercise of power.'" *Id.*

---

[4] *Lochner v. New York*, 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905), *abrogated by W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S. Ct. 578, 81 L. Ed. 703 (1937).

*Yim et al. v. City of Seattle*, No. 96817-9

at 187 (emphasis added) (quoting *Ambler Realty Co.*, 272 U.S. at 395). This language is arguably contradictory, as the "substantial relation" test may appear to require heightened scrutiny, while the "arbitrary or irrational" test suggests that deferential rational basis review applies. However, any confusion has long since been resolved because the United States Supreme Court does not interpret the "substantial relation" test as requiring heightened scrutiny.

Since at least 1934, the United States Supreme Court has recognized that "the use of property and the making of contracts are normally matters of private and not of public concern," but "[e]qually fundamental with the private right is that of the public to regulate it in the common interest." *Nebbia v. New York*, 291 U.S. 502, 523, 54 S. Ct. 505, 78 L. Ed. 940 (1934). Laws regulating the use of property are therefore not subject to heightened scrutiny:

> The doctrine that prevailed in *Lochner* . . . and like cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.

*Ferguson v. Skrupa*, 372 U.S. 726, 730, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963); *see also Greater Chi. Combine & Ctr., Inc. v. City of Chicago*, 431 F.3d 1065, 1071 (7th Cir. 2005) ("[O]ur precedent has routinely applied [*Ambler Realty Co.*] as a rational basis rule for substantive due process and equal protection challenges to municipal ordinances.").

17

*Yim et al. v. City of Seattle*, No. 96817-9

Thus, according to current United States Supreme Court precedent, a law that regulates the use of property violates substantive due process only if it "fails to serve any legitimate governmental objective," making it "arbitrary or irrational." *Chevron U.S.A.*, 544 U.S. at 542. Even where a law restricts the use of private property, "ordinances are 'presumed valid, and this presumption is overcome only by a clear showing of arbitrariness and irrationality.'" *Samson*, 683 F.3d at 1058 (quoting *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234 (9th Cir. 1994)); *see also Kentner*, 750 F.3d at 1280-81.

As noted above, this test corresponds to rational basis review, which requires only that "the challenged law must be rationally related to a legitimate state interest." *Amunrud*, 158 Wn.2d at 222. The plaintiffs do not cite, and we cannot find, any post-*Chevron U.S.A.* decision in which the United States Supreme Court has held the "substantial relation" or "substantially advances" tests require heightened scrutiny in substantive due process challenges to laws regulating the use of property. To the contrary, as recently as 2017, the United States Supreme Court reiterated "that the test articulated in *Agins*—that regulation effects a taking if it 'does not substantially advance legitimate state interests'—was improper *because it invited courts to engage in heightened review of the effectiveness of government regulation.*" *Murr v. Wisconsin*, 582 U.S. ___, 137 S. Ct. 1933, 1947,

198 L. Ed. 2d 497 (2017) (emphasis added) (internal quotation marks omitted)

(quoting *Chevron U.S.A.*, 544 U.S. at 540).

> 3.    The use of property is not recognized as a fundamental right for
>       substantive due process purposes

Finally, the plaintiffs argue that heightened scrutiny is required because the

"fundamental attribute[s] of property" are recognized as "fundamental right[s]" for

substantive due process purposes—not so fundamental as to require strict scrutiny,

but fundamental enough to require "some form of intermediate scrutiny." Pls.'

Resp. Br. at 31, 39.  None of the cases the plaintiffs cite could fairly be read to

make such a holding.

Without question, the federal due process clauses do require "heightened

protection against government interference with certain fundamental rights and

liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258,

138 L. Ed. 2d 772 (1997).  However, our Court of Appeals recently held that the

use of property is not a fundamental right for substantive due process purposes:

"Just as the right to pursue a particular profession is not a fundamental right but is

a right that is nevertheless subject to reasonable government regulation, so, for

substantive due process purposes, is the right to use one's property." *Olympic

Stewardship Found. v. Envt'l & Land Use Hr'gs Office*, 199 Wn. App. 668, 720-

21, 399 P.3d 562 (2017) (citation omitted) (citing *Amunrud*, 158 Wn.2d at 220),

*Yim et al. v. City of Seattle*, No. 96817-9

*review denied*, 189 Wn.2d 1040, *cert. denied*, 139 S. Ct. 81 (2018).  Both this court

and the United States Supreme Court declined to review this holding.

Nevertheless, the plaintiffs contend *Olympic Stewardship* was incorrect,

relying on cases from this court and the United States Supreme Court that discuss

the importance of property rights, primarily in the context of takings cases.  *See*

Pls.' Resp. Br. at 2, 16-17, 31, 39; Pls.' Second Statement of Additional Auth.[5]

We do not question that property rights are important.  However, as noted above,

the United States Supreme Court has also made it clear that takings claims and

substantive due process claims are different matters involving different

considerations.  *Chevron U.S.A.*, 544 U.S. at 541-42.  None of the cases cited by

the plaintiffs actually addresses the question of whether the use of property is a

fundamental right for substantive due process purposes, and they certainly do not

make such a holding.

---

[5] Citing *Knick v. Township of Scott*, 588 U.S. ___, 139 S. Ct. 2162, 204 L. Ed. 2d 558 (2019) (takings); *Nollan*, 483 U.S. at 833 (takings); *Kaiser Aetna v. United States*, 444 U.S. 164, 179-80, 100 S. Ct. 383, 62 L. Ed. 2d 332 (1979) (takings); *Fuentes v. Shevin*, 407 U.S. 67, 81, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972) (procedural due process); *McCoy v. Union Elevated R.R. Co.*, 247 U.S. 354, 365, 38 S. Ct. 504, 62 L. Ed. 1156 (1918) (just compensation); *City of Bremerton v. Widell*, 146 Wn.2d 561, 572, 51 P.3d 733 (2002) (criminal trespass); *Mfd. Hous. Cmtys. of Wash. v. State*, 142 Wn.2d 347, 363-65, 13 P.3d 183 (2000) (plurality opinion) (takings); *Guimont v. Clarke*, 121 Wn.2d 586, 595, 854 P.2d 1 (1993) (takings); *City of Des Moines v. Gray Bus., LLC*, 130 Wn. App. 600, 613-14, 124 P.3d 324 (2005) (takings); *State Farm Fire & Cas. Co. v. English Cove Assocs.*, 121 Wn. App. 358, 365, 88 P.3d 986 (2004) (insurance contract interpretation).

*Yim et al. v. City of Seattle*, No. 96817-9

The plaintiffs also cite many cases from this court and the United States

Supreme Court applying the "substantial relation" or "unduly oppressive" tests as

evidence that the use of property is a fundamental right.  Pls.' Resp. Br. at 2-3, 13-

15, 17-22, 32, 37-39; Pls.' Statement of Additional Auths. at 14-15.[6]  However, as

discussed above, both tests are now interpreted as deferential standards

corresponding to rational basis review.  Therefore, the application of these tests

---

[6] Citing *Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 85, 100 S. Ct. 2035, 64 L. Ed.
2d 741 (1980) (substantial relation); *Moore v. City of East Cleveland*, 431 U.S. 494, 498 n.6, 97
S. Ct. 1932, 52 L. Ed. 2d 531 (1977) (plurality opinion) (substantial relation); *Goldblatt*, 369
U.S. at 594-95 (unduly oppressive); *Wash. ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116,
121, 49 S. Ct. 50, 73 L. Ed. 210 (1928) (substantial relation); *Nectow*, 277 U.S. at 187-88
(substantial relation); *Ambler Realty Co.*, 272 U.S. at 395 (substantial relation); *Thomas Cusack
Co. v. City of Chicago*, 242 U.S. 526, 531, 37 S. Ct. 190, 61 L. Ed. 472 (1917) (substantial
relation); *Chi., Burlington & Quincy Ry. Co. v. Illinois*, 200 U.S. 561, 593, 26 S. Ct. 341, 50 L.
Ed. 596 (1906) (substantial relation); *Jacobson v. Massachusetts*, 197 U.S. 11, 31, 25 S. Ct. 358,
49 L. Ed. 643 (1905) (substantial relation); *Minnesota v. Barber*, 136 U.S. 313, 320, 10 S. Ct.
862, 34 L. Ed. 455 (1890) (substantial relation); *Tiffany Family Tr. Corp.*, 155 Wn.2d 225
(unduly oppressive); *Viking Props., Inc. v. Holm*, 155 Wn.2d 112, 118 P.3d 322 (2005) (unduly
oppressive); *Willoughby v. Dep't of Labor & Indus.*, 147 Wn.2d 725, 733, 57 P.3d 611 (2002)
(unduly oppressive); *Asarco, Inc. v. Dep't of Ecology*, 145 Wn.2d 750, 762, 43 P.3d 471 (2002)
(unduly oppressive); *Christianson v. Snohomish Health Dist.*, 133 Wn.2d 647, 661, 672 n.11,
946 P.2d 768 (1997) (unduly oppressive); *Sintra, Inc. v. City of Seattle*, 131 Wn.2d 640, 935
P.2d 555 (1997) (unduly oppressive); *Rivett v. City of Tacoma*, 123 Wn.2d 573, 580-81, 870 P.2d
299 (1994) (unduly oppressive); *Margola Assocs. v. City of Seattle*, 121 Wn.2d 625, 649-50, 854
P.2d 23 (1993) (unduly oppressive); *Guimont*, 121 Wn.2d at 609 (unduly oppressive); *Robinson
v. City of Seattle*, 119 Wn.2d 34, 55, 830 P.2d 318 (1992) (unduly oppressive); *Presbytery*, 114
Wn.2d at 330-31 (unduly oppressive); *Orion Corp.*, 109 Wn.2d at 646-47 (unduly oppressive);
*W. Main Assocs. v. City of Bellevue*, 106 Wn.2d 47, 52, 720 P.2d 782 (1986) (unduly
oppressive); *Cougar Bus. Owners Ass'n v. State*, 97 Wn.2d 466, 477, 647 P.2d 481 (1982)
(unduly oppressive); *State ex rel. Rhodes v. Cook*, 72 Wn.2d 436, 439, 433 P.2d 677 (1967)
("The test when lawful activity upon private property is involved has been said to be more
stringent."); *Remington Arms Co.*, 55 Wn.2d at 5 ("'clear, real, and substantial connection'"
required (quoting 16 C.J.S. *Constitutional Law* § 195 (1956))); *City of Seattle v. Ford*, 144
Wash. 107, 111, 115, 257 P. 243 (1927) (holding regulation at issue went "'beyond what is
necessary'" and was "excessive" (quoting 1 CHRISTOPHER G. TIEDEMAN, STATE AND FEDERAL
CONTROL OF PERSONS AND PROPERTY 5 (1900))).

*Yim et al. v. City of Seattle*, No. 96817-9

does not indicate that the use of property is a fundamental right for substantive due process purposes.

In sum, the "unduly oppressive" test recited in our precedent can no longer be interpreted as requiring heightened scrutiny because its legal underpinnings have disappeared. The plaintiffs also do not show that laws regulating the use of property must be subject to heightened scrutiny as a matter of current federal law or that the use of property is a fundamental right for substantive due process purposes. Therefore, in answer to the third certified question, we hold that rational basis review applies to the plaintiffs' state substantive due process challenge to the Fair Chance Housing Ordinance.

## CONCLUSION

Based on the foregoing, we answer the certified questions as follows: Unless and until this court recognizes a principled basis for adopting heightened protections as matter of independent state law, state substantive due process claims are subject to the same standards as federal substantive due process claims. The same is true of state substantive due process claims involving land use regulations and other laws regulating the use of property. Therefore, the standard applicable to the plaintiffs' state substantive due process challenge to the Fair Chance Housing Ordinance is rational basis review.

*Yim. et al.. v. City of Seattle*, No. 96817-9

_____

WE CONCUR:

_____

_____

_____

*Yim et al. v. City of Seattle*, No. 96817-9

# APPENDIX

The following is a nonexclusive list of Washington Supreme Court cases

that may no longer be interpreted as requiring heightened scrutiny in article I,

section 3 substantive due process challenges to laws regulating the use of property:

*Abbey Rd. Grp., LLC v. City of Bonney Lake*, 167 Wn.2d 242, 218 P.3d 180 (2009) (plurality opinion)
*Allen v. City of Bellingham*, 95 Wash. 12, 163 P. 18 (1917)
*Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 143 P.3d 571 (2006)
*Asarco, Inc. v. Dep't of Ecology*, 145 Wn.2d 750, 43 P.3d 471 (2002)
*Biggers v. City of Bainbridge Island*, 162 Wn.2d 683, 169 P.3d 14 (2007) (plurality opinion)
*Brown v. City of Seattle*, 150 Wash. 203, 272 P. 517, 278 P. 1072 (1928)
*Christianson v. Snohomish Health Dist.*, 133 Wn.2d 647, 946 P.2d 768 (1997)
*City of Olympia v. Mann*, 1 Wash. 389, 25 P. 337 (1890)
*City of Seattle v. Ford*, 144 Wash. 107, 257 P. 243 (1927)
*City of Seattle v. Montana*, 129 Wn.2d 583, 919 P.2d 1218 (1996) (plurality opinion)
*City of Seattle v. Proctor*, 183 Wash. 293, 48 P.2d 238 (1935)
*City of Seattle v. Ross*, 54 Wn.2d 655, 344 P.2d 216 (1959)
*City of Spokane v. Latham*, 181 Wash. 161, 42 P.2d 427 (1935)
*Convention Ctr. Coal. v. City of Seattle*, 107 Wn.2d 370, 730 P.2d 636 (1986)
*Cougar Bus. Owners Ass'n v. State*, 97 Wn.2d 466, 647 P.2d 481 (1982)
*Covell v. City of Seattle*, 127 Wn.2d 874, 905 P.2d 324 (1995)
*Crane Towing, Inc. v. Gorton*, 89 Wn.2d 161, 570 P.2d 428 (1977)
*Duckworth v. City of Bonney Lake*, 91 Wn.2d 19, 586 P.2d 860 (1978)
*Ellestad v. Swayze*, 15 Wn.2d 281, 130 P.2d 349 (1942)
*Erickson & Assocs. v. McLerran*, 123 Wn.2d 864, 872 P.2d 1090 (1994)
*Guimont v. Clarke*, 121 Wn.2d 586, 854 P.2d 1 (1993)
*Hass v. City of Kirkland*, 78 Wn.2d 929, 481 P.2d 9 (1971)
*Hauser v. Arness*, 44 Wn.2d 358, 267 P.2d 691 (1954)
*Homes Unlimited, Inc. v. City of Seattle*, 90 Wn.2d 154, 579 P.2d 1331 (1978)
*Horney v. Giering*, 132 Wash. 555, 231 P. 958 (1925)
*Isla Verde Int'l Holdings, Inc. v. City of Camas*, 146 Wn.2d 740, 49 P.3d 867 (2002)
*Lenci v. City of Seattle*, 63 Wn.2d 664, 388 P.2d 926 (1964)
*Lutz v. City of Longview*, 83 Wn.2d 566, 520 P.2d 1374 (1974)

*Manos v. City of Seattle*, 173 Wash. 662, 24 P.2d 91 (1933)

*Margola Assocs. v. City of Seattle*, 121 Wn.2d 625, 854 P.2d 23 (1993)

*Markham Advert. Co. v. State*, 73 Wn.2d 405, 439 P.2d 248 (1968)

*Maytown Sand & Gravel, LLC v. Thurston County*, 191 Wn.2d 392, 423 P.3d 223 (2018)

*McNaughton v. Boeing*, 68 Wn.2d 659, 414 P.2d 778 (1966)

*Myrick v. Bd. of Pierce County Comm'rs*, 102 Wn.2d 698, 677 P.2d 140, 687 P.2d 1152 (1984)

*Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987)

*Patton v. City of Bellingham*, 179 Wash. 566, 38 P.2d 364 (1934)

*Presbytery of Seattle v. King County*, 114 Wn.2d 320, 787 P.2d 907 (1990)

*Ragan v. City of Seattle*, 58 Wn.2d 779, 364 P.2d 916 (1961)

*Remington Arms Co. v. Skaggs*, 55 Wn.2d 1, 345 P.2d 1085 (1959)

*Rivett v. City of Tacoma*, 123 Wn.2d 573, 870 P.2d 299 (1994)

*Robinson v. City of Seattle*, 119 Wn.2d 34, 830 P.2d 318 (1992)

*Sintra, Inc. v. City of Seattle*, 131 Wn.2d 640, 935 P.2d 555 (1997)

*Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 829 P.2d 765 (1992)

*State ex rel. Brislawn v. Meath*, 84 Wash. 302, 147 P. 11 (1915)

*State ex rel. Faulk v. CSG Job Ctr.*, 117 Wn.2d 493, 816 P.2d 725 (1991)

*State ex rel. Modern Lumber & Millwork Co. v. MacDuff*, 161 Wash. 600, 297 P. 733 (1931)

*State ex rel. Rhodes v. Cook*, 72 Wn.2d 436, 433 P.2d 677 (1967)

*State ex rel. Spokane Int'l Ry. Co. v. Kuykendall*, 128 Wash. 88, 222 P. 211 (1924)

*State ex rel. Warner v. Hayes Inv. Corp.*, 13 Wn.2d 306, 125 P.2d 262 (1942)

*State v. Bowen & Co.*, 86 Wash. 23, 149 P. 330 (1915)

*State v. Conifer Enters., Inc.*, 82 Wn.2d 94, 508 P.2d 149 (1973)

*State v. Fabbri*, 98 Wash. 207, 167 P. 133 (1917)

*State v. Van Vlack*, 101 Wash. 503, 172 P. 563 (1918)

*Tiffany Family Tr. Corp. v. City of Kent*, 155 Wn.2d 225, 119 P.3d 325 (2005)

*Town of Woodway v. Snohomish County*, 180 Wn.2d 165, 322 P.3d 1219 (2014)

*Valley View Indus. Park v. City of Redmond*, 107 Wn.2d 621, 733 P.2d 182 (1987)

*Viking Props., Inc. v. Holm*, 155 Wn.2d 112, 118 P.3d 322 (2005)

*Wash. Kelpers Ass'n v. State*, 81 Wn.2d 410, 502 P.2d 1170 (1972)

*Weden v. San Juan County*, 135 Wn.2d 678, 958 P.2d 273 (1998)

*W. Main Assocs. v. City of Bellevue*, 106 Wn.2d 47, 720 P.2d 782 (1986)

*Willoughby v. Dep't of Labor & Indus.*, 147 Wn.2d 725, 57 P.3d 611 (2002)

*Yim et al. v. City of Seattle*
(Stephens, J., concurring in part and dissenting in part)

96817-9

STEPHENS, J. (concurring in part, dissenting in part)—I agree with the majority's answers to the first two certified questions, but I write separately because the third certified question does not involve a matter of state law and is therefore not appropriately before this court.

"[C]ertified questions should be confined to uncertain questions of state law." *City of Houston v. Hill*, 482 U.S. 451, 471 n.23, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987) (citing 17 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4248 (1978)). Any federal court may certify a "question of local law" to this court, RCW 2.60.020, but "[t]he decision whether to answer a certified question . . . is within [our] discretion," *Broad v. Mannesmann Anlagenbau, AG*, 141 Wn.2d 670, 676, 10 P.3d 371 (2000) (citing *Hoffman v. Regence Blue Shield*, 140 Wn.2d 121, 128, 991 P.2d 77 (2000); RAP 16.16(a)). At times, we have "declined to answer certified questions where . . . any

*Yim et al. v. City of Seattle*, 96817-9
(Stephens, J., concurring in part and dissenting in part)

attempt to answer would be improvident." *United States v. Hoffman*, 154 Wn.2d 730, 748, 116 P.3d 999 (2005) (citing *Hoffman*, 140 Wn.2d at 128).

Here, the district court asks us (1) what standard of scrutiny generally applies to a substantive due process claim under the Washington Constitution, (2) whether that same standard of scrutiny applies to substantive due process claims involving land use regulations, and (3) what standard of scrutiny should be applied to Seattle's Fair Chance Housing Ordinance, chapter 14.09 Seattle Municipal Code. *See* Order, No. C18-0736-JCC, at 2-3 (W.D. Wash. Feb. 5, 2019). As the majority cogently explains in response to the first two certified questions, the standard of scrutiny applicable to substantive due process claims under the Washington Constitution is identical to the standard applicable to such claims under the federal constitution. But then, despite recognizing that "the parties' primary dispute [under the third certified question] is the minimum level of scrutiny required by the federal due process clauses," the majority provides a fairly encompassing analysis of federal substantive due process precedent and proposes a conclusion under "current federal law." Majority at 11-12.

The majority justifies its decision to answer a question of federal law by claiming "it is necessary to provide complete answers to the certified questions in this case." *Id.* at 11 (citing *Broad*, 141 Wn.2d at 676). But "certified questions

*Yim et al. v. City of Seattle*, 96817-9
(Stephens, J., concurring in part and dissenting in part)

should be confined to uncertain questions of state law." *Hill*, 482 U.S. at 471 n.23. There is nothing to be gained by offering the district court our interpretation of federal law, when that court must make its own decision and will undoubtedly consider further arguments from the parties about whether our (nonbinding) interpretation is right or wrong. Moreover, there is no requirement for us to provide complete—or, indeed, any—answers to certified questions. *See Broad*, 141 Wn.2d at 676 ("The decision whether to answer a certified question pursuant to chapter 2.60 RCW is within the discretion of the court." (citing Hoffman, 140 Wn.2d at 128; RAP 16.16(a))). We frequently limit certified questions, change them, or simply decline to answer—and that is when state law questions are presented. We have all the more reason to decline to answer a question that requires interpretation of uncertain federal law.

I would decline to answer the third certified question here and accordingly dissent from that portion of the majority's opinion.

*Yim, et al. v. City of Seattle*, 96817-9
(Stephens, J., concurring in part and dissenting in part)

Stephens, J.

Fairhurst, C.J.

Madsen, J.

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHONG and MARILYN YIM, *et al.*,<br><br>                    Plaintiffs,<br><br>      v.<br><br>THE CITY OF SEATTLE,<br><br>                    Defendant. | CASE NO. C18-0736-JCC<br><br>ORDER |

This matter comes before the Court on Defendant's motion to certify a question to the Washington Supreme Court (Dkt. No. 51). Having thoroughly considered the parties' briefing and the relevant record, the Court hereby GRANTS the motion for the reasons explained herein.

I.      **BACKGROUND**

Plaintiffs, individual landlords and a membership association providing screening services to its landlord members, have filed suit against the City of Seattle. (Dkt. No. 1-1 at 2–3.) They challenge the constitutionality of Seattle Municipal Code § 14.09 ("Fair Chance Housing Ordinance"). (*Id.* at 4.) Specifically, they allege that a subsection of the ordinance, which generally precludes landlords from inquiring about a tenant or a prospective tenant's criminal history or from taking adverse action against the same based on criminal history, violates landlords' free speech and substantive due process rights. (*Id.* at 14–18.)

The parties have filed cross motions for summary judgment. (Dkt. Nos. 23, 33.) Various

ORDER
C18-0736-JCC
PAGE - 1

1   interested parties have filed *amicus curiae* briefs in support of both sides. (Dkt. Nos. 38, 39, 40,

2   42, 43, 44.) At the end of the summary judgment briefing schedule, Defendant moved the Court

3   to certify the following question to the Washington Supreme Court—what is the proper standard

4   for evaluating substantive due process claims that arise under the Washington Constitution?

5   (Dkt. No. 51.) Plaintiffs oppose the motion because they argue that the law is clear and that the

6   question is not dispositive to this case. (Dkt. No. 52.)

7   **II.   DISCUSSION**

8          A federal court may certify to the Washington Supreme Court a question of Washington

9   law involved in the underlying federal case when "it is necessary to ascertain the local law . . . in

10  order to dispose of such proceeding and the local law has not been clearly determined." Wash.

11  Rev. Code § 2.60.020. The certification process serves the important judicial interests of

12  efficiency and comity. Certification saves "time, energy, and resources and helps build a

13  cooperative judicial federalism." *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974).

14         The Court finds several important reasons to certify the proposed question to the

15  Washington Supreme Court. First, the case involves an important and far-reaching issue of local

16  law and public policy. Second, the Washington Supreme Court has not squarely answered what

17  the proper standard is for a substantive due process claim arising under these or similar

18  circumstances. Third, the Washington Supreme Court may soon decide this same question in

19  another case and this Court is therefore wary about applying a potentially inaccurate standard

20  under state law. (*See* Dkt. No. 52-3.) For those reasons, this matter should be presented for

21  expedited review to the Washington Supreme Court. The following questions are hereby

22  certified to the Washington Supreme Court:

23         1.   What is the proper standard to analyze a substantive due process claim under the

24              Washington Constitution?

25         2.   Is the same standard applied to substantive due process claims involving land use

26              regulations?

3.  What standard should be applied to Seattle Municipal Code § 14.09 ("Fair Chance Housing Ordinance")?

The Court does not intend its framing of the questions to restrict the Washington Supreme Court's consideration of any issues that it determines are relevant. The Washington Supreme Court may in its discretion reformulate the questions, if it decides to consider the questions. *Affiliated FM Ins. Co. v. LTK Consulting Servs. Inc.*, 556 F.3d 920, 922 (9th Cir. 2009).

The Clerk is DIRECTED to submit to the Washington Supreme Court a certified copy of this order; a copy of the docket in the above-captioned matter; and Docket Numbers 23, 24, 33, 38, 39, 40, 42, 43, 44, 48, 50, 51, and 52 in this case. The record so compiled contains all matters in the pending case deemed material for consideration of the local law questions certified for answer.

## III.   CONCLUSION

For the foregoing reasons, Defendant's motion to certify a question to the Washington Supreme Court (Dkt. No. 51) is GRANTED. The matter is STAYED until the Washington Supreme Court answers the certified questions. Defendant shall file the opening brief on the certified questions, in accordance with the Washington Rules of Appellate Procedure. The Clerk is DIRECTED to terminate all pending motions and case management deadlines.

DATED this 5th day of February 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER
C18-0736-JCC
PAGE - 3

1

2

3

4

5

6

7

8

9

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10  YIM, *et al.*,

11              Plaintiffs,

12       vs.

13  CITY OF SEATTLE,

14              Defendant.

No.    2:18-cv-736-JCC

DECLARATION OF ASHA
VENKATARAMAN

NOTED ON MOTION CALENDAR:
Friday, January 11, 2019

15

16    I, ASHA VENKATARAMAN, declare as follows:

17    1.      I am over the age of 18, have personal knowledge of the matters set forth below,

and am competent to be a witness herein.

18

19    2.      I am a Policy Analyst with the Legislative Department of the City of Seattle

20  (City). My duties include providing independent fiscal and policy analysis to the City Council. I

have worked with the City since August 2015.

21

22    3.      I have reviewed the Stipulated Facts ("SF") filed in this matter, Dkt. # 24 at 2-11.

23

DECLARATION OF ASHA VENKATARAMAN - 1
*YIM ET AL. V. CITY OF SEATTLE*, No. C18-736JCC

**PETER S. HOLMES**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

4.     I have reviewed the Stipulated Record ("SR") the City is filing contemporaneously with this Declaration.

5.     From approximately July 2016 to January 2018, I was involved in work related to the City's Fair Chance Housing Ordinance ("Ordinance"). My work began as a member of the Fair Chance Housing Committee ("Committee"), convened by Mayor Edward Murray on January 19, 2016. SF ¶ 22, Dkt. # 24 at 8.

6.     In 2014, the City Council passed and Mayor Murray signed Resolution 31546 to develop a Seattle Housing and Affordability and Livability Agenda ("HALA") and establish a HALA Advisory Committee to evaluate potential housing strategies. SR 28-29.

7.     In 2015, the HALA Committee recommended that the City address the barriers faced by renters with criminal records via legislation, education, and technical assistance. SR 26, 51.

8.     The Seattle Office for Civil Rights ("SOCR") convened Committee members, referred to as stakeholders, for six meetings between January 2016 and January 2017. SR 227.

9.     Stakeholders represented a diverse array of interests including persons with prior convictions, legal advocacy organizations, landlord associations (including a representative for Plaintiff Rental Housing Association of Washington ("RHA")), nonprofit housing providers, and social service agencies specializing in working with people in re-entry. SR 230.

10.     Committee stakeholders relayed the importance of ensuring that legislation meaningfully addressed the experiences of communities of color. SR 229.

11.     SOCR reached out to residents living in transitional housing and members of the Black Prisoners Caucus at Clallam Bay State Penitentiary. These people emphasized the importance of racial equity as a part of this legislation. SR 229.

DECLARATION OF ASHA VENKATARAMAN - 2
*YIM ET AL. V. CITY OF SEATTLE*, NO. C18-736JCC

ER 075

**PETER S. HOLMES**
Seattle City Attorney
701 5ᵗʰ Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

12. Working for a year, the Committee heard from those facing barriers to housing due to their criminal records, considered academic research, and reviewed legislation from other jurisdictions that have regulated the use of criminal records in tenant screening. SR 224; 276-77.

13. The Committee met in January 2016 to discuss stakeholders' current experience with criminal record screening. In August 2016, the Committee discussed the University of Michigan study on the unintended consequences of ban-the-box policies on racial equity. During the September and October 2016 meetings, the Committee discussed what should be included in a legislative framework. SOCR provided the Committee with a draft proposal for feedback and response during the December 2016 meeting. SOCR updated the draft proposal and the Committee provided further feedback during the January 2017 meeting. SR 224.

14. On May 23, 2017, the City Council Civil Rights, Utilities, Economic Development and Arts ("CRUEDA") Committee held a meeting to review the fair chance housing legislative process. SF ¶ 25, Dkt. # 24 at 9. Twelve people spoke during public comment, including a woman with a 15-year-old felony conviction who felt "reconvicted" when applying for housing although she served her 15-month, paid her fines, and served her probation. *See* http://seattlechannel.org/mayor-and-council/city-council/2016/2017-civil-rights-utilities-economic-development-and-arts-committee?videoid=x76441&Mode2=Video at 16:50 – 18:58 (Criminal records "are being used by private citizens to reconvict me and others who have already paid their debt to society. Unless my sentence says I'm going to struggle with employment the rest of my life and that I won't be able to find anywhere to rent; then to me, my debt is paid."). A social worker also testified, describing a client's difficulty in securing housing due to a recent misdemeanor resulting from the theft of less than $40 in medical supplies, noting that people are

DECLARATION OF ASHA VENKATARAMAN - 3
*YIM ET AL. V. CITY OF SEATTLE*, NO. C18-736JCC

**PETER S. HOLMES**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

1  being denied housing "for crimes that are not a danger to the community" *Id.* at 0:28:01-0:30:03,

2  and 00:29:02-00:29:37.

3      15. During the May CRUEDA meeting, a presentation was made with an update on the

4  Committee stakeholder process, highlighting the four main goals: using racial equity, keeping

5  families together, building inclusive communities, and addressing homelessness. SR 221. The

6  presentation included discussion from individual Committee stakeholders, one of whom shared

7  that landlords are already following federal guidance regarding individualized assessments of

8  criminal records. Another raised concerns that the two-year lookback could maintain barriers faced

9  by homeless persons with criminal histories and suggested additional solutions to address this

10  particular population. *See* http://seattlechannel.org/mayor-and-council/city-council/2016/2017-

11  civil-rights-utilities-economic-development-and-arts-

12  committee?videoid=x76441&Mode2=Video (Sean Flynn of RHA at 2:05:22 – 2:07:25; Andrew

13  Kashyap of the Racial Disparity Project at 2:17:00 – 2:21:35).

14      16. On June 20, 2017, Mayor Murray transmitted proposed Fair Chance Housing

15  legislation to the City Council. SF ¶ 26, Dkt. # 24 at 9. The legislation was developed with input

16  from the Committee and, although it "did not represent a consensus from the group," it "aim[ed]

17  to address barriers while balancing concerns." SR 260.

18      17. The proposal prohibited blanket or categorical exclusions of criminal history in rental

19  advertisements, and regulated the tenant screening process by prohibiting landlords from asking

20  about arrests that did not lead to a conviction, including: pending charges; expunged, vacated or

21  sealed convictions; juvenile records; and criminal history older than two years. SR 260-61. The

22  proposed legislation allowed landlords to review information obtained from a sex offender

23

DECLARATION OF ASHA VENKATARAMAN - 4
*YIM ET AL. V. CITY OF SEATTLE*, NO. C18-736JCC

**PETER S. HOLMES**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

registry, and required a legitimate business justification if a landlord took an adverse action against an applicant because of criminal history. SR 261

18. On July 13, 2017, the CRUEDA Committee held a public meeting that included a presentation and a question-and-answer session with six panelists, many of whom were also Committee stakeholders: Nick Straley of Columbia Legal Services, Hillary Young of Pioneer Humans Services, Augustine Cita of the Urban League, and Marcel Baugh of the Seattle Human Rights Commission. William Shadbolt of RHA and Susan Mason of What's Next Washington were also panelists. Forty-one people commented, including seven who had been denied tenancy based on their criminal histories, some for convictions going back more than 20 years. *See* http://seattlechannel.org/mayor-and-council/city-council/2016/2017-civil-rights-utilities-economic-development-and-arts-committee?videoid=x78912 (Anitra Freeman at 1:31:51 – 1:33:25; George Sidwell at 1:34:25 – 1:35:00).

19. One panelist at the July CRUEDA meeting described how an employee was denied housing for a 10-year-old conviction, following two years of stable renting at transitional housing. This panelist explained that background checks show conviction information and the full sentence, but do not necessarily show when a person left prison or completed parole. The panelist added that under current state law, criminal records follow applicants for much longer than seven years because the screening will look back seven years from the full sentence, even though most people do not complete the full sentence. *See* http://seattlechannel.org/mayor-and-council/city-council/2016/2017-civil-rights-utilities-economic-development-and-arts-committee?videoid=x78912 (Hilary Young at 0:35:00 – 0:38:00). The representative of RHA expressed his view that being able to look back two years for minor crimes, but not further back for more serious crimes, did not make sense. *Id.* at 0:29:09 – 0:32:36 (William Shadbolt). Another

DECLARATION OF ASHA VENKATARAMAN - 5
*YIM ET AL. V. CITY OF SEATTLE*, No. C18-736JCC

ER 078

PETER S. HOLMES
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

panelist noted that there is no empirical data to show that people with criminal histories are poor tenants and, because background checks can be inaccurate, they are an unreliable indicator of good tenancy. *Id.* at 0:26:20 – 0:29:06 (Nick Straley).

20. Part of the Committee process included completion of a Racial Equity Toolkit shared during the July 13, 2017 presentation. SF ¶ 28, Dkt. # 24 at 9. The Toolkit included an analysis of potential unintended consequences of the proposed limit on reviewing criminal records. The Toolkit referenced the University of Michigan study on the unintended consequences of ban-the-box policies on racial equity.SR 270. To mitigate unintended consequences, the Committee proposed including a two-year lookback period (banning landlords from reviewing criminal histories more than two years old) to reduce instances of racial bias infecting the process. SR 268. But the Toolkit also concluded that the lookback posed a risk to applicants with recent criminal history, creating an "access gap for individuals experiencing homelessness, with low level offenses, disproportionately living with disabilities, and disproportionately Black." SR 270.

21. The CRUEDA Committee held another meeting on July 25, 2017, featuring a memorandum I drafted, outlining the status of the proposed legislation and describing seven proposed amendments. SF ¶ 29, Dkt. # 24 at 10; SR 296-320. The more substantive amendments included removing the exclusion for four or fewer units where the owner lives on the premises, prohibiting the review of a sex offense conviction if the conviction occurred as a juvenile, and the elimination of the two-year lookback period. SR 299-300.

22. Fourteen people provided public comment, most in support of the legislation; one noted that no landlord has testified to being safer with criminal background checks, while there were many stories of how criminal histories present obstacles to securing housing. *See*

DECLARATION OF ASHA VENKATARAMAN - 6
*YIM ET AL. V. CITY OF SEATTLE*, NO. C18-736JCC

**PETER S. HOLMES**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

1 http://seattlechannel.org/mayor-and-council/city-council/2016/2017-civil-rights-utilities-

2 economic-development-and-arts-committee?videoid=x79283 at 0:36:55 – 0:39:05.

3    23. On August 8, 2017 another CRUEDA meeting was held. During this meeting,

4 Councilmember O'Brien discussed his proposal to eliminate the two year lookback period. SR

5 300. In support of this amendment, Councilmember O'Brien noted that reviewing criminal history

6 doesn't benefit landlords or other tenants because there is no  evidence that criminal history is an

7 indicator of a bad tenant. He also stated that criminal histories were not so readily available a

8 decade ago and there was no outcry at that time from landlords that housing was being

9 compromised due to tenants with criminal histories. Thus screening for criminal history was never

10 a solution to an identified problem. He noted that stable housing assists with reintegration and

11 reduces recidivism. *See* http://seattlechannel.org/mayor-and-council/city-council/2016/2017-

12 civil-rights-utilities-economic-development-and-arts-committee?videoid=x79673 at 1:02:15-

13 1:05:23.

14    24. Councilmembers Debora Juarez, Sally Bagshaw, Lisa Herbold, and Kshama Sawant

15 also expressed support for removing the two-year lookback period. *Id.* at 1:05:23-1:17:45.

16    25. On August 8, 2017, the CRUEDA Committee unanimously passed all seven

17 amendments and recommended that the City Council pass the proposed council bill as amended.

18 SF ¶ 31, Dkt. # 24 at 10. Prior to the vote being taken,  14 people provided public comment. *See*

19 http://seattlechannel.org/mayor-and-council/city-council/2016/2017-civil-rights-utilities-

20 economic-development-and-arts-committee?videoid=x79673&Mode2=Video.

21    26. On August 14, 2017, a substitute bill reflecting the CRUEDA Committee's

22

23

DECLARATION OF ASHA VENKATARAMAN - 7
*YIM ET AL. V. CITY OF SEATTLE*, NO. C18-736JCC

**PETER S. HOLMES**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

1  amendments was introduced and the City Council unanimously adopted the Ordinance. SF

2  ¶¶ 32-33, Dkt. # 24 at 10. All 13 people who provided public comment supported the passage of

3  the Ordinance. *See* http://www.seattlechannel.org/FullCouncil?videoid=x79943&Mode2=Video.

4

5      I declare under penalty of perjury under the laws of the State of Washington that the

6  foregoing is true and correct.

7      Signed this 26th day of October, 2018 at Seattle, Washington.

8

9                                      Asha Venkataraman

10

11

12

13

14

15

16

17

18

19

20

21

22

23

DECLARATION OF ASHA VENKATARAMAN - 8
*YIM ET AL. V. CITY OF SEATTLE*, NO. C18-736JCC

**PETER S. HOLMES**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

# Appendix 1

Pl. Mtn. for Summ. J./Stipulated Facts (SF)

Court: W.D. Wash.  Case No. 2:18-cv-00736-JCC

Pacific Legal Foundation
10940 Northeast 33rd Place, Suite 210
Bellevue, WA 98004 - 425.576.0484

Honorable John C. Coughenour

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10 | CHONG and MARILYN YIM, KELLY
LYLES, EILEEN, LLC, and RENTAL
11 | HOUSING ASSOCIATION OF
WASHINGTON,

     No.    2:18-cv-736-JCC

12

                  Plaintiffs,

     STIPULATED FACTS AND RECORD

13

          vs.

14

THE CITY OF SEATTLE, a Washington
15 | municipal corporation,

16

                 Defendant.

17

**A.**    **Agreement.**

18

      For purposes of forthcoming cross motions for summary judgment, the parties stipulate to

19

the following facts and will limit themselves to these facts and the attached documents unless the

20

parties agree to additional facts or documents.

21

22

23

STIPULATED FACTS AND RECORD - 1
*YIM ET AL. V. CITY OF SEATTLE*, NO. 2:18-cv-736-JCC
ER 083

The stipulated facts and attached documents are numbered consecutively. The parties may cite the stipulated facts by paragraph number (using "SF" for "stipulated fact") and the attached documents by page number (using "SR" for "stipulated record").

Although Defendant City of Seattle ("City") is unable to confirm the facts regarding individual plaintiffs (SF 1 - 18), the City stipulates to those facts for purposes of the cross motions for summary judgment. The City also agrees Plaintiffs have established standing to maintain this action.

Nothing in this stipulation precludes either party from: characterizing the attached documents or relying on facts the documents support; citing published material, such as articles in periodicals or papers posted online; citing legislation or legislative history from other jurisdictions; asking the court to take judicial notice of adjudicative facts under FRE 201; or arguing that certain stipulated facts are immaterial to this dispute.

**B.     Agreed Facts and Record.**

**Plaintiffs and their interests in this dispute.**

1.  Chong and MariLyn Yim, Kelly Lyles, and Eileen, LLC, are plaintiff landlords who own and manage small rental properties in Seattle and are subject to Seattle's Fair Chance Housing Ordinance.

2.  Chong and MariLyn Yim own a duplex and a triplex within Seattle city limits. They and their three children live in one of the units in the triplex. The Yims rent out the other two units in the triplex and both units in the duplex. The Yims share a yard with their renters in the triplex, and the Yim children are occasionally at home alone when the renters are at home.

3.  Currently, the four units that the Yims rent out in Seattle are occupied. A single woman occupies one of the two rented units in the triplex, and a couple occupies the other. Three

STIPULATED FACTS AND RECORD - 2
*YIM ET AL. V. CITY OF SEATTLE*, NO. 2:18-cv-736-JCC
ER 084

Peter S. Holmes
Seattle City Attorney
701 Fifth Ave., Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

roommates live in one of the duplex units, and two roommates occupy the other duplex unit. Occasionally, the duplex tenants need to find a new roommate. Some of the new roommates were strangers to the tenants before moving in. Prior to the Fair Chance Housing Ordinance, the Yims regularly requested criminal background screening of rental applicants, including new-roommate applicants.

4.   The Yims and their children could not afford to live in Seattle without the rental income from these properties. The Yims consider prospective tenants on a case-by-case basis and are willing to rent to individuals with a criminal history depending on the number of convictions, the severity of the offenses, and other factors they deem relevant to the safety of the Yims, their children, and their other tenants.

5.   Kelly Lyles is a single woman who, in addition to the dwelling unit in which she resides, owns and rents a house in West Seattle. Ms. Lyles considers prospective tenants on a case-by-case basis. Ms. Lyles understands the needs of individuals recovering from addiction and would consider an applicant who did not otherwise satisfy her screening criteria if the applicant was part of a recovery program.

6.   Ms. Lyles is a local artist who relies on rental income to afford living in Seattle. The $1,300 in rent she receives monthly makes up most of her income. Ms. Lyles cannot afford to miss a month's rental payment from her tenant and cannot afford an unlawful detainer action to evict a tenant who fails to timely pay. As a single woman who frequently interacts with her tenants, she considers personal safety when selecting her tenants.

7.   Ms. Lyles rents her home to a PhD student at the University of Washington. With Ms. Lyles's permission, that tenant has subleased the basement to a single, divorced woman.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Ave., Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

8.  Scott Davis and his wife own and manage Eileen, LLC, through which they operate a seven-unit residential complex in the Greenlake area of Seattle. The Davises would consider applicants with a criminal history based on the circumstances of the crime(s) and the safety needs of the other tenants.

9.  The Rental Housing Association of Washington ("RHA") is a statewide non-profit organization established in 1935. RHA has over 5,300 landlord members, most of whom own and rent residential properties in Seattle. Most RHA members rent out single-family homes, often on a relatively short-term basis due to the landlord's work, personal, or financial needs. As part of the RHA membership application, landlords must list the zip codes in which they own and rent residential property.

10.  RHA provides professional screening services. Landlords must become RHA members to utilize these services. Additionally, tenants can purchase a reusable screening report from RHA.

11.  Landlord members who wish to receive screening services must also go through a certification process verifying that they maintain ownership of at least one rental property. They can so certify by providing two of any of the following documents: a county tax assessor's bill, deed, escrow closing statement, flood certification, property insurance, title insurance, or a utility bill.

12.  Two full-time employees work in RHA's screening department. RHA contracts with Judicial Information Services and Innovation Software Solutions to provide an array of background information on rental applicants.

13.  Members can request three different types of screening packages: Basic, Background Screening, and Premium. The Basic package includes the applicant's credit report and

STIPULATED FACTS AND RECORD - 4
*YIM ET AL. V. CITY OF SEATTLE*, NO. 2:18-cv-736-JCC
ER 086

Peter S. Holmes
Seattle City Attorney
701 Fifth Ave., Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

previous address. The Background Screening package includes multi-state criminal background, multi-state eviction history, and address history. The Premium package combines the Background Screening and Basic packages.

14. A sample Premium screening report displays the type and format of data on RHA's reports. SR 0001- SR 0006. The report, with RHA's logo at the top, first displays an executive summary of the types of screening in the report and the status of each screening, such as "completed" or "adverse." SR 0001. The report includes address history, employment history, credit history, eviction history, and criminal history. SR 0003-0006.

15. The criminal history displays a multistate and federal criminal background. SR 0004-0006. For any given offense, the report lists the relevant jurisdiction, a short description of the offense, disposition and disposition date, sentence length, probation length, and an assortment of other minor details in an "additional information" section.

16. RHA members can make a screening request through email, fax, or RHA's online system. The request must provide the rental applicant's application, including the applicant's consent to be screened. Regardless of the means a landlord uses to request a screening (email, fax, or RHA's online system), RHA provides the landlord member the same information.

17. If the landlord requests a background check via email or fax, RHA staff will submit the applicant's name, date of birth, and social security number through Innovative Software Solutions, and the online system will pull the background check information provided by Judicial Information Services. RHA staff does not alter or re-format the information provided by Innovative Software Solutions. Instead, they send a PDF document of the information as displayed by Innovative Software Solutions to the requesting landlord. If a landlord requests background check services through RHA's online system, the landlord directly inserts the

STIPULATED FACTS AND RECORD - 5
*YIM ET AL. V. CITY OF SEATTLE*, NO. 2:18-cv-736-JCC
ER 087

Peter S. Holmes
Seattle City Attorney
701 Fifth Ave., Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

applicant's name, date of birth, and social security number, but RHA staff still reviews the report before delivering it to the landlord. If information retrieved through Innovative Software Solutions contains criminal history, RHA staff contacts the court(s) with the relevant records directly to verify the records' accuracy.

18. Because of the Fair Chance Housing Ordinance and because the Background Screening and Premium packages offer criminal histories, RHA has added Seattle-specific versions of those packages that omit criminal histories. An example of a report provided as part of the Seattle Premium package is included as SR 0007 – 0013. A landlord leasing property located within the City of Seattle ("Seattle Landlord") can obtain either the Seattle Premium package or the Seattle Background Screening package, which are substantially similar to the non-Seattle packages aside from the omission of criminal history.[1] If a Seattle Landlord requests one of the packages that includes criminal history, RHA staff denies the request and notifies the landlord of the Fair Chance Housing Ordinance via email. An example of an email denying a screening request and notifying the landlord of the Fair Chance Housing Ordinance is included as SR 0014 (attachments omitted). In response to the Fair Chance Housing Ordinance, RHA also created a new model application for tenancy for Seattle Landlord members that contains mandatory disclosures and omits questions about criminal history, an example of which is included as SR 0015 – 0016. Additionally, the RHA webpage where

---

[1] The example Seattle Premium package report (SR 0007 - 0013) and example non- Seattle Premium package report (SR 0001 - 0006) differ slightly in other respects not germane to this dispute. For purposes of this dispute, the salient difference is how each treats criminal history.

STIPULATED FACTS AND RECORD - 6
*YIM ET AL. V. CITY OF SEATTLE*, NO. 2:18-cv-736-JCC
ER 088

landlords can request screening services displays a notice about the screening limits imposed by the Fair Chance Housing Ordinance. A screenshot of the notice is included as SR 0017.[2]

**Activity before adoption of the Fair Chance Housing Ordinance.**

19. On July 13, 2015, the Seattle City Council's Housing and Affordability and Livability Agenda ("HALA") Committee issued its Final Advisory Committee Recommendations to City Mayor Edward B. Murray and the rest of the City Council. SR 0018-0093.

20. In October 2015, the City Council adopted Resolution 31622. The Resolution included one attachment: the Council Work Plan for HALA Recommendations. SR 0094-0107.

21. On June 13, 2016, the City Council adopted Resolution 31669. The Resolution included four attachments: Appendix F-11 of the HALA recommendations; "Selecting a Tenant Screening Agency: Guideline for Property Management in Affordable Housing"; Engrossed Senate Bill 6413; and "Recommended Best Practices to Do and Not Do in Drafting and Implementing a Criminal Conviction Screening Policy." SR 0108-0133.

22. In a January 19, 2016 press release, Mayor Murray announced that he had convened a 19-member Fair Chance Housing Committee. SR 0134-0136.

23. On February 16, 2016, City Councilmembers Lisa Herbold, M. Lorena Gonzalez, Debora Juarez, and Mike O'Brien submitted a memorandum to Mayor Murray related to the Fair Chance Housing Committee. SR 0137-0139.

---

[2] SF 9 – 18 constitute the facts on which RHA relies to adjudicate its as-applied First Amendment claim. The other Plaintiffs do not present an as-applied First Amendment claim.

STIPULATED FACTS AND RECORD - 7
*YIM ET AL. V. CITY OF SEATTLE*, NO. 2:18-cv-736-JCC
ER 089

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Ave., Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

24. In December 2014, the entity then known as the Committee to End Homelessness King County (now known as All Home), released a report titled "Family Homelessness Coordinated Entry System Analysis and Refinement Project." SR 0140-0218.

25. On May 23, 2017, the Seattle Office of City Rights ("SOCR") made a presentation to the City Council's Civil Rights, Utilities, Economic Development, and Arts Committee ("CRUEDA") regarding the Fair Chance Housing Stakeholder Process, which included a slide show (SR 0219-0225) and a May 17, 2017 memorandum from SOCR Director Patty Lally. SR 0226-0230.

**The Fair Chance Housing Ordinance (Ord. 125393)**

26. On June 20, 2017, Mayor Murray transmitted legislation to the City Council, which was ultimately assigned Council Bill Number ("CB") 119015 (SR 0231-0259), along with a cover letter. SR 0260-0261. The version of the bill Mayor Murray transmitted was labeled "D3b" in the bill's header, indicating it was at least the third iteration of the document at that time. When entered into the City Council's electronic legislation system, that version was deemed "version 1," indicating it was the first version uploaded to that system.

27. On June 26, 2017, the Council referred CB 119015 to the CRUEDA Committee.  SR 0262-0263.

28. On July 13, 2017, the CRUEDA Committee held a special meeting to discuss CB 119015, which included a presentation, panel discussion, and public hearing. The agenda included several supporting documents, including: a Racial Equity Toolkit (SR 0264-0271); the Mayor's June 20, 2017 letter (*see* SR 0260-0261); a July 10, 2017 SOCR memorandum (SR 0272-0278); and a slide show. SR 0279-0295.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Ave., Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

29. On July 24, 2017, Council Central Staff submitted a memorandum to the CRUEDA Committee for discussion at its July 25, 2017 meeting, which included seven proposed amendments to CB 119015. SR 0296-0320.

30. One proposed amendment was to create a separate Clerk's File for the documents and research supporting CB 119015. *Id.* The documents and research supporting CB 110915 ultimately became Clerk's File number 320351. SR 0321-0546.

31. On August 8, 2017, the CRUEDA Committee met and unanimously passed all seven proposed amendments and recommended that the full City Council pass CB 1109015 as amended. SR 0547-0548.

32. At the full Council's August 14, 2017 meeting, Councilmember Lisa Herbold moved to substitute version 5 of CB 119015 (labeled "D5" in the bill's header and reflecting the CRUEDA Committee's recommendations), for version 4 (an earlier version). SR 0549-0550. The proposed substitute showed the proposed amendments to version 4, labeled "D4-revised" in the bill's header. SR 0551-0581. The City Council unanimously passed the motion and version 5. *See* SR 0550. A summary and fiscal note accompanied the final legislation. SR 0582-0584.

33. On August 23, 2017, Mayor Murray signed the bill, which became Ordinance 125393. SR 0585-0616. The Ordinance took effect 30 days later (on September 22, 2017), but to provide time for rule-making and to adjust business practices, the Ordinance's operative provisions did not take effect until February 19, 2018, 150 days after the Ordinance. *See* SR 0616.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Ave., Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

**2018 University of Washington study**

34. In June 2018, the University of Washington completed a City-commissioned "Seattle Rental Housing Study," including a final report and appendices. SR 0617-1141.

Agreed to September 12, 2018.

PACIFIC LEGAL FOUNDATION

By: s/Ethan W. Blevins, WSBA #48219
Pacific Legal Foundation
10940 NE 33rd Place, Suite 210
Bellevue, WA 98004
Ph: (425) 576-0484
EBlevins@pacificlegal.org
*Attorney for Plaintiffs Yim, et al.*

PETER S. HOLMES
Seattle City Attorney

By: s/Sara O'Connor-Kriss, WSBA #41569
By: s/Roger D. Wynne, WSBA #23399
Seattle City Attorney's Office
701 Fifth Ave., Suite 2050
Seattle, WA 98104-7097
Ph: (206) 615-0788
Ph: (206) 233-2177
Sara.OConnor-Kriss@seattle.gov
Roger.Wynne@seattle.gov
*Attorneys for Defendant City of Seattle*

STIPULATED FACTS AND RECORD - 10
*YIM ET AL. V. CITY OF SEATTLE*, NO. 2:18-cv-736-JCC
ER 092

Peter S. Holmes
Seattle City Attorney
701 Fifth Ave., Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

# Appendix 2

Pl. Mtn. for Summ. J./Stipulated Record (SR)
(Excerpts)
Court: W.D. Wash.  Case No. 2:18-cv-00736-JCC

Pacific Legal Foundation
10940 Northeast 33rd Place, Suite 210
Bellevue, WA 98004 - 425.576.0484



2414 SW ANDOVER ST
SEATTLE , WA 98106
Phone: (206) 283-0816 / (800) 335-2990
Fax: (206) 286-9461

| | | | |
|---|---|---|---|
| **File No:** | 72313898 | **Requested By:** | RHAWA |
| **Name:** | Non- Seattle Applicant | **Date Ordered:** | 06/27/2018 |
| **SSN:** | ***-**-9874 | **Date Completed:** | 06/27/2018 |
| **Address:** | 10821 Wonderland AVE SEATTLE , WA 98106 | | |
| **Prepared For:** | RHAWA | | |

**EXECUTIVE SUMMARY**

| Report Type | Description | Status |
|---|---|---|
| Tenant Credit Infile | Trans Union | Completed |
| Criminal Court Record | XX , MULTISTATE , Non- Sea App | Completed |
| Eviction Report | XX | Completed |
| PREVIOUS ADDRESS HISTORY | | Completed |



**2414 SW ANDOVER ST**
**SEATTLE , WA 98106**
**Phone: (206) 283-0816 / (800) 335-2990**
**Fax: (206) 286-9461**

| Tenant Credit Infile |
|---|

| Prepared For: | RHAWA 2414 Andover Seattle, WA 98106 | Sources: | TU |
|---|---|---|---|
| | | Ordered: | 06/27/2018 |
| | | Completed: | 06/27/2018 |
| | | Report No: | 72313898 |
| | | Requested By: | cyoung206 |

**APPLICANT**

| Name Address | Phone | Social Security | Age/DOB | Dependents |
|---|---|---|---|---|
| Non   SEA App 10821 8TH AVE SEATTLE , WA 98146 | | ***-**-9874 | 19921029 | |

**RESIDENCE**

| Type Ownership | App/CoApp | Address | Since To |
|---|---|---|---|
| PRESENT | APPLICANT | 11911 SEDIVISION ST PORTLAND , OR 97266 | 03/14 |
| PREVIOUS | APPLICANT | 21628 SE239TH ST MAPLE VALLEY , WA 98038 | 11/13 |

**EMPLOYMENT**

| Employer | Position | Income | From VerDate | TO VerBy |
|---|---|---|---|---|
| HOMEMAKER Non Seattle App | HOMEMAKER | | | |

**SCORES**

| Risk Assessment | Codes |
|---|---|
| Non Seattle Applicant                              TUC-01 | |
| FILE NOT SCORED BECAUSE SUBJECT DOES NOT HAVE SUFFICIENT CREDIT | |

**PROFILE SUMMARY**

| | | | COUNT | BALANCES | PAYMENTS | PAST DUE |
|---|---|---|---|---|---|---|
| PUBLIC RECORDS | 0 | INSTALLMENT | 0 | $0 | $0 | $0 |
| INQUIRIES | 6 | REVOLVING | 0 | $0 | $0 | $0 |
| CURRENT ACCOUNTS | 0 | REAL ESTATE | 0 | $0 | $0 | $0 |
| NOW DELINQUENT | 0 | OTHER | 0 | $0 | $0 | $0 |
| PREVIOUSLY DELQ. | 0 | | | | | |
| PAID ACCOUNT | 0 | | | | | |
| R/E NOW DELINQUENT | 0 | TOTAL | 0 | $0 | $0 | $0 |
| OLDEST TRADE: | 08/01 | | | | | |

| PUBLIC RECORDS |
|---|
| NONE FOUND. |
| Reporting Bureau certifies compilance with contractual requirements governing check of public records with these results. |

### CREDIT HISTORY

| ECOA | Creditor Name Account Number | Type | Date Reported | Date Opened Last Activity Term | Hi Credit Mo Term | Balance Amount Amount | Past Due | Historical | | | | MOP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Mo | 30 | 60 | 90 | |

| COLLECTIONS(S) |
|---|
| NONE FOUND. |

| TRADE(S) |
|---|
| NONE FOUND. |

### INQUIRIES

| Date | Name | Code | IC | |
|---|---|---|---|---|
| 06/27/2018 | RNTL HSG ASS | Z01047026 | | Non Seattle Applicant |
| 03/15/2018 | US BANK | B00851016 | | Non Seattle Applicant |
| 09/01/2017 | US BANK | B00851016 | | Non Seattle Applicant |
| 04/14/2017 | US BANK | B00851016 | | Non Seattle Applicant |
| 10/18/2016 | ORCA FINANCI | Z05376310 | | Non Seattle Applicant |
| 07/16/2016 | SYNCB/TOYSDC | B05894261 | | Non Seattle Applicant |

### AKAs

| Non Seattle App | Non Seattle App |
|---|---|

### IDENTIFICATION

TUC-01
Name:   TRANSUNION
Address: 2 BALDWIN PLACE, P.O. BOX 1000
         CHESTER, PA 19016
Phone:   800-888-4213
Name:   Non Seattle Applicant , \*\*\*-\*\*-9874 , DOB: 10/29/1992
ADDRESS DISCREPANCY ALERT: MISMATCH (INQUIRIES IN LAST 60 DAYS=00) SUBSTANTIAL
DIFFERENCE BETWEEN THE ADDRESS SUBMITTED IN THE CREDIT REQUEST AND THE ADDRESS(ES) IN
THE CREDIT FILE. VERIFY IDENTITY OF CONSUMER BEFORE GRANTING CREDIT. (FACT ACT)
HIGH RISK FRAUD ALERT - REQUESTED PRODUCT DELIVERED;
SSN ISSUED: 1993 - 1993; STATE OF: WA
INPUT SSN ISSUED: 1993; STATE: WA; (EST. AGE OBTAINED: 00 TO 01)
- REQUESTED PRODUCT DELIVERED;
REGULAR HIT ON FILE-ALL FILES ARE RETURNED
EXACT MATCH BETWEEN SSN ON INPUT AND SSN ON FILE
IN FILE SINCE: 11/13/2013

### REPORT FOOTER

TRANS UNION
2 BALDWIN PL.
P.O. BOX 1000

CHESTER, PA 19022
(800)888-4213
**END OF CREDIT REPORT**

---

**PREVIOUS ADDRESS HISTORY**

**Name Searched:**      Non Seattle Applicant
**Social Searched:**    ***-**-9874

**Comments:**   SSN IS VALID. ISSUED IN WA
                IN THE YEAR 1993
                Records found: 2

Non Seattle Applicant   DOB: 10/29/1992                              AGE: 25

| **Address:** | AddressType: Unknown |
| 7895231 Neverland S  ST | Format: General |
| PORTLAND, Cal 97266-1081 | From: 2014-03 |
| MULTNOMAH COUNTY | To: 2017-10 |

Non Seattle Applicant   DOB: 10/29/1992                              AGE: 25

| **Address:** | AddressType: Unknown |
| 896512 Neverland S | Format: General |
| MAPLE Highway, WA 98038- | From: 2013-05 |
| 8571 KING COUNTY | To: 2016-10 |

**Date Verified:**
**Verifier:**



2414 SW ANDOVER ST
SEATTLE , WA 98106
Phone: (206) 283-0816 / (800) 335-2990
Fax: (206) 286-9461

| | | | |
|---|---|---|---|
| **File No:** | 72313898 | **Requested By:** | RHAWA |
| **Name:** | Non Seattle Applicant | **Date Ordered:** | 06/27/2018 |
| **SSN:** | ***-**-9874 | **Date Completed:** | 06/27/2018 |
| **Address:** | 10821 8TH AVE SEATTLE , WA 98146 | | |
| **Prepared For:** | RHAWA | | |

---

### CRIMINAL HISTORY

| | |
|---|---|
| *Name Searched:* | Non Seattle Applicant |
| *Search Type:* | Criminal |
| *Jurisdiction:* | MULTISTATE / XX |

### OFFENDER INFORMATION

| | |
|---|---|
| Full Name | Non Seattle |
| DOB | 10/11/1992 |
| Offender Number | 15873215 |

**Offender Comments:** COURT FILE NUMBER: CR6984258; SOURCE ID: 98325
category: CRIMINAL/TRAFFIC
sourceorjurisdiction: MN BUREAU OF CRIMINAL APPREHENSION, AND DEPARTMENT OF PUBLIC SAFETY(CONVICTION RECORDS)
state: MN
counts: 1
arrestingagency: MINNEAPOLIS Police Department
dispositiondate: 09/11/2014
court: HENNEPIN CO DISTRICT COURT

### OFFENSE RECORDS

| | |
|---|---|
| Case Type | Misdemeanor |
| Offense Description | DISORDERLY CONDUCT-OFFENSIVE/ABUSIVE/NOISY/OBSCENE |
| Offense Classification | 609.72.1(3) |
| Disposition | CONVICTED |
| Disposition Date | 01/11/2018 |
| Probation Sentence Length | Days:0, Months:0, Years:1 |

**Offense Comments:** COURT FILE NUMBER: CR148328978; SOURCE ID: 369485

### OFFENDER INFORMATION

| | |
|---|---|
| Full Name | Non Seattle |
| DOB | 10/11/1992 |
| Sex | FEMALE |
| Offender Number | 326598 |

**Offender Comments:** category: CRIMINAL/TRAFFIC
sourceorjurisdiction: WA SEATTLE MUNICIPAL COURT
state: WA
countyorjurisdiction: CITY OF SEATTLE
arrestingagency: SEATTLE POLICE DEPARTMENT
dispositiondate: 05/05/2012
amendeddisposition: CLOSED
amendeddispositiondate: 05/05/2012
court: MUNICIPAL COURT OF SEATTLE

| OFFENSE RECORDS | |
| --- | --- |
| *Offense Description* | THEFT |
| *Offense Date* | 08/05/2011 |
| *Offense Classification* | 12A6598.21 |
| *Disposition* | DISMISSED W/PREJUDICE |
| *Disposition Date* | 05/05/2012 |
| *File Date* | 10/21/2011 |

**Offense Comments:**            CRIMINAL NON-TRAFFIC

**Verified By:**                     Electronic/ In Person
**Date Verified:**                   06/27/2018

| EVICTION REPORT |
| --- |

**State:**                        XX
**Name Searched:**                Non Seattle Applicant

**Comments:**                     NO RECORDS FOUND

 RHAWA
Rental Housing Association of WA

## APPLICATION FOR TENANCY (SEATTLE)

**AGENT / OWNER CONTACT INFORMATION (COMPLETED BY OWNER/AGENT):**

Name: _____    Member #: _____

Phone: _____    Fax: _____    Date: _____

Email: _____

Screening Package: ☐Basic Package   ☐Premium Package   ☐Background Screening Package   ☐Other _____

**APPLICANT INFORMATION**

| Applicant's Last Name | First Name | Middle | Phone # |
|---|---|---|---|

| Current Address | City | State | Zip |
|---|---|---|---|

| Social Security/ITIN # | Date of Birth | Government Issued ID | Email |
|---|---|---|---|

MANAGERS CHECKLIST: Visual Proof Of: ☐Driver's License   ☐State ID   ☐SS Card   ☐Other _____

**OCCUPANCY INFORMATION**

List all persons in addition to yourself that will also be residents, including a date of birth for each. All persons 18 or older must complete a separate rental application and pay a screening fee.

1. _____    3. _____

2. _____    4. _____

Are you, or any other occupant, a smoker?  ☐ ☐Yes ☐ ☐No

Do you have renter's insurance?  ☐ ☐Yes ☐ ☐No    If yes, proof of insurance is required.

Do you have a waterbed or aquarium over 20 gallons? ☐ ☐Yes ☐ ☐No

Will pets reside in the unit?  ☐ ☐Yes ☐ ☐No    If yes, how many? _____    Type(s) _____

Breed(s) _____    Weight(s) _____

**PERSONAL BACKGROUND HISTORY**

Landlord is prohibited from requiring disclosure, asking about, rejecting an applicant, or taking an adverse action based on any arrest record, conviction record, criminal history, except for registry information as described in SMC 14.09.025.A.3, SMC 14.09.025.A.4, SMC 14.09.025.A.5, and subject to the exclusions and legal requirements in SMC 14.09.115.

Owner / Agent requires offender screening:   ☐Yes   ☐No

**FINANCIAL INFORMATION**

Current monthly expenses for financial obligations:   ☐Car _____    ☐Loan _____

☐Credit _____    ☐Other _____

Have you ever filed for bankruptcy?   ☐Yes   ☐No

**PREVIOUS RESIDENCE HISTORY**

| Current Address | City | State | Zip | Landlord's Name | Landlord Phone # | Dates of Occupancy | Rent Amount $ |
|---|---|---|---|---|---|---|---|

| Previous Address | City | State | Zip | Landlord's Name | Landlord Phone # | Dates of Occupancy | Rent Amount $ |
|---|---|---|---|---|---|---|---|

| Previous Address | City | State | Zip | Landlord's Name | Landlord Phone # | Dates of Occupancy | Rent Amount $ |
|---|---|---|---|---|---|---|---|

Formal legal advice and review is recommended for both Resident and Owner prior to selection and use of provided form. RHAWA does not represent your selection or execution of this form as appropriate for your specific circumstances. © RHAWA 2017. For use by current RHAWA members only. No representation is made as to the sufficiency or tax consequences from use of this form.

Application for Tenancy
Reviewed 02/2018 | Revised 02/2018

SR_0015

 **RHAWA** Rental Housing Association of WA

# APPLICATION FOR TENANCY (SEATTLE)

## PREVIOUS RESIDENCE HISTORY – CONT.

Have you given notice of termination of tenancy to your current landlord?    ☐Yes    ☐No

For what date are you seeking occupancy? _____

Have you ever been served an unlawful detainer or been evicted?    ☐Yes    ☐No

If yes, include month / yr & address: _____

Have you ever received a notice to pay rent or vacate and/or another unlawful detainer notice from a landlord?    ☐Yes    ☐No

If yes, describe circumstances: _____

## INCOME HISTORY

| Applicant's Current Source of Income | Position | Monthly Income | Start Date | Supervisor / H.R. Name & Phone |
|---|---|---|---|---|
| Previous Source of Income | Position | | Dates Employed | Supervisor / H.R. Name & Phone |
| Other Sources of Verifiable Income | Monthly Income | Other Sources of Verifiable Income | | Monthly Income |

## VEHICLE REGISTRATION

Written permission separate from this application must be obtained to park on premises.

| Vehicle Make | Model | Year | Color | Plate # / State |
|---|---|---|---|---|
| Vehicle Make | Model | Year | Color | Plate # / State |

Description of any other vehicles (boat, trailer, RV, motorcycle, etc.) you would like to keep on the property.

| Vehicle Make | Model | Year | Color | Plate # / State |
|---|---|---|---|---|

## EMERGENCY / PERSONAL CONTACTS

| Name | Relationship | Phone # |
|---|---|---|
| Name | Relationship | Phone # |

## ACKNOWLEDGMENT

In compliance with the Fair Credit Act and RCW 59.18.257 (2), this is to inform you that a credit investigation involving the statements made on this application for tenancy will be initiated. Any false, fraudulent or misleading information provided on the application may be grounds for denial of tenancy and/or forfeiture of rental or lease agreement. An incomplete application causes delay in processing and may result in denial of tenancy. If you are declined due to the consumer report, you may obtain a free copy of your credit report from the bureau it was obtained from within 60 days of denial. You also have the right to dispute the accuracy of the report and/or add a consumer statement to the report. This is NOT an agreement to rent and all applications must be approved. **Disputes:** If the screening of your application for tenancy included RHAWA's Full Credit Report and you wish to dispute any or all information on your credit report, contact Rental Housing Association to file the dispute on your behalf. Rental Housing Association of WA - Tenant Screening 2414 SW Andover St, Ste D207 Seattle, WA 98106 Phone: (800) 335-2990/tenantscreening@RHAwa.org

A non-refundable processing fee of _____ is required per applicant for non-refundable tenant screening fees.

I certify to the best of my knowledge all statements are true. I authorize the agent/owner for initial tenancy and again upon any future lease modifications or renewals to verify the information provided on the application including, but not limited to, obtaining credit reports, character reports, civil and/or criminal records, verifying source of income and rental history. I understand that false, fraudulent or misleading information may be grounds for denial of tenancy and/or forfeiture of my rental or lease agreement.

_____ By initialing, I acknowledge having been notified in writing, or by posting, of what types of information will be accessed to conduct the tenant screening and what criteria may result in denial of the application, as required by RCW 59.18.257.

_____    _____    _____
Applicant Signature                Print Name                             Date

Formal legal advice and review is recommended for both Resident and Owner prior to selection and use of provided form.
RHAWA does not represent your selection or execution of this form as appropriate for your specific circumstances.
© RHAWA 2017. For use by current RHAWA members only. No representation is made as to the sufficiency or tax consequences from use of this form.

Application for Tenancy
Reviewed 02/2018 | Revised 02/2018

SR_0016

Erika Pablo
OCR Fair Chance Housing ORD
D3b

1  within two years from the date of the rental application. The Department shall adopt a rule or

2  rules to enforce this Section 14.09.020.

3  **14.09.025 Prohibited use of criminal history**

4      A.    It is an unfair practice for any person to:

5          1.    Advertise, publicize, or implement any policy or practice that

6  automatically or categorically excludes all individuals with any arrest record, conviction record,

7  or criminal history from any rental housing that is located within the City.

8          2.    Require disclosure, inquire about, or carry out an adverse action in

9  housing, based on an arrest record of a prospective occupant, a tenant, or a member of their

10  household. An arrest record is not proof that a person has engaged in unlawful conduct.

11          3.    Require disclosure, inquire about, or take an adverse action in housing

12  against a prospective occupant, a tenant or a member of their household, based on (a) criminal

13  history, except for conviction records pursuant to subsection 14.09.025.A.4; (b) juvenile records;

14  (c) convictions that have been expunged, sealed, or vacated; and/or (d) conviction records that,

15  from the date of disposition, precede the date of the rental application by more than two years,

16          4.    Carry out an adverse action based on a conviction record with a

17  disposition date within two years from the date of the rental application of a prospective

18  occupant, a tenant or a member of their household, unless the landlord has a legitimate business

19  reason for taking such action.

20          5.    Carry out an adverse action based on status obtained from a county, state,

21  or national sex offender registry, of a prospective adult occupant, an adult tenant, or an adult

22  member of their household, unless the landlord has a legitimate business reason for taking such

23  action.

# Glossary of terms

***Automated fingerprint identification system (AFIS):*** An automated system for searching fingerprint files and transmitting fingerprint images. AFIS computer equipment can scan fingerprint impressions (or use electronically transmitted fingerprint images) and automatically extract and digitize ridge details and other identifying characteristics in sufficient detail to enable the computer's searching and matching components to distinguish a single fingerprint from thousands or even millions of fingerprints previously scanned and stored in digital form in the computer's memory. The process eliminates the manual searching of fingerprint files and increases the speed and accuracy of ten-print processing (arrest fingerprint cards and noncriminal justice applicant fingerprint cards).

AFIS equipment also can be used to identify individuals from "latent" (crime scene) fingerprints, even fragmentary prints of single fingers in some cases.

***Criminal history record information (CHRI) or criminal history record information system:*** A record (or the system maintaining such records) that includes individual identifiers and describes an individual's arrests and subsequent dispositions. Criminal history records do not include intelligence or investigative data or sociological data such as drug use history.

CHRI systems usually include information on juveniles if they are tried as adults in criminal courts. Most, however, do not include data describing involvement of an individual in the juvenile justice system. Data in CHRI systems are usually backed by fingerprints of the record subjects to provide positive identification. State legislation and practices vary widely concerning disclosure of juvenile record information and access to criminal history records for noncriminal justice purposes.

***Data quality:*** The extent to which criminal history records are complete, accurate, and timely. In addition, accessibility sometimes is considered a data quality factor. The key concern in data quality is the completeness of records and the extent to which records include dispositions as well as arrest and charge information. Other concerns include the timeliness of data reporting to state and Federal repositories, the timeliness of data entry by the repositories, the readability of criminal history records, and the ability to have access to the records when necessary.

***Interstate Identification Index (III):*** A fingerprint-supported "index-pointer" system for the interstate exchange of criminal history records. Under III, the Federal Bureau of Investigation (FBI) maintains an identification index to persons arrested for primarily felonies or serious misdemeanors under state or Federal law. The index includes identification information (such as name, date of birth, race, and sex), FBI Numbers, and State Identification Numbers (SID) from each state that holds information about an individual.

Search inquiries from criminal justice agencies nationwide are transmitted automatically via state telecommunications networks and the FBI's National Crime Information Center (NCIC) telecommunications lines. Searches are made on the basis of name and other identifiers. The process is entirely automated. If a hit is made against the Index, record requests are made using the SID or FBI Number, and data are automatically retrieved from each repository holding records on the individual and forwarded to the requesting agency. As of October 5, 2008,

all 50 states and the District of Columbia participated in III. Responses are provided from FBI files when a jurisdiction, such as a U.S. territory, is not a participant in III. The III system may also be employed when responding to fingerprint-based noncriminal justice purpose record background checks.

Participation in III requires that a state maintain an automated criminal history record system capable of interfacing with the III system and also capable of responding automatically to all interstate and Federal/state record requests.

***Juvenile justice records:*** Official records of juvenile justice adjudications. Most adult criminal history record systems do not accept such records, which are frequently not supported by fingerprints and which usually are confidential under state law. The FBI accepts and disseminates juvenile records. States, however, are not required to submit such records to the FBI and may be legislatively prohibited from doing so.

***Lights-out processing:*** "Lights-out" criminal record processing occurs when fingerprint data submitted to a criminal record repository by a local justice jurisdiction for the purpose of determining an individual's identity, and frequently associated criminal history record information, is processed electronically and a response is returned electronically to the submitting jurisdiction, all without human intervention.

***Livescan:*** The term "livescan" refers to both the technique and technology used to electronically capture fingerprint and palm print images without the need for the more traditional ink-and-paper methods. Livescan devices also allow the electronic transfer of

digitized images and accompanying textual information to a criminal history repository.

***National Crime Information Center (NCIC):*** A computerized information system available to law enforcement and criminal justice agencies maintained by the FBI. The system includes records for wanted persons, missing persons, other persons who pose a threat to officer and public safety, and various property files. The III is accessible through the NCIC system. The NCIC operates under a shared-management concept between the FBI and local, state, tribal, and Federal criminal justice agencies. The FBI maintains the host computer and provides a telecommunications network to the Criminal Justice Information Services Systems Agency (CSA) in each of the 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, Guam, and Canada, as well as Federal criminal justice agencies. A CSA is a criminal justice agency that has overall responsibility for the administration and usage of NCIC within a district, state, territory, or Federal agency. NCIC data may be provided only for criminal justice and other specifically authorized purposes.

***National Crime Prevention and Privacy Compact:*** An interstate and Federal/state compact that establishes formal procedures and governance structures for the use of the III. It is designed to facilitate the exchange of criminal history data among states for noncriminal justice purposes and to eliminate the need for the FBI to maintain duplicate data about state offenders. Under the Compact, the operation of this system is overseen by a policymaking council comprised of state and Federal officials.

The key concept underlying the Compact is agreement among all signatory states that all criminal history information (except sealed records) will be provided in response to noncriminal justice requests from another state—regardless of whether the information

significantly exacerbate existing challenges among low-income parents and their families. We explore the intergenerational effects of criminal records through five pillars of family well-being:

- **Income.** Parents with criminal records have lower earning potential, as they often face major obstacles to securing employment and receiving public assistance.
- **Savings and assets.** Mounting criminal justice debts and unaffordable child support arrears severely limit families' ability to save for the future and can trap them in a cycle of debt.
- **Education.** Parents with criminal records face barriers to education and training opportunities that would increase their chances of finding well-paying jobs and better equip them to support their families.
- **Housing.** Barriers to public as well as private housing for parents with criminal records can lead to housing instability and make family reunification difficult if not impossible.
- **Family strength and stability.** Financial and emotional stressors associated with parental criminal records often pose challenges in maintaining healthy relationships and family stability.

Because these challenges affect such a large share of our nation's children, we ignore these intergenerational consequences at our peril. In this report, we make the case for a "two-generation approach" to address barriers to opportunity associated with having a criminal record.[6] We then offer policy recommendations to give both parents with criminal records and their children a fair shot.

As bipartisan momentum continues to mount in support of criminal justice reform, now is the time to find common ground and enact solutions to ensure that a criminal record does not consign an individual—and his or her children and family—to a life of poverty.

The nation's two major housing assistance programs are the Section 8 Housing Choice Voucher Program and Public Housing. Both are federally funded, and their use is governed by federal law and policies. Both are administered by local public housing authorities, or PHAs, however, which have tremendous discretion regarding admission and eviction policies.[58]

Federal public housing law includes a narrow, mandatory ban on access to public housing for people with certain types of criminal histories.[59] But it also gives local PHAs broad discretion to deny housing to prospective tenants and to evict current tenants on the basis of "criminal activity."[60] Thus, federal law effectively provides a floor that many PHAs choose to exceed by exercising their discretion in extreme ways. For example, many PHAs will evict or deny housing to an individual or even to an entire household if one household member has had an arrest, even if that arrest did not lead to conviction.[61] Guidance for PHAs published in November 2015 by the Department of Housing and Urban Development clarified the federal "one strike" policy, noting that arrests without conviction may not be considered evidence of "criminal activity" and thus may not serve as the basis for denial of housing or eviction.[62]

Overly broad interpretations of this policy by local PHAs can put housing out of reach for returning citizens. It also can stand in the way of family reunification because a returning citizen would put his entire family at risk of eviction if he or she went to live with them. Indeed, a 2015 study by the Ella Baker Center found that 79 percent of returning citizens reported being denied housing due to their criminal history, and 18 percent of families reported being evicted or denied housing when their incarcerated family member returned home.[63]

In addition to the obstacles that people with criminal records face to public housing, private housing can also be unattainable for individuals with criminal records and for their families. Four out of five landlords use criminal background checks to screen out potential tenants.[64] And as noted previously, the income-limiting effects of criminal records can also lead to eviction and housing instability—and, combined with the savings-limiting effects of a criminal record, can put home-ownership far out of reach for many individuals with records and their families.

Housing instability can have harmful and long-lasting consequences for children. In the early years, frequent moves can affect children's mental health and language development. Multiple moves can lead to disruptions in education, residence in lower-quality housing and neighborhoods, and less parental engagement in the

To remove barriers to private housing, states and cities should adopt fair housing policies that prohibit landlords from discriminating on the basis of criminal history. While policies that lay out specific rights—such as Oregon's recently enacted fair housing law[94]—are optimal, states may be able to issue regulations that construe their own fair housing laws to limit discriminatory denials of housing without the need for new legislation.

## Remove barriers to education and training

While progress has been made in terms of reducing barriers to federal financial aid for students with criminal histories, the harsh lifetime ban on the American Opportunity Tax Credit for individuals with felony drug convictions puts a vital source of financial aid out of reach for current and prospective students who might not otherwise be able to afford to pursue higher education or training. Congress should remove this ban to enable parents with criminal records to obtain the additional qualifications they need to compete in the labor market and provide for their families.

In 2015, the Obama administration announced the launch of a pilot program to test the restoration of Pell Grants to currently incarcerated students.[95] Upon the release of positive results, Congress should act to restore full access. Additionally, Congress and the states should increase investment in prison education and training to boost parents' employment and earnings prospects and better equip them to support their families upon release. And colleges and universities should follow New York's lead by limiting consideration of criminal history in the higher-education admissions process until after a conditional admission has been made; they also should only consider convictions if they indicate that the student poses a threat to public safety or if they have bearing on some aspect of the academic program or student responsibilities.

## Enact policies to support family strength and stability

A previous CAP report offered a framework for family policy and laid out a two-part policy agenda to support strong and stable families. This framework includes an economic plank to bolster family economic security, as well as a social plank to ensure that struggling families are armed with the same tools as higher-income families to

N.Y.U. JOURNAL OF LEGISLATION & PUBLIC POLICY QUORUM                    EHMAN & REOSTI

# TENANT SCREENING IN AN ERA OF MASS INCARCERATION: A CRIMINAL RECORD IS NO CRYSTAL BALL

*Merf Ehman & Anna Reosti*

## INTRODUCTION

H *ere in prison I understand that my name comes with a number and I am paying for my poor choices, but at the end of my time am I not paid in full? I lose the number and gain a box marked felon. I leave here in a year and I am told unless I know a private landlord who's willing to rent to me that it will be next to impossible to rent.*[1]

The writer is not alone; her fear is real.[2] Every year the Washington Department of Corrections releases seven to eight thousand prisoners and even more cycle through county jails.[3] Estimates are that one in four, or approximately 65 million, people in the United States have a criminal record.[4] Upon release, many cannot obtain rental housing because of the stigma of a criminal record.[5] The ex-

---

[1] Letter from prisoner at Wash. Corr. Ctr. for Women to author (June 4, 2013) (on file with author).

[2] *See* Journey v. State*, 895 P.2d 955, 959 (1995) ("Courts, commentators, and legislatures have recognized that a person with a criminal record is often burdened by social stigma, subjected to additional investigation, prejudiced in future criminal proceedings, and discriminated against by prospective employers.") (footnotes omitted).

[3] WASH. DEP'T OF CORRS., NUMBER OF PRISON RELEASES BY COUNTY OF RELEASE (2013), http://www.doc.wa.gov/aboutdoc/docs/msPrisonReleases.pdf.

[4] MICHELLE NATIVIDAD RODRIGUEZ & MAURICE EMSELLEM, NAT'L EMP'T LAW PROJECT, 65 MILLION "NEED NOT APPLY": THE CASE FOR REFORMING CRIMINAL BACKGROUND CHECKS FOR EMPLOYMENT 3 (2011), *available at* http://www.nelp.org/page/-/SCLP/2011/65_Million_Need_Not_Apply.pdf?nocdn=1.

[5] HOUS. LINK, TENANT SCREENING AGENCIES IN THE TWIN CITIES: AN OVERVIEW OF TENANT SCREENING PRACTICES AND THEIR IMPACT ON RENTERS 40 (2004), *available at* http://www.housinglink.org/Files/Tenant_Screening.pdf ("[T]he increasingly popular use of tenant screening reports has resulted in a new class of people who are unable to access rental housing be-

2                                                          *QUORUM*                                                       2015

perience of incarceration and the stigmatizing effect of a criminal record erect formidable barriers to accessing safe, affordable housing.[6] Many landlords routinely refuse to rent to applicants with a criminal record based upon a belief that a criminal record is a reliable indicator of a tenant's inability to meet rental obligations.[7] Tenant screening websites reinforce this belief through dire warnings about potential lawsuits and damage awards against landlords who rent to an applicant with a criminal record who may later harm another tenant.[8]

As detailed in this article, the notion that individuals with criminal conviction histories pose a future threat to people or property may seem superficially persuasive, but past criminal history is not predictive of future criminal activity. Moreover, landlord policies that ban admittance to applicants with a criminal history may violate fair housing law by negatively and disproportionately impacting

---

cause of past credit problems, evictions, poor rental histories or criminal backgrounds."); John Wildermuth, *Ex-offenders Compete for Low-Income Housing*, S.F. GATE (Feb. 17, 2013, 9:01 PM), http://www.sfgate.com/bayarea/article/Ex-offenders-compete-for-low-income-housing-4286606.php (reporting that nearly fifty percent of San Francisco prisoners who recently have been released under a statewide prison realignment effort are without permanent housing).

[6] *See* MARTA NELSON ET AL., VERA INST., THE FIRST MONTH OUT: POST-INCARCERATION EXPERIENCES IN NEW YORK CITY (1999); CATERINA GOUVIS ROMAN & JEREMY TRAVIS, URBAN INST., TAKING STOCK: HOUSING, HOMELESSNESS, AND PRISONER REENTRY 31 (2004), *available at* http://www.urban.org/UploadedPDF/411096_taking_stock.pdf; Amanda Geller & Marah A. Curtis, *A Sort of Homecoming: Incarceration and the Housing Security of Urban Men*, 40 SOC. SCI. RES. 1196, 1198 (2011); *cf.* KATHARINE BRADLEY ET AL., CMTY. RES. FOR JUSTICE, NO PLACE LIKE HOME: HOUSING AND THE EX-PRISONER 9 (2001), *available at* http://b.3cdn.net/crjustice/a5b5d8fa98ed957505_hqm6b5qp2.pdf (describing the difficulties that convicted criminals face finding housing following release from prison).

[7] *See* Marie Claire Tran-Leung, *Beyond Fear and Myth: Using the Disparate Impact Theory Under the Fair Housing Act to Challenge Housing Barriers Against People with Criminal Records*, 45 CLEARINGHOUSE REV. 4, 6 (2011) (citing David Thacher, *The Rise of Criminal Background Screening in Rental Housing*, 33 L. & SOC. INQUIRY 5, 12 (2008)) ("In 2005 four out of five members of the National Multi-Housing Council engaged in criminal records screening.").

[8] *See* Heidi Lee Cain, *Housing Our Criminals: Finding Housing for the Ex-Offender in the Twenty-First Century*, 33 GOLDEN GATE U. L. REV. 131, 149–50 (2003) (citing Shelley Ross Saxer, *Am I My Brother's Keeper?: Requiring Landowner Disclosure of the Presence of Sex Offenders and Other Criminal Activity*, 80 NEB. L. REV. 522, 561–69 (2001)) (observing that a private landlord may be fearful of the possibility that he might be held liable for criminal acts committed by his tenants); *FAQ – Landlord Responsibilities: Criminal Activities*, FINDLAW, http://realestate.findlaw.com/landlord-tenant-law/faq-landlord-responsibilities-criminal-activities.html ("In increasing numbers, landlords are being brought to court by tenants that have been injured by criminals while in their rental properties. Settlements from these cases often reach into the millions of dollars, especially when a similar assault or crime occurred on the same rental property in the past."); Paul Prudente, *Background Check Quality & Landlord Liability*, MY SCREENING REPORT BLOG (Nov. 4, 2011, 1:28 PM), http://www.myscreeningreport.com/blog/archive/2011/11/04/negligent-leasing-theory-tenant-screening.aspx ("[A]n injured party (employee, another resident or others) may bring an action against a landlord arguing that the landlord failed to exercise sufficient care in conducting background checks on prospective tenants.").

N.Y.U. JOURNAL OF LEGISLATION & PUBLIC POLICY *QUORUM*                                    EHMAN & REOSTI

black or Latino men.[9] These restrictive policies "create a racial caste system"[10] with no evidence that they achieve any safety goals.[11] In fact, sociological research suggests that criminal history does not provide reliable information about the potential for housing success.[12] Similarly, research shows that stable housing reduces the incidence of future criminal activity.[13] This research should inform the way courts consider negligence claims against landlords based upon harm caused by a tenant who had a criminal record. Under current negligence standards, an actor is only responsible for harm he could reasonably have foreseen and prevented. Based upon social science research, a criminal record cannot reliably indicate the risk of future problematic tenant behavior.[14] Therefore, the presence of a criminal record does not equal foreseeability of harm and should not by itself lead to liability.

Washington needs a rational research-based tort law standard that clearly sets out the boundaries of landlord liability for the criminal acts of third parties that harm tenants. A landlord should be liable only if he or she fails to maintain a habitable and secure premises that results in reasonably foreseeable harm to tenants by third-party criminal acts. A criminal record should not be considered evidence of a foreseeable risk of dangerousness or harm that creates landlord liability. We propose that future harm to tenants by an applicant with a criminal record should be unforeseeable as a matter of law. As shown in detail below, a landlord should not be held liable solely upon renting to an applicant with a criminal record. The need for tenant safety and the societal goals of reduced recidivism, public safety and fairness can be met by adopting this standard.

This article focuses on Washington tort law and landlord liability. Part I examines the concept of foreseeability as it pertains to potential landlord liability for renting to an applicant with a criminal record whose actions harm another tenant. Part II surveys the relevant sociological research on the relationship between a criminal record and the ability to meet the obligations of tenancy. Based upon this review, we conclude that there is no empirical evidence establishing a relationship between a criminal record and an unsuccessful tenancy. Part III posits that since research demonstrates that a criminal record is not a reliable indicator for future tenant behavior, it should not serve as a proxy to determine future

---

[9] *See* Mireya Navarro, *Lawsuit Says Rental Complex in Queens Excludes Ex-Offenders*, N.Y. TIMES, Oct. 30, 2014, at A25, *available at* http://www.nytimes.com/2014/10/31/nyregion/lawsuit-says-rental-complex-in-queens-excludes-ex-offenders.html?_r=0 (describing a lawsuit alleging that a landlord's policy of rejecting applicants with criminal histories violates fair housing laws due to the policy's disproportionate impact on black and Latino men); *infra* note 145.

[10] *Id.*

[11] *See infra* Part II.

[12] *Id.*

[13] *Id.*

[14] *Id.*

4                                            *QUORUM*                                            2015

tenant dangerousness. Washington landlords should not be liable for future harm to tenants based solely upon renting to an applicant with a criminal record. Refusing to hold landlords liable in this way would increase housing opportunities for this population. Once housed, it is likely that the person's chances for recidivism will decrease, thereby increasing public safety and promoting the rehabilitation of people with a criminal history.[15]

## I. CURRENT STATE OF THE LAW: NO LANDLORD LIABILITY FOR CRIMINAL ACTS OF THIRD PARTIES WITHOUT FORESEEABILITY

> *One morning while showering, Ms. Griffin heard a loud noise in her apartment. She found dirt and debris on her floor near the closet and in it. She saw that the board covering the crawl space above was askew. She immediately went to her property manager's office to report her observations. The property manager sent out two maintenance men who then screwed a two-by- four across the much larger opening of the crawl space. Two weeks later, she was attacked by her next door neighbor after he entered her apartment through that same crawl space. She filed suit against her landlord and the assailant. The jury found the landlord's attempted repair negligent, but awarded Ms. Griffin no monetary damages from the landlord.*[16]

These facts are from the only Washington case that has analyzed liability for the criminal acts of third parties in the landlord-tenant context. This Section first reviews current negligence law to understand whether the above landlord should be liable for the injuries the tenant sustained in the attack and then considers whether negligence liability should attach if her attacker had a criminal record that her landlord knew about when she rented him the apartment.

### A. A landlord is not the insurer of a tenant's safety, but might have a duty to protect tenants from foreseeable harm

To establish negligence under Washington law, "the plaintiff must prove duty, breach, causation, and damages."[17] The legal analysis of a tenant's negligence claim for harm resulting from the criminal act of a third party centers on whether a landlord has a duty to protect tenants and the scope of that duty.[18] Prior

---

[15] *Id.*

[16] *See* Griffin v. W. RS, Inc., 984 P.2d 1070, 1072 (Wash. Ct. App. 1999), *rev'd*, 18 P.3d 558 (Wash. 2001).

[17] *See* Nivens v. 7-11 Hoagy's Corner, 943 P.2d 286, 289 (Wash. 1997).

[18] *Griffin*, 984 P.2d at 1073 (noting that, as a threshold matter, the court had to determine whether landlords owe heightened duties of care to their tenants in order to resolve the case at bar).

2015                                    *QUORUM*                                    5

to 1970, the above tenant's claim would fail, as historically a landlord had no duty to protect tenants from injuries caused by the criminal acts of third parties.[19] However, this principle began to erode as the nature of the landlord-tenant relationship evolved from simply leasing a piece of land to renting a dwelling unit with complicated infrastructures such as heating, lighting, and plumbing that could only be maintained by the landlord.[20] By the 1970s, many states, including Washington, required landlords to adequately maintain these systems and keep the rental premises fit for human habitation.[21]

Once this duty to maintain the rental premises was established, courts began to hold landlords liable for the criminal acts of third parties in cases where landlords failed to maintain the physical premises and that failure facilitated the commission of a crime that injured a tenant.[22] For example, in a New Jersey case, a landlord failed to provide adequate locks on the front door to the building which resulted in a mugger entering the building and attacking a tenant.[23] The court found that the landlord breached his duty by failing to secure the building's front entrance.[24] The court held the landlord liable for the tenant's injuries be-

---

[19] *See Nivens*, 943 P.2d at 290 n.3, 292 (noting that landowners who invited others onto premises had a duty to protect these persons from foreseeable criminal acts of third persons based on a special relationship, but observing that this duty had been applied narrowly because courts had found only rarely that criminal acts were foreseeable); 17 WILLIAM STOEBUCK & JOHN WEAVER, WASH. PRACTICE, REAL ESTATE: PROPERTY LAW § 6.36 (2d ed. 2004) (Washington landlord was traditionally not liable to a tenant for injuries due to defective conditions on the premises); Corey Mostafa, Note, *The Implied Warranty of Habitability, Foreseeability, and Landlord Liability For Third-Party Criminal Acts Against Tenants*, 54 UCLA L. REV. 971, 974–75 (2007). However, all courts have rejected claims of strict liability in this and similar contexts. *See* Peterson v. Superior Court, 899 P.2d 905, 909–911 (Cal. 1995) (overturning previous ruling that landlords were strictly liable based upon the rule, adopted in the majority of other states to have considered the issue, that landlords are not strictly liable for to tenants caused by defective conditions of premises); Lincoln v. Farnkoff, 613 P.2d 1212, 1213 (Wash. Ct. App. 1980), *abrogated on other grounds by* Dexheimer v. CDS, Inc., 17 P.3d 641 (Wash. Ct. App. 2001) (concluding landlord not strictly liable for harm caused by a defect on his premises).

[20] *See* Kline v. 1500 Mass. Ave. Apt. Corp., 439 F.2d 477 (D.C. Cir. 1970); Mostafa, *supra* note 19, at 975.

[21] *See* Foisy v. Wyman, 515 P.2d 160, 164 (Wash. 1973) (en banc) ("[I]n all contracts for the renting of premises, oral or written, there is an implied warranty of habitability . . . ."). The term "warranty of habitability" means that "the tenant's promise to pay rent is in exchange for the landlord's promise to provide a livable dwelling." *Id.* at 164; WASH. REV. CODE ANN. § 59.18.060 (LexisNexis 2014) (landlord must maintain building's structural components and common areas and make repairs).

[22] *See, e.g.*, *Kline*, 439 F.2d at 481; Rosenbaum v. Sec. Pac. Corp., 50 Cal. Rptr. 2d 917, 921 (Cal. Ct. App. 1996) ("[A] landlord's duty to take reasonable steps to secure common areas of the premises against foreseeable criminal acts of third parties has become well established law in California."); Trentacost v. Brussel, 412 A.2d 436, 440 (N.J. 1980). *See also* 17 STOEBUCK & WEAVER, *supra* note 19, § 6.36.

[23] *See Trentacost*, 412 A.2d at 443 (holding that landlord had breached implied warranty of habitability by not securing front entrance in any way, which led to tenants' injuries by permitting access to the "criminal element.")

[24] *Id.*

6                                    *QUORUM*                                    2015

cause there was ample evidence that criminal activity affecting the premises was reasonably foreseeable.[25]

Another court ruled that although the landlord is not an "insurer" of the tenant's safety, he has a duty to minimize the risk of harm to tenants from third party criminal attacks. Specifically, where:

> [T]he landlord has notice of repeated criminal assaults and rob-beries, has notice that these crimes occurred in the portion of the premises exclusively within his control, has every reason to ex-pect like crimes to happen again, and has the exclusive power to take preventive action, it does not seem unfair to place upon the landlord a duty to take those steps which are within his power to minimize the predictable risk to his tenants.[26]

A landlord does not have an absolute duty to ensure a tenant's safety, but may be liable where a criminal attack is the reasonably foreseeable result of the landlord's failure to properly maintain the rental premises. Although no Wash-ington court considering landlord liability for the criminal acts of third parties has based its holding on a violation of a landlord's duty to maintain the premises,[27] other states' courts have done so.[28] Most courts based these decisions on the the-ory that if a landlord violates his duty to maintain or secure the premises and that failure facilitates the commission of a crime that injures the tenant, then he is lia-ble for those injuries.[29]

---

[25] *Id.*

[26] *Kline*, 439 F.2d at 481.

[27] *See* Griffin v. W. RS, Inc., 984 P.2d 1070 (Wash. Ct. App. 1999) (basing landlord's po-tential liability for tenant's injury on the special relationship between landlord and tenant in a resi-dential setting).

[28] *See, e.g.*, Duncavage v. Allen, 497 N.E.2d 433 (Ill. App. Ct.1986) (holding that a landlord could be liable where he breached duty to maintain areas of the building including lighting and weeds that could hide an intruder); Brichacek v. Hiskey, 401 N.W.2d 44 (Iowa 1987); Ward v. In-ishmaan Assocs., 931 A.2d 1235, 1238 (N.H. 2007) (quoting *Walls v. Oxford Mgmt. Co.*, 633 A.2d 103, 106 (N.H. 1993)) ("[A] duty may arise 'when a landlord has created, or is responsible for, a known defective condition on a premises that foreseeably enhance[s] the risk of criminal attack.'"); *Trentacost*, 41 A.2d at 443 (holding that landlord breached implied warranty of habitability by not securing front entrance in any way, thus permitting access to the "criminal element").

[29] *See, e.g.*, *Duncavage*, 497 N.E.2d at 438 ("Illinois law also supports finding that defend-ant had a duty under the circumstances of this case to protect decedent from criminal acts of third persons."); *Brichacek*, 401 N.W.2d at 48 (holding that landlords can be held liable for criminal at-tacks on their tenants under some circumstances); *Ward*, 931 A.2d at 1238 (recognizing "four pos-sible exceptions to the general rule that landlords have no duty to protect tenants from criminal at-tack"); *Trentacost*, 41 A.2d at 443 ("Under modern living conditions, an apartment is clearly not habitable unless it provides a reasonable measure of security from the risk of criminal intrusion."). *See also* 17 STOEBUCK & WEAVER, *supra* note 19, at 346.

2015                                    *QUORUM*                                         7

Courts will hold landlords liable if the facilitation of a criminal act was the foreseeable result of the landlord's unreasonable failure to perform his duty.[30] Whether the harm to the tenant was reasonably foreseeable is a primary factor in determining liability.[31]

Foreseeability is the frame setting the boundaries of a landlord's liability for the criminal acts of third parties.[32] Many courts will not find a defendant negligent unless the plaintiff establishes foreseeable risk.[33] Courts that impose a duty on landlords to protect tenants from harm limit the scope of that duty to foreseeable harm.[34] Harm is foreseeable only if there is "some probability or likelihood, not a mere possibility, of harm sufficiently serious that ordinary men would take precautions to avoid it."[35] Criminal conduct can be foreseeable where "the result of the [criminal act] is within the ambit of the hazards covered by the duty imposed upon [the] defendant."[36]

But, whether a landlord has a duty to protect tenants from the criminal conduct of third parties and when that criminal conduct is foreseeable is in flux in Washington. The Washington Supreme Court has recognized that business own-

---

[30] 17 STOEBUCK & WEAVER, *supra* note 19, at 347 (noting that "no post-1970 decision has been found in which the landlord has not been held to be liable for foreseeable criminal injuries caused by an unreasonable failure to perform that duty").

[31] *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 3 (2010) ("A person acts negligently if the person does not exercise reasonable care under all the circumstances. Primary factors to consider in ascertaining whether the person's conduct lacks reasonable care are the foreseeable likelihood that the person's conduct will result in harm, the foreseeable severity of any harm that may ensue, and the burden of precautions to eliminate or reduce the risk of harm."). There is disagreement among tort law scholars about whether foreseeability analysis should be a question of duty, breach, or causation. S*ee* W. Jonathan Cardi, *Purging Foreseeability*, 58 VAND. L. REV. 739 (2005). For purposes of this article, we focus on foreseeability as a part of the analysis of the duty element.

[32] *See* David G. Owen, *Figuring Foreseeability*, 44 WAKE FOREST L. REV. 1277, 1307 (2009) ("No one should doubt that foreseeability is an explicit, central consideration in evaluating whether a person's conduct should be blamed . . . .").

[33] *See* Browning v. Browning, 890 S.W.2d 273 (Ark. 1995); Cunis v. Brennan, 308 N.E.2d 617 (Ill. 1974); Mitchell v. Hadl, 816 S.W.2d 183 (Ky. 1991); Colvin v. A R Cable Servs.-ME, Inc., 697 A.2d 1289 (Me. 1997); Mang v. Eliasson, 458 P.2d 777 (Mont. 1969); Poelstra v. Basin Elec. Power Coop., 545 N.W.2d 823 (S.D. 1996). *See generally* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 3 cmt. g (2010).

[34] *See* McKown v. Simon Prop. Grp., 689 F.3d 1086, 1092 (9th Cir. 2012) (discussing the Washington Supreme Court's conclusion that there is a duty between a business owner and invitees to protect them from reasonably foreseeable criminal conduct by third person); Gurren v. Casperson, 265 P. 472 (Wash. 1928) (holding the innkeeper liable for attack of one guest on another where owner knew of possibility of assault); Griffin v. W. RS, Inc., 984 P.2d 1070, 1077 (Wash. Ct. App. 1999) (recognizing that a residential landlord has a duty to protect its tenant against *foreseeable* criminal acts of third parties).

[35] Thomas v. Hous., 426 P.2d 836, 839 (Wash. 1967) (citing Hammontree v. Edison Bros. Stores, Inc., 270 S.W.2d 117, 126 (Mo. Ct. App. 1954)).

[36] *McKown*, 689 F.3d at 1092.

ers, but not specifically landlords, owe a duty to invitees to protect them from reasonably foreseeable criminal conduct by third persons.[37] However, the scope of that duty is unclear.[38] Four lower courts have limited this duty to circumstances where there is evidence that prior similar criminal conduct[39] occurred on the premises.[40] Under this analysis, third party criminal conduct is not reasonably foreseeable as a matter of law without proof of prior similar acts.[41] The business owner must know or have reason to know from "past experience" or the "place or character of his business" that he should "reasonably anticipate . . . criminal conduct on the part of third persons."[42] In *McKown*, a Washington federal district court found that prior acts were not similar enough because they occurred outside a mall rather than inside it.[43] The acts were "too dissimilar in location" to meet the Washington's "prior similar acts on the premises test."[44] Whether knowledge of prior similar acts off the premises would be sufficient to impose liability on an owner is unclear in Washington. The Ninth Circuit certified this question to the Washington Supreme Court, but, that Court has not yet affirmed or rejected this standard.[45]

Although, the Washington Supreme Court has not analyzed whether a landlord has a duty to protect tenants from the criminal acts of third parties in the

---

[37] *Id.*

[38] *Id.*

[39] Past criminal conduct can constitute a prior similar act when it is of the same nature as current act. For example, in *McKown*, the court gave McKown an opportunity to present evidence acts similar to the shooting that took place in that case. The court received eighty-six pages of information such as news articles, police reports, and courts records that demonstrated six shootings in the eight years prior. *Id.* at 1089–90. There was also evidence of three incidents involving guns at the mall. *Id.* at 1090. The district court ruled that these incidents were not evidence of prior similar acts because they were too remote in time (five years prior), occurred outside rather than inside the mall, and too dissimilar because the violent acts were directed at a specific person rather than at random people. *Id.* at 1090–91.

[40] *Id.* at 1093 (citing Wilbert v. Metro Park Dist., 950 P.2d 522 (Wash. Ct. App. 1998)).

[41] *Id.*

[42] *Id.* at 1092 (citing RESTATEMENT (SECOND) OF TORTS § 344 cmt. f (1965)).

[43] *Id.* at 1091.

[44] *Id.* at 1089–91.

[45] *Id.* The Washington Supreme Court accepted a certified question from the Ninth Circuit in *McKown* on whether prior similar acts are a necessary element to establish the foreseeability of third-party criminal conduct, and heard oral argument on February 21, 2013. *See Supreme Court Docket, Winter 2013*, WASHINGTON COURTS, *available at* http://www.courts.wa.gov/appellate_trial_courts/ supreme/calendar/?fa=atc_supreme_calendar.display&year=2013&file=docwin13#A12 (last visited Feb. 17, 2015). As of February 9, 2015, the court has not issued an opinion. The Second Restatement's standard is: "A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it." RESTATEMENT (SECOND) OF TORTS § 344 (1965).

landlord-tenant context, one Washington court of appeals has done so.[46] The next section takes an in-depth look at the seminal Washington case on this issue regarding a landlord's duty——*Griffin v. West.*

### B. *No definitive tort standard established for Washington landlord liability for criminal acts of third parties*

There is a movement in many courts around the country to erode the common law edict that a landlord owed no duty to protect tenants from the foreseeable criminal acts of third parties. It remains to be seen whether Washington courts will follow this trend. Thus far, no Washington court has definitively determined a landlord's duty in this context. However, *Griffin* and *Faulkner* give some indication that if a duty to protect tenants from the criminal acts of third parties exists in Washington, the scope of that duty—as in other states that have addressed the issue[47]—would be limited to only foreseeable criminal acts arising from a failure to secure or maintain the physical premises.[48] A discussion of the case law demonstrating the lack of a current tort law standard on this issue is set out below.

In *Griffin v. West*, a Washington jury held a landlord liable for the criminal acts of a third party based on the facts set out at the beginning of this Section. These facts are egregious—Ms. Griffin immediately reported to her landlord her suspicions regarding a possible intruder, the landlord failed to properly secure the crawl space entrance, and she was injured shortly thereafter by an attacker entering through that space.[49] The jury found that the corporation that owned Ms. Griffin's building failed in its duty to properly repair the premises and was negligent.[50] Yet, the jury decided that the landlord owed Ms. Griffin no damages because the attacker, rather than the landlord's failed repair, ultimately caused her injuries.[51]

Ms. Griffin appealed, arguing that the trial court gave the jury an incorrect instruction regarding a landlord's duty in these circumstances.[52] She requested this instruction: "[The landlord] had a duty to take reasonable steps to protect Christie Griffin from foreseeable criminal conduct of a third party."[53] Instead, the trial court gave its own instruction: "A landlord may be negligent if it under-

---

[46] *See* Faulkner v. Racquetwood Vill. Condo. Ass'n, 23 P.3d 1135, 1137 (Wash. Ct. App. 2001); Griffin v. W. RS, Inc., 984 P.2d 1070, 1077 (Wash. Ct. App. 1999).
[47] *See Faulkner*, 23 P.3d at 1137; *Griffin*, 984 P.2d at 1077.
[48] *See Griffin*, 984 P.2d at 1077.
[49] *Id*. at 1072.
[50] *Id*. at 1073.
[51] *Id*. at 1072.
[52] *Id*. at 1073.
[53] *Id*.

takes to protect a tenant against a danger of which it knows or in the exercise of ordinary care ought to know, and fails to exercise ordinary care in its efforts, and if the tenant reasonably relied upon the landlord's actions and therefore refrained from taking actions to protect herself."[54]

The appeals court agreed with Ms. Griffin that the trial court's instruction was incorrect. It held that Washington landlords have an affirmative duty to protect tenants from the foreseeable criminal acts of third parties where the landlords failed to properly repair or maintain the property.[55] The court said this was the same duty as that set out by the Washington Supreme Court for a business owner to its invitee since the invitee, like a tenant, "entrusts himself or herself to the control of the business owner over the premises."[56] The court reasoned that although the landlord "is not the insurer of the tenant's safety on the premises,"[57] the tenant "entrusts to the landlord the responsibility to deal with issues that arise from the landlord's control of the common areas of the premises."[58] As a result, the landlord, like a business owner, had a duty to protect Ms. Griffin from "foreseeable criminal conduct of third persons on the premises."[59] Thus, the trial court's instruction gave the jury the wrong standard regarding the duty the landlord owed to the tenant.[60] Moreover, the court reasoned that because duty and causation are intertwined, it could not be sure that the jury properly determined causation because it was incorrectly instructed on duty.[61]

On review, the Washington Supreme Court upheld the jury's verdict.[62] It refused to address the issue of whether a landlord has a duty to protect tenants from the criminal acts of third parties — not even in dicta.[63] Instead, the Court focused on causation.[64] The Court stated that the determination of causation is the same regardless of the type of duty imposed on the landlord.[65] Thus, the scope of the landlord's duty to the tenant was irrelevant given the jury's factual finding that the criminal conduct of the third party caused the tenant's injury rather than

---

[54] *Id.*
[55] *Id.* at 1076.
[56] *Id.*
[57] *Id.*
[58] *Id.* at 1077.
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] Griffin v. W. RS, Inc., 18 P.3d 558, 558 (Wash. 2001).
[63] *Id.*
[64] *Id.* at 562.
[65] *Id.*

the landlord's negligent repair.[66] As a result, the negligent landlord was not held liable for the criminal acts of a third party that attacked a tenant on its premises.[67]

Since *Griffin*, the Washington Supreme Court has only addressed the issue of a landlord's duty to protect tenants from third-party criminal acts in dicta. In a 2001 criminal case regarding a public housing landlord's right to exclude certain guests, the Court noted that the common law rule that a landlord had no duty to protect tenants from the criminal acts of third parties had eroded, but the Court had "never squarely addressed the issue."[68] The Court then posed, but did not answer, the question, "[s]hould a landlord be held liable for the foreseeable criminal acts of third parties causing injury to the landlord's tenant?"[69] The Court of Appeals has not found itself bound by any Supreme Court dicta. In a later case, it reiterated its holding in *Griffin* that a landlord may have a duty to protect the tenant from foreseeable criminal conduct but only in areas where the landlord exerts control over that area.[70] The appeals court imposed no liability in that case because the attack was in an area outside the landlord's control.[71] The Supreme Court refused review.[72]

Washington courts seem poised to adopt a tort law standard that would impose a duty on landlords to protect tenants from reasonably foreseeable criminal acts of third parties. The question remains as to the scope of that duty. Of interest for this article is whether such a duty would encompass requiring landlords to screen tenants for possible future dangerousness. The next Section explores the case law on this issue in the housing context. Due to the dearth of case law in this area, we look to tenant screening decisions in other states and negligent hiring

---

[66] *Id.*

[67] Ms. Griffin likely sued her landlord for money damages as well as her attacker because landlords likely have access to more funds than someone accused of a crime. *See* Ron Nixon, *Public Defenders Are Tightening Belts Because of Steep Federal Budget Cuts*, N.Y. Times (Aug. 23, 2013), http://www.nytimes.com/2013/08/24/us/public-defenders-are-tightening-belts-because-of-steep-federal-budget-cuts.html?pagewanted=all&_r=0 (reporting that about ninety percent of federal criminal defendants qualify for a public defender); Caroline Wolf Harlow, Bureau of Justice Statistics, Defense Counsel in Criminal Cases (Nov. 2000) *available at* http://www.bjs.gov/index.cfm?ty=pbdetail&iid=772 (stating that approximately eighty-two percent of felony defendants in large counties that were accused of a violent crime were represented by a public defender).

[68] City of Bremerton v. Widell, 51 P.3d 733, 738 (Wash. 2001) (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 63, at 442–43 (5th ed. 1984)). *See also* Tracey A. Bateman & Susan Thomas, Annotation, *Landlord's Liability for Failure to Protect Tenant from Criminal Acts of Third Person,* 43 A.L.R. 5th 207, 257 (1996) (addressing cases in which courts have held that a landlord has a duty to protect tenants against reasonably foreseeable criminal acts of third parties).

[69] *Widell*, 51 P.3d at 739. In *Widell*, the court considered the appropriateness of criminal trespass convictions for guests invited onto the property by tenants.

[70] Faulkner v. Racquetwood Vill. Condo. Ass'n, 23 P.3d 1135, 1136 (Wash. Ct. App. 2001).

[71] *Id.*

[72] *See* Faulkner v. Racquetwood Vill. Condo. Ass'n, 37 P.3d 291 (Wash. 2001).

12                                               *QUORUM*                                               2015

cases to better understand how courts may analyze criminal records and foreseeability in the housing context.

## C. Tenant screening process—likely no landlord duty to screen tenants

### 1. Tenant Screening

Washington landlords have no statutory obligation to screen tenants for possible violent behavior.[73] There is also no Washington case law regarding a landlord's liability for negligent selection of tenants. This section considers the few cases from other states that consider a claim of negligent tenant screening.

Courts outside of Washington have not imposed a duty on landlords to affirmatively conduct tenant screening. In a Louisiana case, a court determined that a landlord owed no duty to protect the tenant from harm by conducting background investigations on prospective tenants.[74] The same court later considered whether a landowner could be liable for injuries to occupants when he allowed a person he knew or should have known had dangerous propensities to occupy the property.[75] The court determined that there was no liability for the landowner because it was not the occupant's mere presence on the property that caused the harm, but the person's unforeseeable act of shooting the tenant.[76] The California Supreme Court considered whether a landlord should be required to obtain criminal backgrounds on possible gang members.[77] The court rejected this argument because the landlord could not screen particular applicants without facing allegations of discrimination.[78] Ultimately, the landlord would be required to obtain full background checks on all applicants.[79] The court said that refusal to rent to those with arrests or convictions for any crime that could have involved a gang constituted — a "burden-

---

[73] Under the state Residential Landlord-Tenant Act, landlords are not required to screen tenants, but if they do then they must follow specific protocols. WASH. REV. CODE ANN. 59.18.257 (LexisNexis 2014) (stating that a landlord is required to provide prospective tenants information about the type of information reviewed, criteria considered and the name and address of the consumer reporting agency used, if any; and also providing that if the applicant is denied, the landlord must state in writing the reasons for the decision). Of course, landlords must comply with local, state, and federal fair housing laws. The lack of regulation and enforcement on tenant screening issues has created a myriad of problems. *See* Eric Dunn & Marina Grabchuk, *Background Checks and Social Effects: Contemporary Residential-Tenant Screening Problems in Washington State*, 9 SEATTLE J. FOR SOC. JUST. 319, 327–38 (2010) (discussing the problems caused by modern tenant screening practices such as errors and misleading information in tenant screening reports and unfair admission practices by landlords).

[74] *See* Robicheaux v. Roy, 352 So. 2d 766, 768 (La. Ct. App. 1977).

[75] *See* Dore v. Cunningham, 376 So. 2d 360, 362 (La. Ct. App. 1979).

[76] *Id.*

[77] *See* Castaneda v. Olsher, 162 P.3d 610, 618 (Cal. 2007).

[78] *Id.*

[79] *Id.*

some, dubiously effective and socially questionable obligation on landlords, at least absent circumstance making gang violence extraordinarily foreseeable."[80]

Only one state appellate court, in Georgia, found possible liability for a landlord who rented to an applicant with a criminal record who later harmed another tenant.[81] In *Stephens v. Greensboro Properties*, the court did not impose an affirmative duty on the landlord to screen tenants, but ruled that the landlord could be potentially liable for the shooting death of another tenant where it rented to *and* employed the perpetrator who had an extensive criminal record.[82] The management company "authorized him to engage in security-related activities which might reasonably result in altercations with co-tenants, notwithstanding knowledge of his long history of convictions and arrests for numerous violent crimes."[83] Under Georgia law, a prior similar criminal act is generally required to impose liability in these circumstances, but if the danger is "so obvious" then that act might be foreseeable even without a prior act.[84] Pursuant to this standard, the court permitted the case to go to the jury to determine if the harm to the tenant was foreseeable under these circumstances.[85]

No courts have imposed a duty on landlords to conduct background checks. Imposing this duty to protect other tenants would not "further the goals of the criminal rehabilitation system for 'ex-criminals' to be denied housing as they attempt to assimilate back into society."[86] Moreover, assessing whether a tenant might be violent in the future is challenging for even well-trained mental health experts let alone a landlord using a criminal background check.[87] Such a requirement may thwart fair housing laws by adversely impacting those with mental health issues, chemical dependency or racial minorities.[88] Only the *Stephens* court has allowed a jury to consider whether the tenant's harm was foreseeable given the specific facts in that case, which included employing and empowering the person with a criminal record.[89] There, foreseeability was the key

---

[80] *Id.*
[81] *See* Stephens v. Greensboro Props., Ltd., 544 S.E.2d 464 (Ga. Ct. App. 2001).
[82] *Id.*
[83] *Id.*
[84] *Id.* at 468.
[85] *Id.*
[86] *See* Saxer, *supra* note 8, at 565.
[87] *See id.* at 564–65.
[88] *See id.* at 564; *see also infra* Part III.B.
[89] *See* Saxer, *supra* note 8, at 567–68 (discussing Stephens v. Greensboro Props., Ltd., 544 S.E.2d 464 (Ga. Ct. App. 2001)).

issue in determining liability.[90] At this time, no appellate court has imposed liability for negligent renting.[91]

### 2. Employment Screening

Unlike landlords, employers have historically had a duty to foreseeable victims "to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others."[92] This duty flows from the traditional "master-servant" relationship.[93] Most negligent hiring cases focus on duty and foreseeability.[94] However, there is little agreement among courts as to what constitutes a foreseeable act.[95] Courts usually employ either a totality of the circumstances, a prior similar incidents test, or a balancing test.[96] The totality of the circumstances test scrutinizes past criminal acts, the nature of the business and the condition of the premises.[97] In contrast, the prior similar incidents test only looks to "the proximity, time, number, and types of prior violent incidents" to determine foreseeability.[98] The balancing test examines the type of employment to determine if a more thorough background check is warranted.[99] Courts have not imposed this type of duty and resultant test for foreseeability on landlords, although at least one scholar argued they should do so in the late 1970s.[100]

---

[90] *Id.*

[91] We could only find one trial court in the country that has imposed liability on a landlord in this context, where the landlord did not follow its own screening policies. *See Jury rules city liable in murder of public housing resident*, WCNC.COM (Feb. 15, 2010), http://www.wcnc.com/story/news/local/2014/06/19/10946859/; *Jury issues verdict in wrongful death lawsuit*, WBTV.COM (updated Mar. 8, 2010, 2:07 PM), http://www.wbtv.com/story/11958156/jury-issues-verdict-in-wrongful-death-lawsuit (both sources describing case in which plaintiff argued that public housing authority failed to conduct a background check when renting to an applicant with a criminal record, and jury returned an award against PHA for $132,000 of the $10.4 million sought).

[92] *See* Niece v. Elmview Grp. Home, 929 P.2d 420, 426 (Wash. 1996).

[93] *See* Davis v. Clark Cnty., 966 F. Supp. 2d 1106, 1141 (W.D. Wash. 2013) (quoting *Niece*, 929 P.2d at 426).

[94] *See* Stephen J. Beaver, Comment, *Beyond the Exclusivity Rule: Employer's Liability for Workplace Violence*, 81 Marq. L. Rev. 103, 110 (1997).

[95] *Id.* (few guidelines exist to help employers define employee fitness or determine how sufficient a background check should be).

[96] *Id.* at 109.

[97] *Id.*

[98] *Id.*

[99] *See* Carlsen v. Wackenhut Corp., 868 P.2d 882, 887 (Wash. Ct. App. 1994) ("Past Washington decisions tend to employ a type of balancing test to determine if the given employment warrants the extra burden of a thorough background check.").

[100] *See* Charles W. Cunningham, Note, *The Duty of a Landlord to Exercise Reasonable Care in the Selection and Retention of Tenants*, 30 Stan. L. Rev. 725 (1978) (arguing that landlords should be required to exclude foreseeably dangerous individuals from the premises). This proposed duty has not taken hold in the courts, as most have not found an affirmative duty for landlords to screen tenants. *See supra* Part I.B.

2015                                     *QUORUM*                                          15

Washington courts generally use the balancing test.[101] With no duty on employers to conduct specific background checks, courts focus on all the information from the background check process, such as references, resumes, criminal history and interviews rather than on the specific questions asked.[102] If the job involves "a serious risk of great harm" to third parties, then an employer's responsibility to thoroughly investigate a future employee increases.[103] When an employer discovers inconsistencies on an employment application and a lack of information provided by an applicant, the next step is to make additional inquiries if the position requires interaction with the public.[104]

Scholars considering the issue of negligent hiring find that in most cases, an employer's knowledge of a criminal record alone will not impose negligent hiring liability.[105] "The mere fact that a person has a criminal record, even a conviction for a crime of violence, does not in itself establish the fact that that person has a violent or vicious nature so that an employer would be negligent in hiring him to meet the public."[106]

This same lack of foreseeability analysis should be applied to reject attempts to impose liability on landlords for merely renting to a person with a criminal record who harms another tenant. Employment law can help frame the standard in the landlord context. Just like a landlord, an employer reviews information about an applicant to determine if that applicant has the necessary qualifications for a particular job. Similarly, landlords obtain information from rental applicants to see if they have the qualifications necessary to meet tenant obligations. These inquiries include a criminal background check, but also include reference checks with prior landlords and usually an interview with the applicant.

---

[101] *But see* Niece v. Elmview Grp. Home, 929 P.2d 420, 427 (Wash. 1996) (employing a totality-of-the-circumstances test to find foreseeability of sexual assaults in an employer liability setting by considering prior sexual assaults, a policy against unsupervised contact with residents, and legislative recognition that sexual abuse is a problem in residential care facilities).

[102] *See* Rucshner v. ADT Sec. Sys., Inc., 204 P.3d 271, 279 (Wash. Ct. App. 2009) (citing La Lone v. Smith, 234 P.2d 893, 896 (Wash. 1951)) (holding that employer can assume person offering to perform simple work is qualified, but there can be a contractual obligation to do so).

[103] *See Rucshner*, 204 P.3d at 279.

[104] *See Carlsen*, 868 P.2d at 886.

[105] *See* Timothy L. Creed, *Negligent Hiring and Criminal Rehabilitation: Employing Ex-Convicts, Yet Avoiding Liability*, 20 ST. THOMAS L. REV. 183, 193–94 (2008); Jennifer Leavitt, Note, *Walking a Tightrope: Balancing Competing Public Interests in the Employment of Criminal Offenders*, 34 CONN. L. REV. 1281, 1286–87 (2002).

[106] Hersh v. Kentfield Builders, Inc., 189 N.W.2d 286, 289 (1971). *See also* Pruitt v. Pavelin, 685 P.2d 1347, 1354–55 (Ariz. Ct. App. 1984) (holding employer liable for the fraudulent actions of a real estate broker because it knew the employee had been convicted of passing bad checks and forging a signature on a document, and had lied to officers of the company about obtaining a real estate license); Betty Y. v. Al-Hellou, 988 P.2d 1031 (Wash. Ct. App. 1999) (holding employer not liable under negligent hiring theory where it knew of employee's conviction for third-degree child rape, but position was working on vacant apartments and contact with others was incidental).

16                                        *QUORUM*                                        2015

Even though landlords have less control over the day-to-day behavior of tenants (they are not directly supervising tenant behavior and do not interact with a tenant several hours a day in the way an employer may), landlords still have control over who they do and do not accept as tenants. Given this, landlords should be subject to a similar tort standard as that imposed on employers.

## II. SOCIAL SCIENCE RESEARCH: CRIMINAL RECORD NOT PREDICTIVE OF UNSUCCESSFUL TENANCY

Some courts have evaluated evidence intended to demonstrate an empirical link between a criminal history and propensity for dangerousness. In one such case, a city tried to argue that it was justified in refusing to issue a permit to an agency that facilitated the reentry of federal offenders into society because occupants of that residence were more likely to commit crimes than a person who had never been convicted of a crime.[107] The expert in that case was unable to provide conclusive research evidence to support this contention.[108] A later case considered whether the denial of a special zoning exception for a drug and alcohol treatment facility that accepted referrals from local prisons was constitutionally permissible.[109] The city based the denial in part on safety and security concerns.[110] The treatment provider appealed.[111] The court found that there was no evidence that the incidents presented to demonstrate a safety threat were "greater in number and intensity than incidents linked to similarly situated uses, such as dormitories, fraternities, or sororities."[112] According to the court "any safety concern related to the men being recovering addicts is therefore based upon unfounded fear, speculation, and prejudice."[113] This section reviews the recent social science research which supports the proposition that a criminal record is not predictive of a future threat.

The ostensible relationship between criminal history and an increased likelihood of a problematic tenancy is often cited by rental housing providers in defense of restrictive screening procedures and admissions policies.[114] Yet, there has been little discussion on the predictive value of a criminal record in the hous-

---

[107] *See* Bannum Inc., v. City of Louisville, 958 F.2d 1354, 1360–61 (6th Cir. 1992) (noting that city was unable to show that occupants who had been incarcerated more likely to commit crimes than those community residents without a criminal record).

[108] *Id.*

[109] *See* Open Homes Fellowship v. Orange Cnty, 325 F. Supp. 2d 1349, 1361 (M.D. Fla. 2004).

[110] *Id.* at 1354.

[111] *Id.*

[112] *Id.* at 1361.

[113] *Id.*

[114] *See* HOUSING LINK, *supra*  note 5.

2015                                   *QUORUM*                                      17

ing context.[115] A review of relevant scholarly research reveals there is no empirical basis for the assertion that a criminal record indicates a future problematic tenancy or a dangerous tenant.

This review describes the findings from academic studies in two areas: evaluations of supportive housing programs[116] and research on the relationship between housing status, incarceration and recidivism. Evaluations of supportive housing programs offer unique lessons regarding the predictive power of a criminal record in the housing context as they investigate how residents with criminal histories fare in those programs. Meanwhile, findings from studies exploring the impact of housing status on recidivism underscore the social imperative to expand housing access for the formerly incarcerated or those with criminal records.

A number of studies have evaluated the efficacy of supportive housing program serving populations at risk of homelessness.[117]  More recently, some scholars have utilized evaluation data from such programs to investigate whether a criminal record or history of incarceration predicts program success.[118] Our broad survey of the relevant academic literature returned two large-scale, methodologically rigorous studies that compare program participants with and without criminal histories.[119]

---

[115] *See* Corinne Carey, *No Second Chance: People With Criminal Records Denied Access to Public Housing*, 36 U. TOL. L. REV. 545, 563 (2005) ("Curiously, there has been relatively little discussion among federal or local housing officials as to what, in fact, predicts a good tenant, much less the predictive value of a criminal record.").

[116] Supportive housing programs typically provide populations at risk of chronic homelessness with a variety of health and social services, including some form of subsidized housing. Those populations include those struggling with substance dependence and mental and physical health issues. Because these issues are relatively common among those that have had contact with the criminal justice system, supportive housing clients often include the formerly incarcerated or individuals with criminal conviction records. *See generally* Seena Fazel et al., *Substance Abuse and Dependence in Prisoners: A Systematic Review*, 101 ADDICTION 181 (2006) (discussing substance dependence among those who have been incarcerated); Michael Massoglia, *Incarceration, Health, and Racial Disparities in Health*, 42 LAW & SOC'Y REV. 275 (2008) (discussing the impact of criminal justice system contact on mental and physical health outcomes). Supportive housing programs are thus a relevant setting for research around the link between criminal history and tenant behavior. Nonetheless, findings from supportive housing programs may not be completely generalizable to other housing contexts on account of the unique resources and social services made available to residents.

[117] *See* H. Stephen Leff et al., *Does One Size Fit All? What We Can and Can't Learn from a Meta-Analysis of Housing Models for Persons with Mental Illness* 60 PSYCHIATRIC SERVS. 473 (2009); Debra J. Rog, *The Evidence on Supported Housing*, 27 PSYCHIATRIC REHAB. J. 334 (2004).

[118] *See* Edward S. Casper & Doris Clark, *Service Utilization, Incidents and Hospitalizations Among People with Mental Illnesses and Incarceration Histories in a Supportive Housing Program*, 28 PSYCHIATRIC REHAB. J. 181 (2004); Daniel K. Malone, *Assessing Criminal History as a Predictor of Future Housing Success for Homeless Adults with Behavioral Health Disorders*, 60 PSYCHIATRIC SERVS. 224 (2009); Jack Tsai & Robert A. Rosenheck, *Incarceration Among Chronically Homeless Adults: Clinical Correlates and Outcomes*, 12 J. FORENSIC PSYCHOL. PRAC. 307 (2012). .

[119] *See* Malone, *supra* note 118; Tsai & Rosenheck, *supra* note 118. While Casper and Clark also addressed this question, the generalizability of the study's findings are very limited in light of the small

18                                          *QUORUM*                                          2015

     One study explored the impact of criminal history status on a wide range of outcomes among participants in a multi-city supportive housing program.[120] The researchers drew on a sample of 751 clients divided into three groups: those with no history of incarceration, those who had been incarcerated for one year or less and those who had been incarcerated for over one year.[121] Upon entering the program, the formerly incarcerated clients were markedly distinct from their never incarcerated counterparts; reporting higher levels of drug and alcohol dependence, longer histories of homelessness and lower levels of education.[122]After controlling for these baseline differences, researchers found that there were *no statistically significant differences* between the formerly incarcerated and never incarcerated study groups in program outcomes.[123] In light of their findings, the authors suggest that chronically homeless adults with incarceration histories can benefit as much from supportive housing as those without incarceration histories.[124]

     In another study of the relevance of criminal history for successful supportive housing participation, Malone analyzed data collected from a Seattle housing program for homeless adults with behavioral health disorders.[125] The study drew on data from 347 housing clients, slightly more than half of whom

---

sample size and potential selection effects stemming from the fact that the formerly incarcerated participants were recruited as part of a jail-diversion program, in contrast to the voluntary recruitment of the never incarcerated participant group. Casper & Clark, *supra* note 118. For a review of statistical standards for generalizability, see JASON W. OSBORNE, BEST PRACTICES FOR QUANTITATIVE METHODS (2007).

[120] Tsai & Rosenheck, *supra* note 118, at 310 (examining community adjustment, substance abuse, employment, health status and utilization of health services for clients enrolled in a multisite supportive housing program implemented in eleven cities: Chattanooga, Tennessee; Chicago, Illinois; Columbus, Ohio; Denver, Colorado; Fort Lauderdale, Florida; Los Angeles, California; Martinez, California; New York, New York; Philadelphia, Pennsylvania; Portland, Oregon; and San Francisco, California).

[121] *Id.*

[122] *Id.* at 314–15 tbl.1 (showing baseline differences between participants with different incarceration histories).

[123] *Id.* at 316 (with the exception that clients who had been incarcerated longer than one year reported poorer physical health).

[124] *Id.* at 319 (citing Malone, *supra* note 118) ("The overall finding of no group difference in outcomes runs in contrast to our hypothesis, although it is similar to at least one previous study (Malone, 2009) and suggests chronically homeless adults with incarceration histories can benefit as much from supported housing as those with no incarceration histories. This finding may have particular implications for housing providers and policy makers who support practices that exclude those with criminal histories from applying for public housing.").

[125] Malone, *supra* note 118. The study defined success as the continuous retention of housing for two years. *Id.* at 224. The author focused on program success rather than recidivism in light of the research suggesting that much of the reoffending on the part of the formerly incarcerated—particularly those with mental illness—stems from low-level, nonviolent offenses. *Id.* at 225 (referencing R.A. Desai & Robert A. Rosenheck, *Childhood Risk Factors for Criminal Justice Involvement in a Sample of Homeless People with Serious Mental Illness*, 188 J. NERVOUS & MENTAL DISEASE 324 (2000)). Consequently, recidivism data may not be a justifiable basis on which supportive housing providers screen out prospective clients with criminal histories out of concern for the safety of other clients.

had a criminal record.[126] That analysis revealed that a *criminal record was not statistically predictive* of program failure.[127] When other characteristics that could potentially affect tenant behavior were taken into account, age was the only statistically significant determinant of housing success, where younger clients were less likely to retain housing.[128] In contrast to other similar evaluations of supportive housing programs, Malone's study was able to draw on detailed data on the *nature* of clients' criminal history, including the time elapsed since last conviction, the number of prior offenses, and the seriousness of past offenses.[129] None of these dimensions were statistically predictive of program success.[130]

These studies provide evidence that, at least within the supportive housing context, *criminal history is not predictive of problematic tenancy*.[131] As such, they raise important questions about the validity of standards of risk estimation, screening practices and admissions policies related to criminal records in the general rental housing context. With respect to the potential broader policy implications of his study for screening and admissions policies in other residential settings, Malone notes that:

> The finding that criminal history does not provide good predictive information about the potential for housing success is additionally important because it at least partially contradicts the expectations of housing operators and others. It certainly runs counter to common beliefs that housing needs to be free of offenders in order to be safe for the other residents.[132]

---

[126] *Id*. at 224.

[127] *Id*. ("Data were available for 347 participants. Most (51%) had a criminal record, and 72% achieved housing success. The presence of a criminal background did not predict housing failure. Younger age at move-in, presence of a substance abuse problem, and higher numbers of drug crimes and property crimes were separately associated with more housing failure; however, when they were adjusted for each of the other variables, only move-in age remained associated with the outcome.").

[128] *Id*.

[129] *Id*. at 228.

[130] *Id*. at 227–28 ("Criminal history appears to be largely unrelated to the ability of homeless persons with behavioral health disorders to succeed in supportive housing, suggesting that policies and practices that keep homeless people with criminal records out of housing may be unnecessarily restrictive. People with a more extensive criminal history succeeded at rates equivalent to those of others, as did people with more recent criminal activity, people with more serious criminal offenses, and people who began criminal activity at an earlier age. In other words, the criminal history of those who succeeded in housing was nearly indistinguishable from that of those who failed in housing.").

[131] *Id*. at 229. On account of the unique features of supportive housing programs, Malone cautions that his results are not necessarily generalizable to all housing contexts: "Because the study present here involved individuals with specific characteristics (lengthy homelessness and behavioral health disorders) who received a particular intervention (supportive housing), generalizing the results of our study to other situations may not be valid." *Id*.

[132] *Id*. at 228.

N.Y.U. JOURNAL OF LEGISLATION & PUBLIC POLICY *QUORUM*                                     EHMAN & REOSTI

20                                   *QUORUM*                                     2015

The notion that excluding those with criminal histories from housing enhances public safety is also undermined by a larger body of research that has established the strong empirical association between housing insecurity and recidivism. A number of studies have investigated the impact of former prisoners' post-release housing circumstances upon recidivism by utilizing statistical models that control for a number of individual level characteristics thought to potentially affect recidivism.[133] For example, researchers analyzed the case management records of 6,327 parolees in Georgia and found that, controlling for all other relevant factors, housing instability was significantly associated with recidivism (here defined as arrest for a new offense while under parole supervision).[134] Each change of address while on parole was associated with a twenty-five percent increase in the likelihood of re-arrest.[135] Their findings underscore the importance of access to *stable, affordable* housing for the formerly incarcerated.

Two Washington studies examined post-release outcomes as they related to housing stability. One study assessed the impacts of a pilot re-entry housing program in Washington by contrasting the re-entry outcomes of participants with a comparison group composed of non-participants who were released from corrections facilities at the same time.[136] Across every measure of recidivism and re-integration, the stably housed portion of the comparison group fared better than their unstably housed or homeless counterparts.[137] These findings offer strong support for the notion that housing stability significantly reduces recidivism and improves reintegration of the formerly incarcerated. This finding holds even after controlling for various individual-level background characteristics potentially shaping housing circumstances.[138]

---

[133] *See, e.g.*, FAITH E. LUTZE ET AL., WASHINGTON STATE'S REENTRY HOUSING PILOT PROGRAM EVALUATION: YEAR 3 FINAL REPORT (2011), *available at* http://www.co.whatcom.wa.us/health/wchac/pdf/rhpp_year3_report_june_2011.pdf; TAMMY MEREDITH ET AL., APPLIED RESEARCH SERVS., INC., ENHANCING PAROLE DECISION-MAKING THROUGH THE AUTOMATION OF RISK ASSESSMENT, (2003); MELISSA SHAH ET AL., WASH. STATE DEP'T OF SOC. & HEALTH SERVS., ACHIEVING SUCCESSFUL COMMUNITY RE-ENTRY UPON RELEASE FROM PRISON (2013), *available at* https://www.dshs.wa.gov/sites/default/files/SESA/rda/documents/research-11-193.pdf.

[134] *See* MEREDITH, *supra* note 133, at 15.

[135] *Id.* ("Finally, there is a 25% increase in the likelihood of arrest each time a parolee changes address. That translates into doubling the odds of arrest by simply moving three times while on parole (having four residences).").

[136] *See* LUTZE ET AL., *supra* note 133.

[137] *Id.* at 15–16. Those dependent or outcome measures included new convictions, revocation of community supervision, readmission to prison, and the "time to failure" or the length of time between an individual's release date and the first instance of recidivism. *See also id.* at 36 ("Although this study was focused on RHPP/HGAP [the two pilot programs under study] performance, it is important to note the reentry experience of those who were released to unstable housing. These offenders tended to perform poorly across all counties on each of the outcome measures.").

[138] *Id.* at 14–18 (including age, gender, incarceration history, criminal conviction history and exposure to rehabilitative programming in prison).

In the second study, Washington researchers investigated the impact of post-release housing circumstances on various dimensions of prisoner reentry including recidivism, employment, earnings, medical care and substance abuse.[139] The researchers followed a sample of approximately 12,000 individuals released from a Washington State Department of Corrections (DOC) facility for one year.[140] Among study participants, those that received housing assistance and eventually secured permanent housing fared the best across multiple measures of reintegration; this group had the lowest rates of recidivism and the highest rates of employment, medical coverage and substance abuse treatment.[141]

Despite the importance of housing stability for successful reentry, a large body of research literature has unfortunately found that the formerly incarcerated experience high rates of homelessness and housing instability relative to the general population.[142] One such study drew on longitudinal survey data to compare the housing circumstances of formerly incarcerated men and of a group of men who share similar demographic characteristics but have never been incarcerated.[143] After controlling for an array of background characteristics (i.e. race, age, education, employment history, behavioral characteristics, etc.) and housing circumstances prior to incarceration, the authors found that the formerly incarcerated men were nearly twice as likely to have been homeless during the study period than their never-incarcerated counterparts.[144]

Of all the studies reviewed on the topic for this article, not one indicated a positive correlation between a criminal record and a future problematic tenancy. Rather, the studies indicated no correlation between the two. Based upon this

---

[139] *See* SHAH ET AL., *supra* note 133, at 1.

[140] *Id.*

[141] *Id.* at 1 ("Homeless ex-offenders who received housing assistance and transitioned to permanent housing had *lower* rates of criminal recidivism and *higher* rates of employment, Medicaid coverage, and substance abuse treatment, compared to other homeless ex-offenders.").

[142] *See, e.g.*, Stephen Metraux & Dennis P. Culhane, *Homeless Shelter Use and Reincarceration Following Prison Release*, 3 CRIMINOLOGY & PUB. POL'Y 139 (2004); BRADLEY, *supra* note 6; Geller & Curtis, *supra* note 6, at 1196; NELSON, *supra* note 6; Roman, *supra* note 6.

[143] *See* Geller & Curtis, *supra* note 6, at 1197.

[144] *Id.* at 1206 ("[F]ormerly incarcerated men face more than twice the odds of homelessness as men who have not been incarcerated."). Another notable finding to emerge from that study is that formerly incarcerated men were not significantly more likely to have been evicted or to have skipped mortgage payments relative to their never-incarcerated study counterparts when relevant covariates are controlled for. *Id.* at 1203 ("Namely, differences in frequent moves and ''living with others without paying rent'' are consistently statistically significant, while differences in skipping a mortgage payment, eviction, and doubling up lose significance as additional covariates are controlled."). Their research is the first to compare the tenant behavior of formerly incarcerated and never-incarcerated individuals in the general rental housing context. As such, these findings provide early but important evidence challenging the assumption that a criminal history is an effective predictor of at least some forms of "bad" tenant behavior that result in eviction.

N.Y.U. JOURNAL OF LEGISLATION & PUBLIC POLICY *QUORUM*                                            EHMAN & REOSTI

research, future harm resulting from renting to an applicant with a criminal record is not reasonably foreseeable.

### III. BECAUSE CRIMINAL RECORDS DO NOT CREATE A FORESEEABLE RISK OF FUTURE HARM, TORT LIABILITY SHOULD NOT ATTACH TO RENTING TO A PERSON WITH A CRIMINAL RECORD

A tort standard that would not impose landlord liability on the sole basis of renting to an applicant with a criminal record supports societal goals of fair housing, habitable premises, public safety and rehabilitation.

### A. Fair Housing

Imposing liability upon landlords for negligent screening also conflicts with the goals, policies, and language of laws that prohibit discrimination in housing. Reducing or eliminating liability on landlords who rent to tenants with a criminal record furthers fair housing goals. A specific goal of the Fair Housing Act is to "[e]nsure the removal of artificial, arbitrary, and unnecessary barriers when the barriers operate invidiously to discriminate on the basis of impermissible characteristics."[145] However, restrictive tenant screening practices with respect to criminal history could undermine that goal and facilitate discriminatory treatment.[146] If a landlord refuses to rent to a person with a criminal history, she could be liable for violating the Fair Housing Act.[147]

The U.S. Department of Housing and Urban Development (HUD) has issued no guidance regarding fair housing and criminal records screening.[148] However, over twenty years ago, the EEOC recognized that "an employer's policy or practice of excluding individuals from employment on the basis of their convic-

---

[145] *See* Llanos v. Estate of Coehlo, 24 F. Supp. 2d 1052, 1056 (E.D. Cal. 1998) (discussing goal of Federal Housing Act, 42 U.S.C. § 3601). *See also* United States v. City of Black Jack, 508 F.2d 1179, 1184 (8th Cir. 1974).

[146] *See* Rebecca Oyama, *Do Not (Re)Enter: The Rise of Criminal Background Tenant Screening as a Violation of the Fair Housing Act*, 15 MICH. J. RACE & L. 181, 212–13 (2009).

[147] *Id.*; *see also* Gamble v. City of Escondido, 104 F.3d 300, 304–05 (9th Cir. 1997) (describing the burden-shifting scheme for disparate treatment claims under the Fair Housing Act).

[148] HUD has issued regulations regarding disparate impact liability that set out a three-step burden-shifting analysis. 24 C.F.R. § 100.500(c) (2013). A recent law review article provides an in-depth discussion of this rule and its implications for future court decisions. *See* Michael G. Allen et al., *Assessing HUD's Disparate Impact Rule: A Practitioner's Perspective*, 49 HARV. C.R.-C.L. L. REV. 155 (2014). *See also, e.g.*, Inclusive Cmtys. Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs, 747 F.3d 275, 282–83 (5th Cir. 2014) (applying the disparate impact test set out in the HUD regulations). The U.S. Supreme Court heard oral arguments in this case on January 21, 2015 to determine whether the Fair Housing Act prohibits housing policies that have a disparate impact on protected classes. Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmty. Project, Inc., No. 13-1371 (U.S. argued Jan. 21, 2015).

2015                                        *QUORUM*                                        23

tion records has an adverse impact on [African American and Latino workers] in light of statistics showing that they are convicted at a disproportionately higher rate than their representation in the population."[149]

Washington State corrections statistics demonstrate that African Americans are disproportionately represented in the corrections system. Washington State's 2013 estimated Census population estimate was 6,971,406.[150] Of that number, 81.2% were White, 11.9% Hispanic or Latino, 1.9% Native American and 4.0% were African American.[151] The Washington State Department of Corrections (DOC) collects data on the race of all offenders admitted to its facilities.[152] Of the 18,059 prisoners as of September 2014, 18.1% were African American, a rate almost five times the rate of African Americans in the general population.[153] For Native Americans, the incarceration rate was more than double their share of the state population at 4.4%.[154]

As a result of this disproportionate representation of protected classes in the criminal justice system, housing policies that eliminate applicants for consideration based upon a criminal record create a discriminatory effect. A tort law standard that reduces negligence liability for renting to an applicant with a criminal record could increase access to housing for historically marginalized groups. Landlords would have less fear of a negligence lawsuit, thereby removing one possible business justification for restrictive background screening policies. The proposed tort law standard supports the important public policy objective of removing unnecessary and impermissible barriers to housing for protected classes.

---

[149] *See* U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC POLICY STATEMENT ON THE ISSUE OF CONVICTION RECORDS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000 ET SEQ. (1982) (Feb. 4, 1987), *available at* http://www.eeoc.gov/policy/docs/convict1.html. The EEOC issued guidance in 1990 for consideration of arrest records. U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC POLICY STATEMENT ON CONSIDERATION OF ARREST RECORDS IN EMPLOYMENT DECISIONS UUNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000 ET SEQ. (1982) (Sept. 7, 1990), *available at* http://www.eeoc.gov/policy/docs/arrest_records.html. In 2012, the EEOC updated this guidance. *See* U.S. EQUAL EMP'T OPPORTUNITY COMM'N, ENFORCEMENT GUIDANCE ON THE CONSIDERATION OF ARREST AND CONVICTION RECORDS IN EMPLOYMENT DECISIONS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (Apr. 25, 2012), *available at* http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm. The 2012 guidance consolidates the 1987 and 1990 guidance, updates the research, and discusses disparate treatment and disparate impact analysis for employer criminal record policies under Title VII with an in-depth analysis and specific examples.

[150] U.S. CENSUS BUREAU, STATE & COUNTY QUICKFACTS FOR WASHINGTON, *available at* http://quickfacts.census.gov/qfd/states/53000.html (last revised Feb. 5, 2015).

[151] *Id.*

[152] *Fact Card*, DEP'T OF CORRS. (Sept. 30, 2014), *available at* http://www.doc.wa.gov/aboutdoc/docs/msFactCard_002.pdf.

[153] *Id.*

[154] *Id.*

24                                   *QUORUM*                                          2015

*B. Habitable and Safe Premises*

     Landlords should be liable if they fail to maintain or secure the property resulting in harm to a tenant by another tenant's or third party's criminal act.[155] The few courts that have heard negligent tenant screening claims have not expanded liability to the future criminal acts of tenants who have a criminal record.[156] But, no uniform standard has been established.[157] We posit that a clear tort law standard should be established that reflects the relevant social science and psychological research regarding foreseeability and risk as well as the public policy goals of safety, rehabilitation, and fair housing.

     Courts and legislatures have not and should not expand liability for the criminal acts of third parties to the tenant screening context. Rather than using a criminal record to reject an applicant for fear of future harm to other tenants or property, landlords should instead be incentivized to be responsible property managers and owners.[158] They should be encouraged to do what is already required——comply with applicable common law and statutory habitability and security requirements or face liability if their failure to do so results in reasonably foreseeable harm from the criminal acts of a third party.[159]

     Prior case law and good public policy require that Washington courts hold a landlord liable for tenant injuries caused by a defective condition on the premises that could foreseeably cause harm to a tenant from third party criminal activity if:

- the condition is dangerous
- the landlord was aware of it or should have been
- the landlord failed to properly repair it; and
- the condition violated the warranty of habitability.[160]

---

[155] *See* Griffin v. West RS, Inc., 984 P.2d 1070, 1076 (Wash. Ct. App. 1999).

[156] See discussion *supra* Part I.C.

[157] *Id.*

[158] *See* B.A. Glesner, *Landlords as Cops: Tort, Nuisance & Forfeiture Standards Imposing Liability on Landlords for Crime on the Premises*, 42 CASE W. RES. L. REV. 679, 791 (1992).

[159] *See* Degel v. Majestic Mobile Manor, 914 P.2d 728, 731 (Wash. 1996) (en banc) (holding that landlord has affirmative duty to maintain common areas in safe manner).

[160] *See* Pinckney v. Smith, 484 F. Supp. 2d. 1177, 1182 (W.D. Wash. 2007) (citing WASH. REV. CODE ANN. § 59.18.060(1) (2004) for the proposition that a dangerous condition is one that substantially "impairs the health or safety of the tenant"); Lian v. Stalick, 62 P.3d 933, 936 (Wash. Ct. App. 2003). Both cases cite to the RESTATEMENT (SECOND) OF PROP.: LANDLORD & TENANT § 17.6 (1977). ("A landlord is subject to liability for physical harm caused to the tenant and others upon the leased property with the consent of the tenant or his subtenant by a dangerous condition existing before or arising after the tenant has taken possession, if he has failed to exercise reasonable care to repair the condition and the existence of the condition is in violation of: (1) an implied warranty of habitability; or (2) a duty created by statute or administrative regulation.").

2015                                    *QUORUM*                                    25

To incur liability, the landlord must have control over the part of the property where the defect occurred.[161]

In cases where the issue is an allegation of inadequate security, courts or the state legislature should define the factors that render criminal conduct reasonably foreseeable. These should include factors that actually relate to foreseeability:

> 1) whether criminal conduct previously occurred on or near the property at issue;
> 2) how recently the prior criminal conduct occurred;
> 3) how often the prior criminal conduct occurred;
> 4) how similar the prior criminal conduct was to the conduct that occurred on the property; and
> 5) what publicity was given to the prior criminal conduct that would indicate that the land owner knew or should have known about the potential for crime.[162]

This tort standard also recognizes that landlord behavior related to premises maintenance, adequate security, and appropriate management are more relevant factors in increasing tenant safety, and that these, rather than a past criminal history, should be the focus of liability. Research on criminal activity on or around rental property highlights the importance of factors unrelated to the potential for criminal behavior among tenants with a criminal record. For example, one study investigated the link between residential rental property ownership characteristics and crime.[163] In that study, rates of crime and disturbances were significantly higher in rental properties where property managers lived off-site, lending credence to anecdotal suspicions that absentee landlords or property managers are less effective when it comes to maintaining safety.[164]

## C. Public Safety and Rehabilitation

The Washington legislature has declared that the criminal justice system should protect the public, reduce the risk of offenders reoffending in the community, and encourage the rehabilitation of felons through employment.[165] It has al-

---

[161] *See* Faulkner v. Racquetwood Vill. Condo. Ass'n, 23 P.3d 1135, 1137 (Wash. Ct. App. 2001) (finding no duty to protect tenant from harm suffered in an area outside landlord's control).

[162] *See* Stan Perry & Paul Heyburn, *Premises Liability for Criminal Conduct: When is Foreseeability Established?*, THE HOUSTON LAWYER (Oct. 1998) at 21–22 (citing Timberwalk Apts., Partners, Inc. v. Cain, 972 S.W.2d 749, 757 (1998)).

[163] *See* Terance Rephann, *Rental Housing and Crime: The Role of Property Ownership and Management*, 43 ANNALS REGIONAL SCI. 435 (2009).

[164] *Id.*

[165] *See* WASH. REV. CODE ANN. § 9.94A.010 (West 2014); WASH. REV. CODE ANN. § 9.96A.010 (West 2014).

N.Y.U. JOURNAL OF LEGISLATION & PUBLIC POLICY *QUORUM*                                                                    EHMAN & REOSTI

26                                                *QUORUM*                                                2015

so recognized that housing increases the likelihood of success in the community for previously incarcerated individuals.[166]

The social science studies discussed in the previous section establish a link between reduced recidivism and stable housing.[167] While landlords purport to screen out tenants with a criminal history as a safety precaution,[168] this behavior may actually decrease overall community safety. Courts considering negligent renting claims have recognized the competing interests in landlords protecting tenants and staff and the need for people with conviction histories to find housing. One court turned down a tenant's claim that a landlord was obligated to reasonably screen potential tenants.[169] In rejecting this claim, the court raised concerns about a landlord being expected to predict possible future threats based upon a criminal record. According to the court, this type of liability would:

> induce landlords to decline housing to those with a criminal record in the absence of evidence of an actual threat to cotenants or individual tenants. That would only export the 'problem' somewhere else. The resulting unstable living conditions or homelessness may increase the chances of recidivism to the detriment of public safety[170]

Similar to courts considering negligent renting liability, courts considering negligent hiring cases recognize the competing interests in employers protecting customers and employees and the need for ex-offenders to find jobs. One New York court noted that people with criminal records are "free to walk the streets, visit the playgrounds, and live and work in a society without being branded or segregated — the opportunity for gainful employment may spell the difference between recidivism and rehabilitation."[171] The Supreme Court of Michigan expressed its understanding of the difficulties people with criminal records face in finding employment: "We share … concern for those persons who, having been convicted of a crime, have served the sentence imposed and so are said to have paid their debt to society and yet find difficulty in obtaining employment."[172] One Florida court addressed the tort liability and criminal records issue head on:

> [T]o say an employer can never hire a person with a criminal record at the risk of being held liable for the employee's tortious

---

[166] *See* WASH. REV. CODE ANN. § 35.82.340 (West 2014).
[167] *See supra* Part II.
[168] *See* Oyama, *supra* note 146, at 187–88.
[169] *See* Davenport v. D.M. Rental Props., Inc., 718 S.E.2d 188, 191 (N.C. Ct. App. 2011) (citing *Anderson v. 124 Green St., LLC*, 2011 WL 341709, at *5, (Mass. Super. Jan. 18, 2011), *aff'd*, 974 N.E.2d 1167 (2012)).
[170] *Id.*
[171] *See* Haddock v. City of New York, 553 N.E.2d 987, 992 (N.Y. 1990).
[172] *See* Hersh v. Kentfield Builders, Inc., 189 N.W.2d 286, 289 (1971).

2015                                      *QUORUM*                                          27

assault, 'flies in the face of the premise that society must make a reasonable effort to rehabilitate those who have gone astray.'[173]

Establishing a tort law standard that eliminates negligent renting claims based upon a landlord's decision to accept an applicant for a criminal record effectuates the public policy goals of safety and rehabilitation. Such a standard would provide strong public policy support for a legal rule that such behavior is not foreseeable as a matter of law rather than leaving the question of foreseeability in these cases for the fact finder.[174]

## CONCLUSION

An applicant's criminal record should be absent from the analysis of whether a future crime was foreseeable by a landlord because the mere presence of a record does not implicate foreseeability.[175] Washington courts should not send this question to the jury as the Georgia appeals court did. Rather, Washington courts should examine the relevant research set out above to find that there is no reasonably foreseeable likelihood that a rental applicant is a future threat based solely on a criminal record. A local or state legislature should also adopt this standard to ensure clarity regarding liability for landlords when making these rental decisions and to further the public policy goals outlined above. A reasonable standard would require landlords to meet their common law and statutory duties to maintain safe and habitable premises while removing barriers to housing for qualified applicants with criminal records.

The assumption that a criminal record is accurately predictive of a future problematic tenancy is not supported by current social science research. Tort law should not rely on assumptions about future threats based on a past criminal record when empirical evidence suggests that the risk is not inherent or predictable. Washington needs a rational uniform tort law standard that protects tenants and incorporates the public policy goals of public safety, rehabilitation and fair housing. The standard we suggest—that an applicant's future criminal behavior is not foreseeable solely based on a past criminal record as a matter of law—meets these criteria.



---

[173] *See* Garcia v. Duffy, 492 So.2d 435, 441 (Fla. Dist. Ct. App. 1986) (quoting Williams v. Feather Sound, Inc., 386 So.2d 1238, 1241 (Fla. Dist. Ct. App. 1980)).

[174] *See* Schooley v. Pinch's Deli Mkt., Inc., 951 P.2d 749, 754 (Wash. 1998) (noting that foreseeability is generally an issue of fact for the jury).

[175] There is no method that completely and accurately measures recidivism. *See* Robert Weisberg, *Meanings and Measurements of Recidivism*, 87 S. CAL. L. REV. 785 (2014). There are also methods of attempting to predict dangerousness, but there is no agreed-upon method or simple way to make this determination. *See supra* notes 107–113.

over from incarceration to homelessness, and vice versa, threatens to transform spells of incarceration or homelessness into more long-term patterns of social exclusion."[27] Directing housing assistance to individuals with a history of residential instability before incarceration could reduce the rate of homelessness and re-incarceration among the re-entry population.[28]

## Conclusion

Many formerly incarcerated individuals end up in unstable housing arrangements after release. As the research above indicates, stable housing is a vital component of effective re-entry. By working to reduce the barriers that prevent formerly incarcerated individuals from accessing stable housing, advocates can reduce recidivism and improve public safety and community wellbeing. ∎

# Recent Cases

The following are brief summaries of recently reported federal and state cases that should be of interest to housing advocates. Copies of the opinions can be obtained from a number of sources including the cited reporter, Westlaw,[1] Lexis,[2] or, in some instances, the court's website.[3] Copies of the cases are *not* available from NHLP.

## Housing Choice Voucher Program: Police Report Insufficient to Establish Drug-Related Criminal Activity

*Weekes v. Boston Hous. Auth.*, No. 09H784CV00531 (Mass. Hous. Ct. Dec. 10, 2009). In terminating a voucher tenant's assistance, a hearing officer relied on a police report stating that officers seized clear plastic bags containing a substance "believed to be Class D marijuana" from the tenant's apartment. The court found that the statements in the police report, standing alone, were insufficient to establish by a preponderance of the evidence that the substance seized from the tenant's apartment was marijuana. The court therefore found that the hearing officer's conclusion that the tenant allowed her apartment to be used for drug-related criminal activity in violation of her Section 8 lease was legally erroneous. The court vacated the hearing officer's decision and ordered the housing authority to reinstate the tenant's voucher.

## Housing Choice Voucher Program: Evidence Supported Hearing Officer's Finding that Tenant Was Evicted

*Morford-Garcia v. Metro. Council Hous. & Redev. Agency*, 2009 WL 4909435 (Minn. Ct. App. Dec. 22, 2009) (unreported). An owner filed an eviction action against a voucher tenant. The parties later entered into a settlement agreeing to a mutual termination of the lease. The settlement stated that if the tenant violated its terms, the landlord would be entitled to an immediate writ of recovery. The tenant violated the settlement, and a writ of recovery was issued but later canceled. The tenant argued that the record did not support the hearing officer's finding that she was evicted. The court disagreed, finding that an eviction judgment must have been entered in the owner's favor, or else a writ of recovery would not have been issued. The court also found that there was substantial evidence to support the

---

[27]*Id.* at 142.

[28]*Id.* at 151; *see also* Corp. for Supportive Hous., Getting Out with Nowhere to Go: The Case for Re-entry Supportive Housing, *available at* http://www.csh.org/_data/global/images/ReEntryBooklet.pdf. Research shows that supportive housing—permanent affordable housing linked to services—works to break the cycle of homelessness and incarceration.

[1]http://www.westlaw.com.

[2]http://www.lexis.com.

[3]For a list of courts that are accessible online, see http://www.uscourts.gov/links.html (federal courts) and http://www.ncsc.dni.us/COURT/SITES/courts.htm#state (for state courts). See also http://www.courts.net.

but on better defining the relevance of criminal history records. There is a consensus that the blanket exclusion of individuals with criminal history records makes little sense. Indeed, such a blanket exclusion has been explicitly disallowed as discriminating against minorities under Title VII of the Civil Rights Act.[2] The question is how to decide when a criminal history record is relevant. The Equal Employment Opportunity Commission, while outlawing blanket exclusion, allowed the use of an arrest or conviction record as evidence in an employment decision provided the employer considers the nature and gravity of the offense, *the time that has passed since the arrest*, and the nature of the job held or sought. According to the *Report of the National Task Force on the Commercial Sale of Criminal Justice Record Information* (SEARCH, 2005):

> The relevancy model of the collection, use, and disclosure of criminal justice record information remains in a very nascent stage. Information is increasingly readily available, but relevancy determinations are unclear. As a society, we know very little about whether, and under what circumstances, criminal justice record information (and different kinds of criminal justice record information) is relevant to various determinations involving employment. . .. As a result, the current default, especially in an increasingly dangerous and risk averse society, is to allow all (or virtually all) criminal justice information to reach end-users and then permit end-users, based on their own needs, culture, and law, to sort out the relevancy of the information (SEARCH, p. 75).

The goal of this article is to contribute to the discussion about the relevance of criminal history records for predicting employment behavior. In particular, we focus on the issue of timing. We start with the observation that lifetime bans for all felony convictions are not consistent with the research about desistance from developmental criminology. Recent analysis of data on offenders from adolescence to age 70 shows that most offenders desist, with the bulk of offenders not experiencing additional arrests after age 40 (Blokland et al., 2005; Laub and Sampson, 2003). But if lifetime bans are not appropriate, what exactly is the appropriate "window" on the use of criminal history records? The most recent statistics from the U.S. Department of Justice indicate that over two thirds of prison releasees commit a new offense or violate parole within three years of release (Langan and Levine, 2002) and the probability of failure declines the longer the time since the last offense. Therefore, it is reasonable to ask, from the perspective of the employer, whether the risk of offending

---

2. The Equal Employment Opportunity Commission (EEOC) issued a policy statement in September 1990 explicitly disallowing the "blanket exclusion" of individuals with criminal records.

Erika Pablo / Asha Venkataraman
OCR Fair Chance Housing ORD
D3b4 - revised

1       **CITY OF SEATTLE**

2       **ORDINANCE** _____

3              COUNCIL BILL _____

4       ..title
5       AN ORDINANCE relating to housing regulations; adding a new Chapter 14.09 (Fair Chance
6              Housing) to the Seattle Municipal Code to regulate the use of criminal history in rental
7              housing; authorizing the Seattle Office for Civil Rights to enforce the regulations set out
8              in this new chapter; and amending Section 3.14.931 of the Seattle Municipal Code to
9              expand the Seattle Human Rights Commission's duties.
10      ..body
11      WHEREAS, the U.S. Department of Justice has estimated one in every three adults in the United

12              States has either an arrest or conviction record[1]; and

13      WHEREAS, the Center for American Progress reports that nearly half of all children in the U.S.

14              have one parent with a criminal record[2]; and

15      WHEREAS, over the past two decades, there has been a rise in the use of criminal background

16              checks to screen prospective tenants for housing; and

17      WHEREAS, a study by the Vera Institute of Justice has shown that people with stable housing

18              are more likely to successfully reintegrate into society and are less likely to reoffend;[3]

19              and

20      WHEREAS, individuals and parents who have served their time must be able to secure housing

21              if they are to re-enter into society to successfully rebuild their lives and care for their

22              families; and

---

[1] Bureau of Justice Statistics, U.S. Department of Justice, "Survey of State Criminal History Information Systems,"
2012,available at https://www.ncjrs.gov/pdffiles1/bjs/grants/249799.pdf
[2] Vallas, Boteacg, West, Odum. "Removing Barriers to Opportunity for Parents with Criminal Records and Their
Children: A Two Generation Approach," Center for American Progress. December 2015.
[3] Vera Institute of Justice, "Piloting a Tool for Reentry: A Promising Approach to Engaging Family Members," 2011,
available at http://archive.vera.org/sites/default/files/resources/downloads/Piloting-a-Tool-for-Reentry-Updated.pdf

Erika Pablo / Asha Venkataraman
OCR Fair Chance Housing ORD
D3b4 - revised

1   WHEREAS, the City's Office for Civil Rights (OCR) works to advance civil rights and end

2          barriers to equity; and

3   WHEREAS, in 2010, residents of Sojourner Place Transitional Housing, Village of Hope, and

4          other community groups called on the City to address barriers to housing faced by people

5          with prior records; and

6   WHEREAS, in response, OCR and the Seattle Human Rights Commission held two public

7          forums in 2010 and 2011, bringing together over 300 people including community

8          members with arrest and conviction records, landlords, and employers to share their

9          concerns; and

10  WHEREAS, in 2013, the City Council passed the Seattle Jobs Assistance Ordinance, now titled

11          the Fair Chance Employment Ordinance, to address barriers in employment; and

12  WHEREAS, since 2013, the Office of Housing has worked with nonprofit housing providers to

13          share best practices in tenant screening to address racial inequities; and

14  WHEREAS, in September 2014 the Council adopted Resolution 31546, in which the Mayor and

15          Council jointly convened the Seattle Housing Affordability and Livability Agenda

16          (HALA) Advisory Committee to evaluate potential strategies to make Seattle more

17          affordable, equitable, and inclusive; and in particular, to promote the development and

18          preservation of affordable housing for residents of the City; and

19  WHEREAS, in July 2015, HALA published its Final Advisory Committee Recommendations

20          and the Mayor published *Housing Seattle: A Roadmap to an Affordable and Livable City,*

21          which outlines a multi-pronged approach of bold and innovative solutions to address

22          Seattle's housing affordability crisis; and

Erika Pablo / Asha Venkataraman
OCR Fair Chance Housing ORD
D5

1    WHEREAS, African Americans are 3.4 percent of Washington's population but account for

2        nearly 18.4 percent of Washington's prison population;[4] Latinos are 11.2 percent of

3        Washington's population but account for 13.2 percent of Washington's prison

4        population;[5] and Native Americans are 1.3 percent of the state population but account for

5        4.7 percent of Washington's prison population;[6] and

6    WHEREAS, racial inequities in the criminal justice system are compounded by racial bias in the

7        rental applicant selection process, as demonstrated by fair housing testing conducted by

8        the Seattle Office for Civil Rights in 2013 that found evidence of different treatment

9        based on race in 64 percent of tests, including some cases where African American

10       applicants were told more often than their white counterparts that they would have to

11       undergo a criminal background check as part of the screening process; and

12   WHEREAS, there is no sociological research establishing a relationship between a criminal

13       record and an unsuccessful tenancy;[7] and

14   WHEREAS, an Urban Institute study stated, "men who found [stable] housing within the first

15       month after release were less likely to return to prison during the first year out";[8] and

16   WHEREAS, a study performed in Cleveland found that "obtaining stable housing within the first

17       month after release inhibited re-incarceration";[9] and

---

[4] http://www.ofm.wa.gov/pop/census2010/default.asp#demo; http://www.doc.wa.gov/docs/publications/reports/100-QA001.pdf
[5] http://www.ofm.wa.gov/pop/census2010/default.asp#demo; http://www.doc.wa.gov/docs/publications/reports/100-QA001.pdf
[6] http://www.ofm.wa.gov/pop/census2010/default.asp#demo; http://www.doc.wa.gov/docs/publications/reports/100-QA001.pdf
[7] Ehman and Reosti,"Tenant Screening in an Era of Mass Incarceration: A Criminal Record is No Crystal Ball", *N.Y.U. Journal of Legislation and Public Policy Quorum*, March 2015.
[8] *The Importance of Stable Housing for Formerly Incarcerated Individuals*, Housing Law Bulletin, Volume 40, http://nhlp.org/files/Importance%20of%20Stable%20Housing%20for%20Formerly%20Incarcerated_0.pdf
[9] *Id.*

Erika Pablo / Asha Venkataraman
OCR Fair Chance Housing ORD
D5

1    WHEREAS, in October 2015, the Mayor proposed and Council adopted Resolution 31622,

2        declaring the City's intent to expeditiously consider strategies recommended by the

3        Housing Affordability Livability Agenda (HALA) Advisory Committee; and

4    WHEREAS, the Mayor's Housing and Affordability and Livability Agenda recommended that

5        the City address barriers to housing faced by people with criminal records, and the Mayor

6        responded by creating a Fair Chance Housing Committee; and

7    WHEREAS, the Fair Chance Housing Committee provided input to OCR on a legislative

8        proposal to address these barriers; and

9    WHEREAS, in 2016, the Department of Housing and Urban Development (HUD) issued

10       guidance on the application of the Fair Housing Act to the use of arrest and conviction

11       records in rental housing, stating that a housing provider may be in violation of fair

12       housing laws if their policy or practice does not serve a substantial, legitimate,

13       nondiscriminatory interest, due to the potential for criminal record screening to have a

14       disparate impact on African American and other communities of color; and

15    WHEREAS, except for landlords operating federally assisted housing programs, conducting a

16       criminal background check to screen tenants is a discretionary choice for landlords that

17       they have no legal duty under City or state law to fulfill; and

18    WHEREAS, in 2016, the Seattle City Council passed Resolution 31669, affirming HUD's

19       guidance and the work of the Mayor's Fair Chance Housing Committee; NOW,

20       THEREFORE,

21    **BE IT ORDAINED BY THE CITY OF SEATTLE AS FOLLOWS:**

22       Section 1. The Council expresses the following concerning implementation of Seattle

23    Municipal Code Chapter 14.09:

*Template last revised June 16, 2017*       5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| Chong and Marilyn Yim, Kelly Lyles, Eileen, LLC and Rental Housing Association of Washington, | No. |
| Plaintiffs, | NOTICE OF REMOVAL FROM KING COUNTY SUPERIOR COURT (NO. 18-2-11073-4SEA) |
| vs. | |
| The City of Seattle, a Washington Municipal Corporation, | |
| Defendant. | |

TO:   THE UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON, AT SEATTLE:

Defendant City of Seattle hereby gives notice that it is removing this case to the United States District Court for the Western District of Washington on the grounds set forth below.

## I.   SUMMARY OF STATE COURT PROCEEDINGS

1. Plaintiffs filed this action in King County Superior Court on May 1, 2018. **The Complaint is attached hereto as Exhibit 1**. Defendant was served with the Complaint on May 1, 2018.

NOTICE OF REMOVAL FROM KING COUNTY SUPERIOR COURT - 1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

2. Defendant is filing, concurrently with this Notice of Removal, a Verification of State Court Records that complies with Local Rules W.D. Wash. LCR 101(c). It summarizes all state court proceedings as of today.

3. After filing this Notice of Removal, Defendant will give notice to the King County Superior Court of the removal of this action.

## II.   GROUNDS FOR REMOVAL

4. Plaintiffs assert only claims arising under the United States Constitution and the Washington Constitution. Ex. 1 (Complaint at ¶¶ 49-62). Specifically, they assert a claim arising under the First Amendment of the United States Constitution and its Washington analogue, *id.* ¶ 50, and a claim arising under the Fourteenth Amendment of the United States Constitution and its Washington analogue, *id.* ¶¶ 53-54.

5. This Court has original jurisdiction over Plaintiffs' claims invoking the United States Constitution. 28 U.S.C. § 1331 (giving federal district courts original jurisdiction of "all civil actions arising under the Constitution, laws, or treaties of the United States"). This Court has supplemental jurisdiction over Plaintiffs' claims invoking the Washington Constitution, because they are "so related to" the claims invoking the United States Constitution "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

6. Accordingly, this action is subject to removal to "the district Court of the United States for the district and division embracing the place where [the] action is pending." 28 U.S.C. § 1441(a). Pursuant to Local Rules W.D. Wash. LCR 3(e)(1), Defendant is removing this case to the Western District of Washington, Seattle Division, because it is removing this case from King County Superior Court.

NOTICE OF REMOVAL FROM KING COUNTY SUPERIOR COURT - 2

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

7.  For all of the reasons stated above, Defendant hereby gives notice that the civil action in King County Superior Court, State of Washington has been removed from that Court to the United States District Court for the Western District of Washington at Seattle.

DATED this 21st day of May, 2018.

PETER S. HOLMES
Seattle City Attorney

By:   *s/ Josh Johnson*
 Josh Johnson, WSBA #33570
Assistant City Attorney
Email: Josh.Johnson@Seattle.Gov
Phone: (206) 233-7808

By:   *s/ Sara O'Connor-Kriss*
Sara O'Connor-Kriss, WSBA #41569
Assistant City Attorney
Email: Sara.OConnor-Kriss@Seattle.Gov
Phone: (206) 615-0788

By:   *s/ Roger D. Wynne*
Roger D. Wynne, WSBA #23399
Assistant City Attorney
Email: Roger.Wynne@Seattle.Gov
Phone: (206) 233-2177

Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
Fax: (206) 684-8284

*Attorneys for Defendant City of Seattle*

NOTICE OF REMOVAL FROM KING COUNTY SUPERIOR COURT - 3

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

ER 143

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2018 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Ethan W. Blevins, WSBA #48219<br>Brian T. Hodges, WSBA #31976<br>PACIFIC LEGAL FOUNDATION<br>10940 NE 33rd Place, Suite 210<br>Bellevue, WA 98004<br>(425) 576-0484<br>*[Attorneys for Plaintiffs]* | ( x ) Via CM/ECF system<br>( x )  Via Email<br><br>EBlevins@pacificlegal.com<br>BHodges@pacificlegal.com |

*s/ Jennifer Litfin*
Jennifer Litfin, Legal Assistant

NOTICE OF REMOVAL FROM KING COUNTY SUPERIOR COURT - 4

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

# EXHIBIT 1

FILED
18 MAY 01 AM 9:12

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 18-2-11073-4 SEA

1
2
3
4
5
6

7          **SUPERIOR COURT OF WASHINGTON IN AND FOR KING COUNTY**

8

| | |
|---|---|
| CHONG and MARILYN YIM, KELLY LYLES, EILEEN, LLC, and RENTAL HOUSING ASSOCIATION OF WASHINGTON, | Case No. _____ |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| THE CITY OF SEATTLE, a Washington Municipal corporation, | |
| Defendant. | |

16          PLAINTIFFS, BY AND THROUGH THEIR ATTORNEYS, make this Complaint against

17   the City of Seattle, seeking a declaration that the City's "Fair Chance Housing Ordinance," enacted

18   as Council Bill 119015, violates the Due Process and Free Speech provisions of the Washington

19   State Constitution and the United States Constitution, and also seeking a permanent injunction

20   forbidding the City from enforcing its unconstitutional ordinance.

21   ///

22
23   COMPLAINT - 1 of 18                    PACIFIC LEGAL FOUNDATION
                                            10940 NE 33rd Place, Suite 210
24                                          Bellevue, Washington 98004
                                            (425) 576-0484

1                           **I.      INTRODUCTION**

2    1.      Landowners have a constitutionally protected right to rent their property to whom they

3    choose, at a price they choose, subject to reasonable anti-discrimination measures. *See*

4    *Manufactured Housing Communities of Washington v. State*, 142 Wn.2d 347, 363-65, 13 P.3d 183

5    (2000); *Yim v. City of Seattle (Yim I)*, Case No. 17-2-05595-6 SEA (King Cty. Sup. Ct. Mar. 28,

6    2018).

7    2.      In exercising this property right, residential landlords commonly screen an applicant's

8    criminal history and check the sex offender registry because landlords must protect their tenants

9    against foreseeable criminal acts of third parties. *Griffin v. W. RS, Inc.*, 97 Wn. App. 557, 570, 984

10   P.2d 1070 (1999), *rev'd on other grounds by* 143 Wn.2d 81, 13 P.3d 558 (2001); *see also Hutchins*

11   *v. 1001 Fourth Avenue Associates,* 116 Wn.2d 217, 224, 802 P.2d 1360 (1991). Landlords can

12   even become criminally liable for certain offenses committed by their tenants. *See State v. Sigman*,

13   118 Wn.2d 442, 447, 826 P.2d 144 (1992). Thus, the Washington State Supreme Court posited

14   that if a landlord may be held liable for the foreseeable criminal acts of third parties, "[i]t would

15   seem only reasonable that the landlord should at the same time enjoy the right to exclude persons

16   who may foreseeably cause such injury." *City of Bremerton v. Widell*, 146 Wn.2d 561, 572, 51

17   P.3d 733 (2002). A tragic example of this issue recently arose in Illinois in which a tenant raped

18   and murdered a neighboring tenant. The victim's family has sued the landlord for failing to perform

19   a criminal background check.[1]

20

21   [1] Cate Cuaguiran, *Family of woman murdered in Schaumburg apartment files lawsuit*, Eyewitness News (Aug. 2,
     2017) (*available at* http://abc7chicago.com/family-of-woman-murdered-in-schaumburg-apartment-files-
22   lawsuit/2267952/).

23                                              PACIFIC LEGAL FOUNDATION
         COMPLAINT - 2 of 18                    10940 NE 33rd Place, Suite 210
24                                              Bellevue, Washington 98004
                                                (425) 576-0484

1  3.      The City's new Fair Chance Housing Ordinance prohibits landlords from inquiring after

2  applicants' criminal backgrounds. The City enacted the Ordinance in order to provide more

3  housing opportunities for individuals with a criminal record and to guard against the possibility

4  that rental decisions based on an applicant's criminal record may have a disparate impact on those

5  groups that are disproportionately affected by the criminal justice system.

6  4.      The Ordinance declares it an "unfair practice" for a private residential landlord to

7  consider—or even request—an applicant's criminal history when making a rental decision. It

8  thereby deprives residential landlords of their right and obligation to protect themselves and their

9  tenants from potentially dangerous criminals.

10  5.      The Fair Chance Housing Ordinance also applies to and impacts organizations that provide

11  professional screening services. The Ordinance's prohibition on inquiring after the criminal history

12  of housing applicants applies to any "person," defined by the Ordinance as "one or more

13  individuals, partnerships, organizations, trade or professional associations, corporations, legal

14  representatives, trustees, trustees in bankruptcy, or receivers. It includes any owner, lessee,

15  proprietor, manager, agent, or employee, whether one or more natural persons, and any political

16  or civil subdivision or agency or instrumentality of the City." SMC 14.09.010. Because of the Fair

17  Chance Housing Ordinance, landlords can no longer request screening services, and the screening

18  companies in turn cannot inquire after criminal history of housing applicants or submit such

19  information to landlords.

20  6.      The Ordinance violates the Due Process and Free Speech guarantees of the Washington

21  State Constitution and the United States Constitution.

22

23          COMPLAINT - 3 of 18

PACIFIC LEGAL FOUNDATION
10940 NE 33rd Place, Suite 210
Bellevue, Washington 98004
(425) 576-0484

1

## II.    PARTIES

2    7.    Chong and MariLyn Yim, Kelly Lyles, and Eileen, LLC, are plaintiff landlords who own

3    and manage small rental properties in Seattle and are subject to Seattle's Open Housing Ordinance.

4    8.    The Rental Housing Association, a plaintiff in this action, is a membership association that

5    provides screening services for its landlord members.

6    9.    The City of Seattle is a Washington state municipality located in King County and

7    chartered by the State of Washington.

8

## III.    JURISDICTION AND VENUE

9    10.   This civil action is a case of actual controversy between Plaintiffs and Defendant arising

10   under the Washington State and Federal Constitutions.

11   11.   This Court has jurisdiction over this matter pursuant to RCW 4.28.020, RCW 7.24.010,

12   7.40.010, and Article IV, Sections 1 and 6, of the Washington State Constitution.

13   12.   Under RCW 4.12.020, venue is proper in King County Superior Court because the City of

14   Seattle sits within county limits.

15

## IV.    FACTUAL BACKGROUND

16

### Seattle's Fair Chance Housing Ordinance

17   13.   On August 14, 2017, the City Council voted to adopt the Fair Chance Housing Ordinance

18   (Council Bill 119015), adding Chapter 14.09 to Seattle's Municipal Code to regulate private

19   landlords' use of criminal history checks when reviewing rental applications. Former Mayor Ed

20   Murray signed the bill into law on August 23, 2017. The law went into effect on February 19,

21   2018.

22

23    COMPLAINT - 4 of 18

24

PACIFIC LEGAL FOUNDATION
10940 NE 33rd Place, Suite 210
Bellevue, Washington 98004
(425) 576-0484

14.     The City enacted the Fair Chance Housing Ordinance in response to reports indicating that (1) an estimated one in three adults has either an arrest or a criminal record; (2) certain minority groups are more likely to have criminal records; and (3) that upon release from incarceration, individuals with stable housing are more likely to reintegrate into society and are less likely to reoffend. Council Bill 119015 (Recitals).

15.     The reports that the City cited as support for the Ordinance recommended helping former convicts by expanding public housing assistance and support services such as drug treatment and counseling. The City, however, did not adopt these recommendations. Nor did the City change any of the policies barring individuals with certain criminal histories from supportive public housing. Instead, the City sought only to regulate private rental housing.

16.     The Ordinance declares it an "unfair practice" to inquire about a prospective tenant's arrest records, conviction records, or other criminal history, or to take an adverse action against a prospective tenant based on criminal history. SMC 14.09.025(A)(2).

17.     The Ordinance also declares it an "unlawful practice" for residential landlords to take any adverse actions based on an applicant's status on a county, state, or national sex offender registry, if the crime was committed when the applicant was a juvenile. SMC 14.09.025(A)(5).

18.     If the prospective tenant's status on a sex offender registry resulted from a crime committed as an adult, then a landlord can only take adverse action based on a prospective tenant's registry status if the landlord can prove to the satisfaction of the Seattle Office for Civil Rights that the decision to screen applicants was based on a "legitimate business reason." SMC 14.09.025(A)(3).

19.     The Ordinance states that a "legitimate business reason" will exist only if the landlord can demonstrate that

COMPLAINT - 5 of 18

PACIFIC LEGAL FOUNDATION
10940 NE 33rd Place, Suite 210
Bellevue, Washington 98004
(425) 576-0484

1    the policy or practice is necessary to achieve a substantial, legitimate,

2    nondiscriminatory interest. To determine such an interest, a landlord must

3    demonstrate, through reliable evidence, a nexus between the policy or practice and

4    resident safety and/or protecting property, in light of the following factors:

5        A.  The nature and severity of the conviction;

6        B.  The number and types of convictions;

7        C.  The time that has elapsed since the date of conviction;

8        D.  The age of the individual at the time of conviction;

9        E.  Evidence of good tenant history before and/or after the conviction occurred;

10           and

11       F.  Any supplemental information related to the individual's rehabilitation,

12           good conduct, and facts or circumstances surrounding the conviction

13           provided by the individual, if the individual chooses to do so.

14   SMC 14.09.010.

15   20.   Landlords must provide written notice of these requirements on all rental applications.

16   21.   If a residential landlord takes any adverse action based on a "legitimate business reason,"

17   he or she must provide the applicant with written notice of the action and state the specific records

18   that were the basis for the landlord's decision. SMC 14.09.025(B).

19   22.   The Ordinance does not allow a residential landlord to base a rental decision upon personal

20   safety, safety of other tenants, or revulsion due to convictions for sex offenses, crimes against

21   children, or even hate crimes.

22

23                                          PACIFIC LEGAL FOUNDATION
     COMPLAINT - 6 of 18                    10940 NE 33rd Place, Suite 210
24                                          Bellevue, Washington 98004
                                            (425) 576-0484

1   23.     Although the City claims that preventing landlords from considering an applicant's rental

2   history is necessary to assist individuals reentering society after incarceration, the Ordinance

3   exempts landlords providing "federally assisted housing subject to federal regulations that require

4   denial of tenancy, including but not limited to when any member of the household is subject to a

5   lifetime sex offender registration requirement under a state sex offender registration program

6   and/or convicted of manufacture of production of methamphetamine on the premises of federally

7   assisted housing." SMC 14.09.115(B).

8   24.     A private landlord's failure to comply with the restrictions placed on criminal history

9   screening is deemed a violation of the law and is enforceable by the Seattle Office for Civil Rights,

10  which also acts as a quasi-judicial agency charged with adjudicating any claimed violations of the

11  "Fair Chance Housing Ordinance." SMC 14.09.035, .040, .060, .070. An aggrieved applicant may

12  also file charges with the Seattle Office for Civil Rights within one year after the adverse action.

13  SMC 14.09.050, .055.

14  25.     A final decision of the Seattle Office for Civil Rights denying an aggrieved applicant's

15  charge is appealable to the Seattle Human Rights Commission, which has the authority to either

16  affirm the decision or direct the Seattle Office for Civil Rights to investigate the matter further.

17  SMC 14.09.075.

18  26.     In the event the Seattle Office for Civil Rights determines that reasonable cause exists to

19  believe that a violation occurred, the Director is authorized to facilitate a conciliation agreement

20  that may include an offer of tenancy, reimbursement of application fees, payment of actual

21  damages, attorneys' fees, and payment of civil penalties. SMC 14.09.080.

22

23                                              PACIFIC LEGAL FOUNDATION
        COMPLAINT - 7 of 18                     10940 NE 33rd Place, Suite 210
24                                              Bellevue, Washington 98004
                                                (425) 576-0484

27.     If the Director's efforts at reaching a conciliation agreement are unsuccessful, the Director will forward the investigatory file to the City Attorney, who will then file a complaint with the City Hearing Examiner on behalf of the Seattle Office for Civil Rights. SMC 14.09.085. At its discretion, the Seattle Human Rights Commission may appoint two Commissioners to hear the case on a panel. SMC 14.09.085.

28.     The Hearing Examiner is authorized to order the landlord to take such affirmative action or provide for such relief as is deemed necessary to correct the violation, including damages, attorneys' fees, and equitable relief. SMC 14.09.090. The Hearing Examiner may also impose civil penalties ranging from $11,000 for the first violation to as high as $55,000 for repeat violations. SMC 14.09.100.

29.     In enacting the Fair Chance Housing Ordinance, City Councilmembers recognized that Washington's Residential Landlord-Tenant Act, Ch. 59.18 RCW, allows landlords to screen potential tenants based on a variety of information, including an applicant's status on the sex offender registry and criminal history going back seven years, subject to a requirement that the applicant be notified of the check and provided an opportunity to respond to the information. RCW 59.18.257; RCW 59.18.030.

### Plaintiffs Will Be Irreparably Harmed If the Ordinance Goes Into Effect

30.     Each of the plaintiffs will be irreparably injured if the Fair Chance Housing Ordinance goes into effect because the City has burdened their constitutionally protected right to choose whom they will house and work with in these often lengthy and interpersonal landlord-tenant relationships. The inability to access valuable information about potential tenants increases various risks faced by plaintiffs when renting their property.

COMPLAINT - 8 of 18

1   31.   Chong and MariLyn Yim own a duplex and a triplex in Seattle. They and their three

2   children live in one of the triplex units. They rent out the other two units. The Yim family could

3   not afford to live in Seattle without the rental income from these properties. The Yims consider

4   prospective tenants on a case-by-case basis, and have rented units to individuals with a criminal

5   history based on the number of convictions, the seriousness of the crimes, and other factors relating

6   to personal and financial risks and the safety of their children and other tenants.

7   32.   The Yims value their right to select their tenants. The Yim family cannot afford to absorb

8   losses because of a tenancy gone bad. And for a family with three children, selecting a tenant who

9   will also be their close neighbor requires careful discretion. The Yims share a yard with their

10   renters, and the Yim children are occasionally at home alone when their renters are home. The

11   Yims treasure their right to ensure compatibility and safety for themselves and their tenants.

12   33.   The Fair Chance Housing Ordinance has an immediate impact on the Yim family and their

13   current tenants. The Yims have long rented their units well below market rate. Because of the Fair

14   Chance Housing Ordinance, they will have to raise rents in order to build up a larger cushion of

15   reserves to absorb the risks they face under the new law.

16   34.   Kelly Lyles is a single woman who owns and rents a home in West Seattle. Ms. Lyles

17   considers prospective tenants on a case-by-case basis. For example, Ms. Lyles understands the

18   needs of individuals who are recovering from addiction and would consider an applicant who did

19   not otherwise satisfy her credit screening requirements if the applicant was part of a recovery

20   program.

21   35.   Ms. Lyles is a local artist who relies on rental income to afford living and working in

22   Seattle. The $1,300 in rent she receives monthly makes up most of her income.

23

COMPLAINT - 9 of 18

PACIFIC LEGAL FOUNDATION
10940 NE 33rd Place, Suite 210

24
Bellevue, Washington 98004
(425) 576-0484

1   36.      Discretion in selecting tenants is vital to Ms. Lyles's livelihood. She cannot afford to miss

2   even a month's rent, and she does not have the resources to pursue an unlawful detainer action. As

3   a single woman who interacts frequently with her tenants, she also considers personal safety when

4   choosing them. Such considerations cannot be adequately addressed under the restrictions imposed

5   by the Fair Chance Housing Ordinance. The Ordinance will impact Ms. Lyles's decisions about

6   her rental criteria because she wants to avoid filling a vacancy with someone that she has not fully

7   vetted.

8   37.      Scott Davis and his wife own and manage Eileen, LLC, through which they operate a

9   seven-unit residential complex in the Greenlake area of Seattle. Mr. Davis also owns and runs a

10   small business, the Davis Sign Company. As a small family venture, the Davises treasure their

11   ability to decide who they will rent their units to. The rental property serves as an important

12   supplement to the Davis family's income. They review all rental applications on a case-by-case

13   basis and would consider applicants with a criminal history based on the circumstances of the

14   crime(s) and other factors relating to personal and financial risks and the safety of their other

15   tenants.

16   38.      Rental Housing Association of Washington (RHA) is a statewide nonprofit organization

17   established in 1935. RHA provides education and assistance to comply with rental housing laws

18   and regularly advocates for uniformity and fairness in state and local policymaking. Most of

19   RHA's over 5,300 members rent out single-family homes, often on a temporary basis for work,

20   personal, or financial reasons. Most of RHA's members own and rent residential properties in

21   Seattle.

22

23                                                    PACIFIC LEGAL FOUNDATION
          COMPLAINT - 10 of 18                        10940 NE 33rd Place, Suite 210
24                                                    Bellevue, Washington 98004
                                                      (425) 576-0484

39.     RHA provides professional screening services to its members. Indeed, RHA's screening service is a primary reason that landlords join RHA. RHA members may request a limited or comprehensive screening of housing applicants. A comprehensive screening includes credit history, eviction history, past residences, and criminal conviction and arrest records within the last seven years. RHA contracts with a third-party vendor, Judicial Information Services, to obtain this criminal background information. If a criminal history shows up on a screening report from Judicial Information Services, RHA staff verifies that the housing applicant is the same individual on the screening report.

40.     Before offering criminal-background-check services to members, RHA requires landlords to go through a certification process in order to comply with the Federal Fair Credit Reporting Act.

41.     The criminal history component of RHA's full screening report provides a short description of any offenses, the disposition of each offense, any fines or confinement periods, the relevant jurisdiction, and the relevant dates. The report may also provide additional information such as probation length and conditions, credit for time served, and probation violations.

42.     As a direct consequence of the Fair Chance Housing Ordinance, RHA cannot provide a long-standing service to its members. Since the Fair Chance Housing Ordinance came into effect, RHA has seen an increase in requests to run credit checks in lieu of criminal background screening. RHA has also seen members switch to reliance on national screening companies instead of RHA to provide screening services.

///

COMPLAINT - 11 of 18

PACIFIC LEGAL FOUNDATION
10940 NE 33rd Place, Suite 210
Bellevue, Washington 98004
(425) 576-0484

1       **V.      DECLARATORY RELIEF ALLEGATIONS (Ch. 7.24 RCW)**

2   43.    Landowners have a well-recognized and constitutionally protected right to rent their

3   property to whom they choose, at a price they choose. *See Manufactured Housing Communities of*

4   *Washington*, 142 Wn.2d at 363-65; *Yim I*, Case No. 17-2-05595-6 SEA.

5   44.    Under Article I, Section 3, of the Washington State Constitution and the Fourteenth

6   Amendment to the U.S. Constitution, the City cannot deprive landlords of property without due

7   process of law. By enacting an unduly oppressive rule that is not reasonably necessary to fulfilling

8   a legitimate public purpose, the City has facially violated the plaintiffs' due process rights.

9   45.    Under Article I, Section 5, of the Washington State Constitution, and the First Amendment

10  to the U.S. Constitution, the City cannot deprive RHA or landlords of the right to access and share

11  truthful information regarding housing applicants without satisfying heightened scrutiny.

12  46.    A declaratory relief judgment as to whether the City may enforce the Fair Chance Housing

13  Ordinance to restrict landlords from screening rental applicants' criminal histories will serve a

14  useful purpose in clarifying and settling the legal relations between plaintiffs and the City. A

15  declaratory relief judgment will also afford relief from the uncertainty and insecurity giving rise

16  to this controversy.

17      **VI.     PERMANENT INJUNCTIVE RELIEF ALLEGATIONS (Ch. 7.40 RCW)**

18  47.    The Yims and the other landlord-plaintiffs have no adequate remedy at law to address the

19  City's unlawful deprivation of their right to lease their property to the eligible candidate of their

20  choosing, nor do landlords or RHA have an adequate remedy at law regarding the speech

21  restriction imposed by the Fair Chance Housing Ordinance.

22

23              COMPLAINT - 12 of 18

PACIFIC LEGAL FOUNDATION
10940 NE 33rd Place, Suite 210
Bellevue, Washington 98004
(425) 576-0484

24

1    48.    The Yims and RHA will suffer irreparable injury absent an injunction restraining the City

2    from enforcing this unconstitutional ordinance.

3    **VII.    CAUSES OF ACTION**

4    **COUNT I**

5    **The Fair Chance Housing Ordinance violates the Free Speech guarantees of the
     state and federal Constitutions because it bars access to truthful information based on
6    speech content, speaker identity and the speaker's purpose**

7    49.    The plaintiffs reallege the preceding paragraphs as though fully set out here.

8    50.    The Washington and Federal Constitutions safeguard speech rights. U.S. Const. Amend. I,

9    Wash. Const. Art. I, § 5. This includes the right to access truthful information as "a necessary

10   predicate to the recipient's meaningful exercise of his own right of speech." *Board of Educ., Island*

11   *Trees Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 867, 102 S. Ct. 2799, 73 L. Ed. 2d

12   435 (1982).

13   51.    The Fair Chance Housing Ordinance violates speech rights on its face and as applied by

14   prohibiting individuals and organizations from accessing and sharing truthful information about

15   housing applicants. This prohibition targets speech based on content, speaker identity, and

16   purpose. The Ordinance forbids anyone from inquiring after criminal background for the purpose

17   of vetting housing applicants, but it does not forbid such inquiries for other purposes. This burden

18   on RHA's and landlords' speech rights must satisfy heightened judicial scrutiny.

19   ///

20

21

22

23                                          PACIFIC LEGAL FOUNDATION
     COMPLAINT - 13 of 18                   10940 NE 33rd Place, Suite 210
24                                          Bellevue, Washington 98004
                                            (425) 576-0484

1          COUNT II

2    **The Fair Chance Housing Ordinance violates substantive due process**
     **because it uses an unreasonable, overbroad, and unduly burdensome**
3                        **means to achieve its purpose**

4    52.    The plaintiffs reallege the preceding paragraphs as though fully set out here.

5    53.    Article I, Section 3, of the state constitution states: "No person shall be deprived of life,

6    liberty, or property, without due process of law." The guarantee of due process requires that all

7    government actions that restrict individual's liberty or property rights must sufficiently relate to a

8    legitimate end of government; otherwise, the action is void. *Presbytery of Seattle v. King County*,

9    114 Wn.2d 320, 330-31, 787 P.2d 907 (1990).

10   54.    The Fourteenth Amendment to the U.S. Constitution states: "nor shall any state deprive

11   any person of life, liberty, or property, without due process of law; nor deny to any person within

12   its jurisdiction the equal protection of the laws."

13   55.    The City enacted the Fair Chance Housing Ordinance to try to assist individuals in

14   reintegrating into society after release from incarceration. That is a laudable goal. But the City's

15   chosen means to achieve that goal are unnecessary, unreasonable, and impose an undue burden on

16   private landlords' right to select their tenants.

17   56.    The studies collected in the City clerk's file report that recidivism rates vary based on a

18   variety of factors that are only discoverable through screening, including the type and seriousness

19   of crime committed, the number of convictions, the age of the individual when the crime was

20   committed, and the number of years that passed without criminal activity. *See The Importance of*

21   *Housing for Formerly Incarcerated Individuals*, 40(2) Housing Law Bulletin 60 (2010) (reporting

22   that 79% of California's parolees either return to prison or abscond); Megan Kurlychek, Robert

23   COMPLAINT - 14 of 18

24

1    Brame & Shawn Bushway, *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict*

2    *Future Offending?*, 5(3) Criminology & Public Policy 483, 486-90, 500 (2006) (discussing factors

3    that affect recidivism rates). Indeed, the City's studies conclude that there is a high risk of future

4    offenses during the first three years after release from custody, when nearly two-thirds of recently

5    incarcerated individuals reoffend. *See* Kurlychek, et al., at 485. Thus, based on data showing that

6    after seven years the overall risk of recidivism returns to a level similar to that of a person who has

7    never been incarcerated, the study reported that case-by-case consideration of criminal convictions

8    for up to seven years may be warranted. *Id*. at 499.

9    57.    The Fair Chance Housing Ordinance, however, makes this type of meaningful, case-by-

10   case screening unlawful, declaring it a *per se* "unfair practice" to inquire about any criminal

11   convictions.

12   58.    The Ordinance's recitals make several statements that are unsupported by fact or law. For

13   example, the recitals incorrectly state that screening is discretionary; private landlords are under

14   no legal obligation to conduct a criminal background check on prospective tenants. Landlords,

15   however, have a legally recognized duty to protect tenants from harm by third parties, including

16   from other tenants. *See*, *e.g.*, *Griffin*, 97 Wn. App. at 570 (Landlords may be held liable for the

17   foreseeable criminal activities of third parties.); *Sigman*, 118 Wn.2d at 447 (Landlords may be held

18   criminally liable for certain crimes committed by tenants.). Indeed, one of the key studies relied

19   on by the City argues that tort reform relieving landlords of liability for criminal acts of tenants

20   must occur before landlords can be asked to stop considering applicants' criminal records. *See*

21   Merf Ehman and Anna Reosti, *Tenant Screening in an Era of Mass Incarceration: A Criminal*

22   *Record is No Crystal Ball*, NYU J. of Leg. & Pub. Pol'y Quorum (Mar. 2015).

23
     COMPLAINT - 15 of 18
24

PACIFIC LEGAL FOUNDATION
10940 NE 33rd Place, Suite 210
Bellevue, Washington 98004
(425) 576-0484

1    59.    The recitals also grossly generalize the conclusions contained in a handful of studies

2    commenting on the problems faced by individuals after release from incarceration, making it

3    appear that access to the private housing market is necessary for successful reintegration into

4    society. To the contrary, the studies conclude that *assisted public housing* is the only viable option

5    for many recently incarcerated individuals—particularly in Seattle where private rental properties

6    are very expensive. *See The Importance of Housing for Formerly Incarcerated Individuals*, 40(2)

7    Housing Law Bulletin 60 (2010).

8    60.    The recitals also omit key facts and conclusions reached by the studies when asserting that

9    "there is no sociological research establishing a relationship between a criminal record and an

10   unsuccessful tenancy." The study cited reported on the success of supportive public housing

11   (providing at-risk individuals with health and social services as well as housing subsidies) in

12   reintegrating chronically homeless individuals with a history of incarceration into society. *See*

13   Ehman and Reosti, *supra* at 17. The study repeatedly warned that "findings from supportive

14   housing programs may not be completely generalizable to other housing contexts on account of

15   the unique resources and social services made available to residents." *Id*. at 17 n.116, 19 n.131

16   ("Because the study presented here involved individuals with specific characteristics (lengthy

17   homelessness and behavioral health disorders) who received a particular intervention (supportive

18   housing), generalizing the results of our study to other situations may not be valid.") (citation

19   omitted). The study concluded only that chronically homeless adults with incarceration histories

20   may benefit as much from supportive housing programs as chronically homeless adults with no

21   criminal histories. *Id*. at 18. The study argues that public housing providers (like the City of Seattle

22   itself) should reconsider their "one strike" policy of excluding persons with criminal histories from

23

24

COMPLAINT - 16 of 18

PACIFIC LEGAL FOUNDATION
10940 NE 33rd Place, Suite 210
Bellevue, Washington 98004
(425) 576-0484

1   applying for public housing. *Id*. The Ordinance, however, excludes public housing providers from

2   restrictions on criminal history screening.

3   61.     There are less oppressive ways for the City to advance its interest in assisting individuals

4   reintegrating into society after release from incarceration. For example, one study the City cites

5   relied on Oregon's fair housing law (Oregon S.B. 91 (2013)) as an "optimal" example of a law

6   that would remove discriminatory barriers to private housing while protecting against high-risk

7   tenants. Rebecca Vallas, et al., *Removing Barriers to Opportunity for Parents with Criminal*

8   *Records and Their Children: A Two-Generation Approach* at 19 (Center for American Progress

9   2015). Unlike Seattle's Fair Chance Housing Ordinance, the Oregon law only prohibits

10  consideration of arrests or charges that did not result in a conviction. Oregon S.B. 91, Sec. 3(2).

11  The law expressly authorizes a landlord to consider criminal convictions for a drug-related crime,

12  a violent crime, a sex offense, a crime involving financial fraud, theft or forgery, or any other crime

13  that would adversely affect the "property of the landlord or tenant" or the "health, safety or right

14  to peaceful enjoyment of the premises of the residents, the landlord or the landlord's agent." *Id*. at

15  Sec.3(3).

16  62.     The "Fair Chance Housing Ordinance" violates the guarantee of due process on its face.

17                              **VIII.   PRAYER FOR RELIEF**

18  Plaintiffs pray for the following relief:

19          1. A declaration that Chapter 14.09 of the Seattle Municipal Code (the Fair Chance

20  Housing Ordinance) facially violates the Free Speech and Due Process guarantees of the

21  Washington State Constitution and the United States Constitution;

22

23                                          PACIFIC LEGAL FOUNDATION
        COMPLAINT - 17 of 18              10940 NE 33rd Place, Suite 210
24                                          Bellevue, Washington 98004
                                            (425) 576-0484

1    2. A permanent injunction forbidding the City from enforcing the Fair Chance Housing

2   Ordinance and its implementing regulation;

3    3. An award of reasonable attorney's fees, expenses, and costs as allowed by law and

4   equity, including RCW 4.84.010 and RCW 7.24.100; and

5    4. Such other relief as the Court deems just and proper.

6                                                                PACIFIC LEGAL FOUNDATION

7

8    Date:  May 1, 2018.                                    By:   s/  Ethan W. Blevins
                                                            Ethan W. Blevins, WSBA No. 48219
                                                            Brian T. Hodges, WSBA No. 31976
9                                                           10940 NE 33rd Place, Suite 210
                                                            Bellevue Washington 98004
10                                                          Telephone: (425) 576-0484
                                                            Email: EBlevins@pacificlegal.org
11                                                          BHodges@pacificlegal.org

12                                                          *Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23                                                          PACIFIC LEGAL FOUNDATION
        COMPLAINT - 18 of 18                                10940 NE 33rd Place, Suite 210
24                                                          Bellevue, Washington 98004
                                                            (425) 576-0484

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

CHONG and MARILYN YIM; KELLY LYLES; EILEEN, LLC; and RENTAL HOUSING ASSOCIATION OF WASHINGTON

**DEFENDANTS**

CITY OF SEATTLE

**(b)** County of Residence of First Listed Plaintiff    King
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    King
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Ethan W. Blevins, WSBA #48219; Brian T. Hodges, WSBA #31976 Pacific Legal Foundation, 10940 NE 33rd Place, Suite 210, Bellevue, WA 98004 (425) 576-0484

Attorneys *(If Known)*

Josh Johnson, WSBA #33570; Sara O'Connor-Kriss, WSBA #41569; Roger D. Wynne, WSBA #23399 -- (206) 684-8200 Seattle City Attorney's Office, 701 5th Ave. Ste. 2050, Seattle 98104

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br><br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☒ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | ☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Claims under United States Constitution, removed under 28 U.S.C. 1441(a)

Brief description of cause:
Constitutional challenge to City of Seattle ordinance

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE           DOCKET NUMBER

DATE   05/21/2018

SIGNATURE OF ATTORNEY OF RECORD   /s Josh Johnson, WSBA #33570

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP    ER 164     JUDGE     MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Honorable Judge John C. Coughenour

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| CHONG and MARILYN YIM, KELLY LYLES, EILEEN, LLC, and RENTAL HOUSING ASSOCIATION OF WASHINGTON, | Civil Action No. 2:18-cv-00736-JCC |
| Plaintiffs, | **NOTICE OF APPEAL** |
| v. | |
| THE CITY OF SEATTLE, a Washington Municipal corporation, | |
| Defendant. | |

Notice is hereby given that all plaintiffs in the above-named case, hereby appeal to the United States Court of Appeals for the Ninth Circuit from the final judgment entered in this action on the 6th day of July, 2021, attached as Exhibit A.

*Pl. Notice of Appeal* - 1
*2:18-cv-00736-JCC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

ER 166

DATED:  July 14, 2021.

Respectfully submitted,

By: s/  BRIAN T. HODGES
By: s/  ETHAN W. BLEVINS
Brian T. Hodges, WSBA # 31976
Ethan W. Blevins, WSBA # 48219
Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
Telephone: (425) 576-0484
Fax: (916) 419-7747
Email: BHodges@pacificlegal.org
Email: EBlevins@pacificlegal.org

Attorneys for Plaintiffs

*Pl. Notice of Appeal - 2*
*2:18-cv-00736-JCC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

ER 167

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to all counsel of record.

s/  ETHAN W. BLEVINS
Ethan W. Blevins, WSBA # 48219

Attorney for Plaintiffs

*Pl. Notice of Appeal - 3*
*2:18-cv-00736-JCC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

ER 168

# U.S. District Court
## United States District Court for the Western District of Washington (Seattle)
## CIVIL DOCKET FOR CASE #: 2:18-cv-00736-JCC

Yim et al v. City of Seattle
Assigned to: U.S. District Judge John C Coughenour
Case in other court: King County Superior Court,
　　　　　　　　　18-00002-11073-4
　　　　　　　　　9th Circuit Court of Appeals, 21-35567
Cause: 28:1441 Petition for Removal

Date Filed: 05/21/2018
Date Terminated: 07/06/2021
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 05/21/2018 | 1 | NOTICE OF REMOVAL from King County Superior Court, case number 18-2-11073-4; (Receipt # 0981-5326180) Attorney Josh Johnson added to party City of Seattle(pty:dft), filed by City of Seattle. (Attachments: # 1 Exhibit 1-Complaint, # 2 Civil Cover Sheet)(Johnson, Josh). Modified on 5/22/2018 (DJ). (Entered: 05/21/2018) |
| 05/21/2018 | 2 | VERIFICATION OF STATE COURT RECORDS re 1 Notice of Removal, by Defendant City of Seattle (Attachments: # 1 Exhibit A-G)(Johnson, Josh) (Entered: 05/21/2018) |
| 05/22/2018 | | U.S. District Judge John C. Coughenour added. (DJ) (Entered: 05/22/2018) |
| 05/22/2018 | 3 | ~~LETTER from Clerk to counsel re: receipt of case from King County Superior Court and advising of WAWD case number and judge assignment.~~ **PLEASE DISREGARD THIS ENTRY AND REFER TO DOCKET ENTRY #4.** (DJ). (Entered: 05/22/2018) |
| 05/22/2018 | 4 | LETTER from Clerk to counsel re: receipt of case from King County Superior Court and advising of WAWD case number and judge assignment. (DJ) (Entered: 05/22/2018) |
| 05/22/2018 | | **NOTICE:** Pursuant to Fed.R.Civ.P 7.1, Plaintiff(s) Eileen, LLC and Rental Housing Association of Washington must file a Corporate Disclosure Statement by 5/29/2018. (DJ) (Entered: 05/22/2018) |
| 05/23/2018 | 5 | ORDER REGARDING DISCOVERY AND DEPOSITIONS by U.S. District Judge John C. Coughenour. (PP) (Entered: 05/23/2018) |
| 05/23/2018 | 6 | MINUTE ENTRY re: STATUS CONFERENCE.

The attorney who will be responsible for trying the case, or that attorney's representative, should attend the conference and be prepared to discuss the following matters at the conference: **1.** An estimate of the number of days needed for trial; **2.** The date by which the case will be ready for trial; **3.** Whether the parties intend to mediate per LCR 39.1 and, if so, when the parties expect to complete mediation; If counsel's office is outside of the Greater Metropolitan Seattle area, local counsel should attend on |

| | | behalf of non-local counsel. If local counsel is unavailable, non-local counsel may make arrangements to participate telephonically in the conference by contacting the Courtroom Deputy Clerk at **Paul_Pierson@wawd.uscourts.gov** at least TEN (10) DAYS in advance of the proceeding. Counsel do NOT need to file a Joint Status Report or Rule 26(f) Report in advance of the Status Conference. Counsel should plan on arriving 10-15 minutes early to check in with the Courtroom Deputy Clerk as the Court's calendar begins promptly at 9:00 a.m. COUNSEL OR THE PRO SE PARTY WHO FILED THIS MATTER SHALL IMMEDIATELY NOTIFY ALL PARTIES OF THE DATE AND TIME OF THE SCHEDULED STATUS CONFERENCE. A. **Status Conference is set for 8/7/2018 at 9:00 AM** in Courtroom 16206 before U.S. District Judge John C. Coughenour. (PP) (Entered: 05/23/2018) |
|---|---|---|
| 05/29/2018 | 7 | CORPORATE DISCLOSURE STATEMENT indicating no Corporate Parents and/or Affiliates. Filed pursuant to Fed.R.Civ.P 7.1. Filed by Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim (Blevins, Ethan) (Entered: 05/29/2018) |
| 05/29/2018 | 8 | ANSWER to Complaint; *for Declaratory and Injunctive Relief* by City of Seattle. (Johnson, Josh) (Entered: 05/29/2018) |
| 07/20/2018 | 9 | Stipulated MOTION Vacate August 7 Status Conference *and Enter Case Schedule*, filed by Defendant City of Seattle. Noting Date 7/20/2018, (O'Connor-Kriss, Sara) (Entered: 07/20/2018) |
| 07/20/2018 | 10 | MINUTE ORDER granting parties' 9 Stipulated Motion to Vacate Status Conference; setting briefing schedule and page limits for cross-motions for summary judgment. Authorized by U.S. District Judge John C Coughenour. (SWT) (Entered: 07/20/2018) |
| 07/23/2018 | 11 | NOTICE OF WITHDRAWAL OF COUNSEL: Attorney Josh Johnson for Defendant City of Seattle. (O'Connor-Kriss, Sara) (Entered: 07/23/2018) |
| 08/02/2018 | 12 | MOTION to Intervene Attorney Kimberlee L Gunning added to party Pioneer Human Services(pty:intv), Attorney Kimberlee L Gunning added to party Tenants Union of Washington(pty:intv), filed by Interested Parties ~~Intervenor Parties~~ Pioneer Human Services, Tenants Union of Washington. Oral Argument Requested. (Attachments: # 1 Exhibit Proposed Answer, # 2 Proposed Order) Noting Date 8/17/2018, (Gunning, Kimberlee) Modified on 8/3/2018 to edit docket text (TH). (Entered: 08/02/2018) |
| 08/02/2018 | 13 | DECLARATION of Kimberlee L. Gunning filed by Plaintiff Rental Housing Association of Washington, Interested Party ~~Intervenor~~ Tenants Union of Washington re 12 MOTION to Intervene Attorney Kimberlee L Gunning added to party Pioneer Human Services(pty:intv), Attorney Kimberlee L Gunning added to party Tenants Union of Washington(pty:intv) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Gunning, Kimberlee) Modified on 8/3/2018 to edit docket text (TH). (Entered: 08/02/2018) |
| 08/02/2018 | 14 | DECLARATION of Violet Lavatai filed by ~~Intervenor~~ Interested Parties Pioneer Human Services, Tenants Union of Washington re 12 MOTION to Intervene Attorney Kimberlee L Gunning added to party Pioneer Human Services(pty:intv), Attorney Kimberlee L Gunning added to party Tenants Union of Washington(pty:intv) (Gunning, Kimberlee) Modified on 8/3/2018 to edit docket text (TH). (Entered: 08/02/2018) |
| 08/02/2018 | 15 | DECLARATION of Hilary Young filed by ~~Intervenor~~ Interested Parties Pioneer Human Services, Tenants Union of Washington re 12 MOTION to Intervene Attorney Kimberlee L Gunning added to party Pioneer Human Services(pty:intv), Attorney |

| | | |
|---|---|---|
| | | Kimberlee L Gunning added to party Tenants Union of Washington(pty:intv) (Gunning, Kimberlee) Modified on 8/3/2018 to edit docket text (TH). (Entered: 08/02/2018) |
| 08/03/2018 | | NOTE re Document 12 . Appearance of attorneys Hillary Madsen and Nicholas B. Allen is not proper, and notices of electronic filing will not be sent until corrected. Signatures must be in accordance with FRCP 11 and LCR 83.2(a) and must comply with ECF Filing Procedures. (TH) (Entered: 08/03/2018) |
| 08/03/2018 | 16 | NOTICE of Appearance by attorney Nicholas Brian Allen on behalf of Interested Parties Pioneer Human Services, Tenants Union of Washington. (Allen, Nicholas) (Entered: 08/03/2018) |
| 08/03/2018 | 17 | NOTICE of Appearance by attorney Hillary Madsen on behalf of Interested Parties Pioneer Human Services, Tenants Union of Washington. (Madsen, Hillary) (Entered: 08/03/2018) |
| 08/13/2018 | 18 | RESPONSE, by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim, to 12 MOTION to Intervene Attorney Kimberlee L Gunning added to party Pioneer Human Services(pty:intv), Attorney Kimberlee L Gunning added to party Tenants Union of Washington(pty:intv). (Attachments: # 1 Proposed Order Denying Motion to Intervene)(Blevins, Ethan) (Entered: 08/13/2018) |
| 08/13/2018 | 19 | DECLARATION of Ethan W. Blevins, in support of Opposition to Motion to Intervene filed by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim re 12 MOTION to Intervene Attorney Kimberlee L Gunning added to party Pioneer Human Services(pty:intv), Attorney Kimberlee L Gunning added to party Tenants Union of Washington(pty:intv) (Blevins, Ethan) (Entered: 08/13/2018) |
| 08/13/2018 | 20 | RESPONSE, by Defendant City of Seattle, to 12 MOTION to Intervene Attorney Kimberlee L Gunning added to party Pioneer Human Services(pty:intv), Attorney Kimberlee L Gunning added to party Tenants Union of Washington(pty:intv). (Attachments: # 1 Proposed Order)(O'Connor-Kriss, Sara) (Entered: 08/13/2018) |
| 08/17/2018 | 21 | REPLY, filed by Interested Parties Pioneer Human Services, Tenants Union of Washington, TO RESPONSE to 12 MOTION to Intervene Attorney Kimberlee L Gunning added to party Pioneer Human Services(pty:intv), Attorney Kimberlee L Gunning added to party Tenants Union of Washington(pty:intv) (Gunning, Kimberlee) (Entered: 08/17/2018) |
| 08/23/2018 | 22 | ORDER denying Interested Parties Pioneer and TU's 12 Motion to Intervene. However, leave to file a joint amicus curiae brief is GRANTED. Signed by U.S. District Judge John C Coughenour. (TH) (Entered: 08/23/2018) |
| 09/28/2018 | 23 | MOTION for Summary Judgment , filed by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim. Oral Argument Requested. (Attachments: # 1 Proposed Order) Noting Date 1/11/2019, (Blevins, Ethan) (Entered: 09/28/2018) |
| 09/28/2018 | 24 | APPENDIX re 23 MOTION for Summary Judgment *containing Stipulated Facts and Record* by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim (Blevins, Ethan) (Entered: 09/28/2018) |

| | | |
|---|---|---|
| 10/01/2018 | 25 | MINUTE ORDER directing interested parties to file any *amicus curiae* briefs no later than 11/23/2018. Authorized by U.S. District Judge John C Coughenour. (PM) (Entered: 10/01/2018) |
| 10/17/2018 | 26 | MOTION for Leave to File *Brief of Amici Curiae*, filed by Amicus National Housing Law Project. (Attachments: # 1 Proposed Order) Noting Date 11/2/2018, (Dunn, Eric) (Entered: 10/17/2018) |
| 10/18/2018 | 27 | NOTICE of Appearance by attorney Melissa R Lee on behalf of Amicus Fred T. Korematsu Center for Law and Equality. (Lee, Melissa) (Entered: 10/18/2018) |
| 10/18/2018 | 28 | MOTION for Leave to File *Brief of Amicus Curiae*, filed by Amicus Fred T. Korematsu Center for Law and Equality. (Attachments: # 1 Proposed Order) Noting Date 11/2/2018, (Lee, Melissa) (Entered: 10/18/2018) |
| 10/19/2018 | 29 | NOTICE of Appearance by attorney Eric Dunn on behalf of Amicus Parties National Housing Law Project, Sargent Shriver National Center on Poverty Law. (Dunn, Eric) (Entered: 10/19/2018) |
| 10/22/2018 | 30 | RESPONSE, by Defendant City of Seattle, to 28 MOTION for Leave to File *Brief of Amicus Curiae*, 26 MOTION for Leave to File *Brief of Amici Curiae*. (O'Connor-Kriss, Sara) (Entered: 10/22/2018) |
| 10/23/2018 | 31 | NOTICE of Appearance by attorney Robert Seungchul Chang on behalf of Amicus Fred T. Korematsu Center for Law and Equality. (Chang, Robert) (Entered: 10/23/2018) |
| 10/25/2018 | 32 | NOTICE of Appearance by attorney Jessica L Goldman on behalf of Defendant City of Seattle. (Goldman, Jessica) (Entered: 10/25/2018) |
| 10/26/2018 | 33 | CROSS-MOTION AND RESPONSE re 23 MOTION for Summary Judgment ., filed by Defendant City of Seattle. Oral Argument Requested. (Attachments: # 1 Appendix 1 to SJ -1, # 2 Appendix 1 to SJ - 2, # 3 Appendix 1 to SJ -3, # 4 Appendix 1 to SJ - 4, # 5 Appendix 1 to SJ - 5, # 6 Appendix 1 to SJ - 6, # 7 Appendix 1 to SJ - 7, # 8 Appendix 1 to SJ - 8, # 9 Appendix 1 to SJ - 9, # 10 Appendix 1 to SJ - 10, # 11 Appendix 1 to SJ - 11, # 12 Appendix 1 to SJ - 12, # 13 Appendix 1 to SJ - 13, # 14 Proposed Order) Noting Date 1/11/2019, (Goldman, Jessica) (Entered: 10/26/2018) |
| 10/26/2018 | 34 | DECLARATION of Asha Venkataraman filed by Defendant City of Seattle re 33 CROSS-MOTION AND RESPONSE re 23 MOTION for Summary Judgment . (Goldman, Jessica) (Entered: 10/26/2018) |
| 11/01/2018 | 35 | STIPULATION AND PROPOSED ORDER *to enter a revised case schedule* by parties (Blevins, Ethan) (Entered: 11/01/2018) |
| 11/02/2018 | 36 | MINUTE ORDER denying the parties' 35 stipulated motion to reset the noting date for the cross motions for summary judgment and to allow and set a deadline for party responses to *amicus curiae* briefs. Authorized by U.S. District Judge John C Coughenour. (PM) (Entered: 11/03/2018) |
| 11/07/2018 | 37 | ORDER granting NHLP and the Korematsu Center's motions for leave to file amicus curiae briefs (Dkt. Nos. 26 , 28 ). The NHLP and the Korematsu Center shall file their amicus briefs no later than November 23, 2018. Signed by U.S. District Judge John C Coughenour. (TH) (Entered: 11/07/2018) |
| 11/20/2018 | 38 | *Amicus* BRIEF *of the Korematsu Center and the ACLU of Washington in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendant's Cross-Motion* |

| | | |
|---|---|---|
| | | *for Summary Judgment* by Amicus Fred T. Korematsu Center for Law and Equality (Lee, Melissa) (Entered: 11/20/2018) |
| 11/20/2018 | 39 | MOTION for Leave to *File Brief of The National Apartment Association as Amicus Curiae in Support of Plaintiffs' Motion for Summary Judgment and in Opposition of Defendant's Cross-Motion for Summary Judgment*, filed by Amicus National Apartment Association. (Attachments: # 1 Exhibit Appendix A, # 2 Proposed Order Proposed Order) Noting Date 12/7/2018, (Mennemeier, Kelly) (Entered: 11/20/2018) |
| 11/20/2018 | 40 | *AMICI CURIAE* BRIEF re 33 CROSS-MOTION AND RESPONSE re 23 MOTION for Summary Judgment . by Interested Parties Pioneer Human Services, Tenants Union of Washington (Gunning, Kimberlee) (Entered: 11/20/2018) |
| 11/21/2018 | 41 | NOTICE of Appearance by attorney Douglas Edward Smith on behalf of Amicus Parties Consumer Data Industry Association, National Association of Professional Background Screeners. (Smith, Douglas) (Entered: 11/21/2018) |
| 11/21/2018 | 42 | Joint MOTION for Leave to File *Brief of Amici Curiae ISO Plaintiffs MSJ*, filed by Amicus Parties Consumer Data Industry Association, National Association of Professional Background Screeners. (Attachments: # 1 Exhibit A, # 2 Proposed Order) Noting Date 12/7/2018, (Smith, Douglas) (Entered: 11/21/2018) |
| 11/23/2018 | 43 | MEMORANDUM filed by Amicus National Housing Law Project re 33 CROSS-MOTION AND RESPONSE re 23 MOTION for Summary Judgment ., 23 MOTION for Summary Judgment *Amicus Brief of NHLP and Shriver Center* (Dunn, Eric) (Entered: 11/23/2018) |
| 11/23/2018 | 44 | MOTION for Leave to File *Brief of the National Consumer Reporting Association as Amicus Curiae in Support of Plaintiffs' Motion for Summary Judgment and in Opposition of Defendant's Cross-Motion for Summary Judgment*, filed by Amicus National Consumer Reporting Association. (Attachments: # 1 Exhibit A - Amicus Curiae, # 2 Proposed Order) Noting Date 12/14/2018, (Bilanko, Jeffrey) (Entered: 11/23/2018) |
| 11/27/2018 | 45 | RESPONSE, by Defendant City of Seattle, to 44 MOTION for Leave to File *Brief of the National Consumer Reporting Association as Amicus Curiae in Support of Plaintiffs' Motion for Summary Judgment and in Opposition of Defendant's Cross-Motion for Summary Judgment*, 42 Joint MOTION for Leave to File *Brief of Amici Curiae ISO Plaintiffs MSJ*. (O'Connor-Kriss, Sara) (Entered: 11/27/2018) |
| 12/04/2018 | 46 | REPLY, filed by Amicus Parties Consumer Data Industry Association, National Association of Professional Background Screeners, TO RESPONSE to 42 Joint MOTION for Leave to File *Brief of Amici Curiae ISO Plaintiffs MSJ* (Smith, Douglas) (Entered: 12/04/2018) |
| 12/06/2018 | 47 | REPLY, filed by Amicus National Consumer Reporting Association, TO RESPONSE to 44 MOTION for Leave to File *Brief of the National Consumer Reporting Association as Amicus Curiae in Support of Plaintiffs' Motion for Summary Judgment and in Opposition of Defendant's Cross-Motion for Summary Judgment* (Bilanko, Jeffrey) (Entered: 12/06/2018) |
| 12/07/2018 | 48 | RESPONSE, by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim, to 33 CROSS-MOTION AND RESPONSE re 23 MOTION for Summary Judgment .. Oral Argument Requested. (Blevins, Ethan) (Entered: 12/07/2018) |

| 12/19/2018 | 49 | ORDER granting parties' motions for leave to file *amicus curiae* briefs (Dkt. Nos. 39 , 42 , 44 ). None of these *amici* need to separately file their *amicus* briefs, as all *amici* attached them as exhibits to their motions (Dkt. Nos. 39-1, 42-1, 44-1). Signed by U.S. District Judge John C Coughenour. (TH) (Entered: 12/19/2018) |
|---|---|---|
| 01/11/2019 | 50 | REPLY, filed by Defendant City of Seattle, TO RESPONSE to 23 MOTION for Summary Judgment (O'Connor-Kriss, Sara) (Entered: 01/11/2019) |
| 01/11/2019 | 51 | MOTION to Certify *Question to WA Supreme Court*, filed by Defendant City of Seattle. (Attachments: # 1 Exhibit) Noting Date 2/1/2019, (O'Connor-Kriss, Sara) (Entered: 01/11/2019) |
| 01/28/2019 | 52 | RESPONSE, by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim, to 51 MOTION to Certify *Question to WA Supreme Court*. (Attachments: # 1 Exhibit 1 - Amended Complaint, # 2 Exhibit 2 - Statement of Grounds, # 3 Exhibit 3 - Order on Direct Review)(Blevins, Ethan) (Entered: 01/28/2019) |
| 02/01/2019 | 53 | REPLY, filed by Defendant City of Seattle, TO RESPONSE to 51 MOTION to Certify *Question to WA Supreme Court* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(O'Connor-Kriss, Sara) (Entered: 02/01/2019) |
| 02/05/2019 | 54 | ORDER granting Defendant's 51 Motion to Certify *Question to WA Supreme Court*. The matter is STAYED until the Washington Supreme Court answers the certified questions. Defendant shall file the opening brief on the certified questions, in accordance with the Washington Rules of Appellate Procedure. Signed by U.S. District Judge John C Coughenour. (TH) (cc: Certified copy of order, copy of docket sheet and Dkt. Nos. 23 , 24 , 33 , 38 , 39 , 40 , 42 , 43 , 44 , 48 , 50 , 51 and 52 submitted to the Washington Supreme Court) (Entered: 02/05/2019) |
| 02/12/2019 | 56 | LETTER from WA State Supreme Court confirming receipt of certifying questions and assigning Supreme Court No 96817-9; briefing schedule established. (TH) (Entered: 02/14/2019) |
| 03/04/2019 | 57 | MOTION to Lift Stay , filed by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim. (Attachments: # 1 Exhibit Exhibit A) Noting Date 3/22/2019, (Blevins, Ethan) (Entered: 03/04/2019) |
| 03/15/2019 | 58 | RESPONSE, by Defendant City of Seattle, to 57 MOTION to Lift Stay . (O'Connor-Kriss, Sara) (Entered: 03/15/2019) |
| 03/19/2019 | 59 | REPLY, filed by Plaintiff Chong Yim, TO RESPONSE to 57 MOTION to Lift Stay (Blevins, Ethan) (Entered: 03/19/2019) |
| 03/20/2019 | 60 | AFFIDAVIT OF SERVICE by Plaintiff Chong Yim re 59 Reply to Response to Motion *to Partially Lift Stay of Proceedings* (Blevins, Ethan) (Entered: 03/20/2019) |
| 04/05/2019 | 61 | ORDER denying Plaintiffs' 57 Motion to Partially Lift Stay signed by U.S. District Judge John C Coughenour. (TH) (Entered: 04/05/2019) |
| 07/23/2019 | 62 | NOTICE OF WITHDRAWAL OF COUNSEL: Attorney Hillary Madsen for Interested Parties Pioneer Human Services, Tenants Union of Washington. (Madsen, Hillary) (Entered: 07/23/2019) |
| 02/05/2020 | 63 | CERTIFICATE OF FINALITY re: questions certified to the Washington Supreme Court, filed by the Washington State Supreme Court. (PM) (Entered: 02/06/2020) |

| | | |
|---|---|---|
| 02/26/2020 | 64 | Stipulated MOTION *AND [PROPOSED] ORDER TO SET SCHEDULE FOR SUPPLEMENTAL BRIEFING*, filed by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim. Noting Date 2/26/2020, (Blevins, Ethan) (Entered: 02/26/2020) |
| 02/28/2020 | 65 | MINUTE ORDER granting parties' 64 Stipulated Motion *to set a schedule for supplemental briefing*. Plaintiffs must file their opening brief by March 13, 2020. Defendant must file its combined opening and response brief by April 3, 2020. Plaintiffs must file their combined response and reply brief by April 17, 2020. Defendant must file its reply brief by May 6, 2020. Authorized by U.S. District Judge John C Coughenour. (TH) (Entered: 02/28/2020) |
| 03/13/2020 | 66 | *Supplemental* BRIEF *on Plaintiffs' Due Process Claims* by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim (Attachments: # 1 Exhibit A - Order Amending Opinion)(Blevins, Ethan) (Entered: 03/13/2020) |
| 03/30/2020 | 67 | Stipulated MOTION *and Proposed Order to Amend Supplemental Briefing Schedule*, filed by Defendant City of Seattle. Noting Date 3/30/2020, (Wynne, Roger) (Entered: 03/30/2020) |
| 03/31/2020 | 68 | MINUTE ORDER granting parties' 67 Stipulated Motion *to Amend Supplemental Briefing Schedule*. Defendant must file its combined opening and response brief by April 17, 2020; Plaintiffs must file their combined response and reply brief by May 1, 2020; and Defendant must file its reply brief by May 22, 2020. Authorized by U.S. District Judge John C Coughenour. (TH) (Entered: 03/31/2020) |
| 04/16/2020 | 69 | *City of Seattle's Supplemental Opening-Response* BRIEF *Re Plaintiffs' Washington Substantive Due Process Claim* by Defendant City of Seattle (Wynne, Roger) (Entered: 04/16/2020) |
| 05/01/2020 | 70 | *Plaintiffs' Response and Reply* BRIEF re 66 Brief, *(Supplemental) on Plaintiffs' Due Process Claims* by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim (Blevins, Ethan) (Entered: 05/01/2020) |
| 05/07/2020 | 71 | MOTION for Leave *to File Brief in Support of Plaintiffs' Motion for Summary Judgment*, filed by Amicus GRE Downtowner, LLC. (Attachments: # 1 Exhibit Exhibit A, # 2 Proposed Order Proposed Order) Noting Date 5/22/2020, (Bowman, Jill) (Entered: 05/07/2020) |
| 05/07/2020 | 72 | CORPORATE DISCLOSURE STATEMENT indicating no Corporate Parents and/or Affiliates. Filed pursuant to Fed.R.Civ.P 7.1. Filed by GRE Downtowner, LLC (Bowman, Jill) (Entered: 05/07/2020) |
| 05/08/2020 | 73 | PRAECIPE to attach document re 71 MOTION for Leave *to File Brief in Support of Plaintiffs' Motion for Summary Judgment* by Amicus GRE Downtowner, LLC (Attachments: # 1 Exhibit Exhibit A)(Bowman, Jill) (Entered: 05/08/2020) |
| 05/18/2020 | 74 | RESPONSE, by Defendant City of Seattle, to 71 MOTION for Leave *to File Brief in Support of Plaintiffs' Motion for Summary Judgment*. (Wynne, Roger) (Entered: 05/18/2020) |
| 05/22/2020 | 75 | REPLY, filed by Amicus GRE Downtowner, LLC, TO RESPONSE to 71 MOTION for Leave *to File Brief in Support of Plaintiffs' Motion for Summary Judgment* (Bowman, Jill) (Entered: 05/22/2020) |

| | | |
|---|---|---|
| 05/22/2020 | 76 | REPLY, filed by Defendant City of Seattle, TO RESPONSE to 71 MOTION for Leave *to File Brief in Support of Plaintiffs' Motion for Summary Judgment* (Wynne, Roger) (Entered: 05/22/2020) |
| 06/09/2020 | 77 | ORDER denying GRE's 71 Motion for Leave *to File Brief in Support of Plaintiffs' Motion for Summary Judgment*. Signed by U.S. District Judge John C Coughenour. (TH) (Entered: 06/09/2020) |
| 01/26/2021 | 78 | NOTICE OF WITHDRAWAL OF COUNSEL: Attorney Kimberlee L Gunning for Interested Parties Pioneer Human Services, Tenants Union of Washington. (Gunning, Kimberlee) (Entered: 01/26/2021) |
| 03/30/2021 | 79 | NOTICE of Supplemental Authority by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim (Attachments: # 1 Exhibit 1 - 9th Cir. Opinion 18-15840)(Blevins, Ethan) (Entered: 03/30/2021) |
| 03/31/2021 | 80 | NOTICE of Supplemental Authority *(Amended)* by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim (Attachments: # 1 Exhibit 1 - 961 F.3d 1062)(Blevins, Ethan) (Entered: 03/31/2021) |
| 04/07/2021 | 81 | MINUTE ORDER: In light of the Washington Supreme Court's decision on the certified questions, the Court hereby LIFTS the stay. The Court will resolve the pending cross-motions for summary judgment promptly. Authorized by U.S. District Judge John C. Coughenour. (SR) (Entered: 04/07/2021) |
| 04/21/2021 | 82 | NOTICE of Supplemental Authority *(Additional)* by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim (Attachments: # 1 Exhibit 1 - Civ 21-413 Memo and Order)(Blevins, Ethan) (Entered: 04/21/2021) |
| 06/16/2021 | 83 | MINUTE ORDER: The Court GRANTS the parties' requests for oral argument on the parties' cross motions for summary judgment. (See Dkt. Nos. 23 , 33 , 48 , 50 .) The Court will hear oral argument in person on Tuesday, July 6, 2021, at 10:00 a.m. in Courtroom 16206. Authorized by U.S. District Judge John C. Coughenour. (SR) (Entered: 06/16/2021) |
| 06/25/2021 | 84 | NOTICE of Supplemental Authority *re: Cedar Point Nursery v. Hassid, US 20-107* by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim (Attachments: # 1 Exhibit Slip Op. US 20-107)(Blevins, Ethan) (Entered: 06/25/2021) |
| 06/30/2021 | 85 | NOTICE of Supplemental Authority re 33 CROSS-MOTION AND RESPONSE re 23 MOTION for Summary Judgment . *with Decisions* by Defendant City of Seattle (Goldman, Jessica) (Entered: 06/30/2021) |
| 07/02/2021 | 86 | NOTICE of Supplemental Authority *(Fourth) with Decisions,* by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim (Attachments: # 1 Exhibit A - IMDB.com v Becerra, # 2 Exhibit B - GPCOC v. Philadelphia)(Blevins, Ethan) (Entered: 07/02/2021) |
| 07/06/2021 | 87 | MINUTE ENTRY for proceedings held before U.S. District Judge John C. Coughenour- Dep Clerk: *Gabriel Traber*; Pla Counsel: *Brian Hodges and Ethan Blevins*; Def Counsel: *Roger Wynne and Jessica Goldman*; CR: *Nancy Bauer*; Time of Hearing: *9:40 AM*; Courtroom: *16206*;**Motion Hearing** held on 7/6/2021 re 33 CROSS-MOTION AND RESPONSE re 23 MOTION for Summary Judgment . filed by City of Seattle, 23 |

| | | |
|---|---|---|
| | | MOTION for Summary Judgment filed by Kelly Lyles, Rental Housing Association of Washington, Eileen, LLC, Marilyn Yim, Chong Yim. After hearing arguments from Counsel, the Court takes this matter under advisement. Order to issue. (GT) (Entered: 07/06/2021) |
| 07/06/2021 | 88 | ORDER denying Plaintiff's 23 Motion for Summary Judgment. City of Seattle's 33 Cross Motion for Summary Judgment and Response is granted. Signed by U.S. District Judge John C. Coughenour. (SR) (Main Document 88 replaced on 7/6/2021 to upload correct Order) (SR). (Entered: 07/06/2021) |
| 07/06/2021 | 89 | JUDGMENT BY COURT. The Court DENIES Plaintiffs' motion for summary judgment and GRANTS the City's motion for summary judgment. (SR) (Entered: 07/06/2021) |
| 07/14/2021 | 90 | NOTICE OF APPEAL to Ninth Circuit ( #21-35567) re 88 Order on Cross Motion,, Order on Motion for Summary Judgment, by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim. $505, receipt number AWAWDC-7164870 (cc: USCA) (Attachments: # 1 Exhibit A - Judgment)(Blevins, Ethan) Modified on 7/15/2021 add CCA # (CDA). (Entered: 07/14/2021) |
| 07/14/2021 | 91 | REPRESENTATION STATEMENT, (21-35567) by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim, (re: 90 Notice of Appeal,.) (Blevins, Ethan) (Entered: 07/14/2021) |
| 07/14/2021 | 92 | TRANSCRIPT REQUEST (#21-35567) by Plaintiffs Eileen, LLC, Kelly Lyles, Rental Housing Association of Washington, Chong Yim, Marilyn Yim for proceedings held on 07/06/2021 re 87 Motion Hearing,,. Requesting Attorney: Ethan W Blevins. Posting of this Transcript Order form does not constitute an official request for transcript(s). If you have not already done so, you MUST contact the individual court reporter(s) Nancy Bauer (nancy_bauer@wawd.uscourts.gov, 206-370-8506) to make payment arrangements and secure your desired delivery time. (Blevins, Ethan) (Entered: 07/14/2021) |
| 07/14/2021 | 93 | TIME SCHEDULE ORDER ( #21-35567) as to 90 Notice of Appeal, filed by Kelly Lyles, Rental Housing Association of Washington, Eileen, LLC, Marilyn Yim, Chong Yim (CDA) (Entered: 07/15/2021) |
| 08/16/2021 | 94 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on 7/6/2021 before Judge John C. Coughenour. Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov. To purchase a copy of the transcript, contact court reporter Nancy Bauer, nancy_bauer@wawd.uscourts.gov. Release of Transcript Restriction set for 11/15/2021, (NB) (Entered: 08/16/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/26/2021 09:22:45 | | | |
| **PACER Login:** | PLFLegalFoundation | **Client Code:** | 4-1618/bpb |
| **Description:** | Docket Report | **Search Criteria:** | 2:18-cv-00736-JCC |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |